IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

AMAL GAZA, an individual,
GAZA 2, an individual,
GAZA 3, an individual,
AHMED MOOR, an individual,
SAID ASSALI, an individual,
HADEEL ASSALI, an individual, and
SHAWAN JABARIN, an individual,

      Plaintiffs,

      v.                         Case No.: Civil Action 24-cv-03503

UNITED STATES SECRETARY OF STATE
MARCO RUBIO in his official capacity, Defendant

---

## AMENDED COMPLAINT

Plaintiffs, through their undersigned attorney, file this Amended Complaint alleging claims arising under the Administrative Procedure Act, 5 U.S.C. § 701 (hereinafter, the "APA") et seq., for violation of the Leahy Law, 22 U.S.C. § 2378d (hereinafter, the "Leahy Law"), seeking declaratory and injunctive relief based on Defendant's *de facto* refusal to implement the statute prohibiting U.S. assistance to Israeli security force units about which there is credible information that they have committed gross violations of human rights (hereinafter, "GVHRs"). Plaintiffs allege as follows:

### SUBJECT MATTER JURISDICTION

1. This Court has jurisdiction over this matter under 28 U.S.C. § 1331 because the claims arise under federal statutes, including the APA, and the Leahy Law. Plaintiffs

allege violations of these statutes that fall squarely within the federal question jurisdiction of this Court.

## PERSONAL JURISDICTION

2.    This Court has personal jurisdiction over Defendant Antony Blinken because he resides and performs his official duties as Secretary of State in the District of Columbia. Additionally, the actions and omissions giving rise to the Plaintiffs' claims occurred within this jurisdiction, further establishing minimum contacts personal jurisdiction.

## VENUE

3.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in the District and the acts and omissions that gave rise to Plaintiffs' claims occurred in the District.

## PARTIES

4.    Defendant Marco Rubio is the United States Secretary of State entrusted with enforcing the Leahy Law to prevent the provision of U.S. assistance to units of foreign security forces that have, according to credible information, committed GVHRs as non-exhaustively defined in 22 U.S.C. 2304(d) of the Foreign Assistance Act (hereinafter the "FAA").

5.    Plaintiff Amal Gaza (a pseudonym used to protect her identity due to security concerns) is a Palestinian resident of Gaza and a mathematics teacher by profession. She worked for four years under temporary contracts with the United Nations Relief and

Works Agency for Palestine Refugees and the United Nations International Children's Emergency Fund. Since October 7, 2023, U.S.-aided Israeli military units have committed GVHRs that have forced displacement of Amal Gaza and her family seven times. Their indiscriminate attacks also caused property loss and the deaths of 20 of her family members. Amal Gaza fears imminent death, injury, repeated displacement, and property loss at the hands of abusive Israeli security forces units. Amal Gaza also fears imminent loss of consortium with aunts, uncles and multiple other family members or relatives who are threatened with death or injury by abusive Israeli security forces, as detailed below, and benefited from U.S. security assistance provided in violation of the Leahy law.

6.    It is reasonably likely that Amal Gaza's imminent fear of death, injury, destruction of her property, displacement by Israeli security forces or loss of consortium by abusive Israeli forces would be significantly dispelled if Defendant properly enforced the Leahy Law, since it is reasonably likely that the ability of Israeli security units to commit GVHRs in Gaza would be materially diminished if Defendant terminated its assistance subject to the Leahy Law; and/or that they would refrain from GVHRs that threaten the lives and wellbeing of Plaintiff's aunts and uncles to avoid a loss of U.S. security assistance.

7.    Plaintiff Gaza 2 is an IT intern at the Gaza Municipality and volunteer intern at the Gaza Construction Industries Union. Gaza 2 has been traumatized by chronic war in Gaza since the age of six in 2008-2009. After October 7, 2023, border crossings were closed, prices spiraled, and random bombing unfolded.  By November 9, 2023, Gaza was

like a ghost town devoid of any signs of life. I fled—the first of nine frightening displacements dodging bombs or bullets. On one occasion, Gaza 2 and his brother sheltered near a Catholic shelter which was struck by incendiary bombs killing six DPs at that location, including some of Gaza 2's cousins and their mother. Gaza 2 reasonably fears imminent death, bodily injury, or loss of consortium caused by Israeli military units guilty of gross violations of human rights using military assistance provided by US and approved by the U.S. Secretary of State in violation of the Leahy Amendment. Gaza 2 reasonably fears that if his identify were publicly disclosed he would risk retaliation by Israel including death and thus is using a pseudonym for security concerns.

8.   Plaintiff Gaza 3 volunteered with PCRF in Gaza in 2023 and volunteered at physical therapy centers in Al-Wusdan in 2021, 2022, and 2023.  Gaza 3 works as a physical therapist at Heal Palestine, following up on amputation cases and collecting information on war casualties since October 7, 2023.  Gaza 3's relatives disappeared in an Israeli airstrike in Jabalia on or about October 25, 2023. Gaza 3 and  this family have been displaced more than 8 times since October 7, and that displacement continues, causing Gaza 3 to lose all possessions, including home and car. On information and belief, Gaza 3 has been injured twice in the head and in the leg requiring stiches from bombing by Israeli miliary units guilty of gross violations of human rights with security assistance provided by the US with the approval of the U.S. Secretary of State in violation of the Leahy law.  Gaza 3 has lost 18 family members since October 7, mostly in bombings of neighborhood homes or streets. Gaza 3 reasonably fears imminent death, bodily injury, destruction of property, or loss of

consortium caused by Israeli military units guilty of gross violations of human rights using security assistance provided by the United States and approved by the U.S. Secretary of State in violation of the Leahy Amendment. Gaza 3 is haunted by watching the death of his cousin on January 16, 2025, with blood pooling before his eyes. Gaza 3 reasonably believes that if his identity were publicly disclosed he would risk retaliation by Israeli military units and thus is using a pseudonym for security concerns.

9. Plaintiff Ahmed Moor is a U.S. citizen. Mr. Moor faces imminent loss of consortium due to Israeli forces committing GVHRs with seven family members—three aunts and one uncle on his mother's side, and two aunts and one uncle on his father's side – who are living as displaced people in Rafah, Gaza. Israeli security forces that have received U.S. assistance in violation of the Leahy Law imminently threaten their lives and wellbeing. U.S.-aided Israeli security forces have extrajudicially killed his cousin's 19-year-old son in November 2023. Israeli security forces have aforcibly displaced his uncle four times since October 7, 2023: from Gaza City to Khan Younis to multiple dwellings in Rafah. One aunt, who originally resided in Khan Younis, has been displaced four times and now lives in a tent in Rafah.

10. It is reasonably likely that if Defendant properly applied the Leahy Law to Israel, Plaintiff Ahmed Moor's imminent fear of loss of consortium would be significantly dispelled. Israeli security units would reasonably likely be materially diminished in their ability to commit GVHRs in Gaza and the West Bank if U.S. military assistance were terminated under the Leahy Law; and/or they would reasonably likely refrain from GVHRs that threaten the lives of Plaintiff's aunts and uncles to avoid a loss of U.S.

assistance.

11. Plaintiff Said Assali is a U.S. citizen. He confronts an imminent loss of consortium with family and relatives in Gaza and the West Bank caused by abusive Israeli security operations aided and facilitated by U.S. assistance that the State Department has provided in violation of the Leahy Law. His fear that his family and relatives in Gaza and the West Bank will be killed or harmed by Israeli security units using U.S. security assistance notwithstanding disqualifying GVHRs is credible.

12. Plaintiff Said Assali alleges a specific and imminent harm: the potential loss of, or harm to, family members in Gaza and the West Bank due to abusive actions by U.S.- aided Israeli security forces. This harm is not hypothetical but based on airstrikes that killed six of his uncle's children in Gaza city in November 2023. A judicial mandate to enforce the Leahy Law would directly materially diminish this harm by limiting weapons and other resources available to Israeli security force units and thus curtail their ability to commit GVHRs and/or deter Israeli units from committing further GVHRs to avoid a loss of United States assistance.

13. Said Assali's uncle, Hussam Assali, a resident of Gaza, is now stranded in Ramallah. Hussam lost six of his seven children who are Said Asali's first cousins to an indiscriminate Israeli airstrike on November 13, 2023, evidencing an imminent threat to his own life by the same means. Mr. Said Assali's surviving cousin Yasmin and her husband are in Gaza notwithstanding three displacements since October 7, 2023. Ongoing Israeli military operations constituting GVHRs in Gaza place them at significant risk of imminent injury or death.

14. It is reasonably likely that if Defendant properly enforced the Leahy Law to Israel, which would prohibit most if not all Israeli military units from receiving U.S. military aid, Plaintiff Said Assali's imminent fear of loss of consortium would be materially diminished because the loss of U.S. assistance would significantly curtail the ability of Israeli security units to commit GVHRs in Gaza and the West Bank; and/or such units would be deterred from committing GVHRs in the West Bank or Gaza to avoid the loss of U.S. assistance.

15. Plaintiff Hadeel Assali is a U.S. citizen and sister of Plaintiff Said Assali. She confronts an imminent loss of consortium through the prospective deaths of or injury to relatives, including her uncles and aunts, in Gaza City by U.S.-aided Israeli military units. Israeli tanks and military operations constantly threaten her relatives in their neighborhood of Saftawi. Hadeel lost her relative Mohammad Ahmad Awad in Khan Younis on January 21, 2024, to an Israeli sniper while walking as a civilian. Plaintiff maintains regular contact with her relatives sheltering in designated "safe zones" in Gaza. Israel security forces that have benefited from U.S. assistance provided in violation of the Leahy Law constantly indiscriminately bombard them. It is reasonably likely that proper application of the Leahy Law to Israel would significantly dispel Plaintiff Hadeel Assali's imminent fear of loss of consortium. It is reasonably likely that Israeli security units would be materially diminished in their capacity to commit GVHRs in Gaza and the West Bank if U.S. assistance were terminated; and/or that Israeli security units would refrain from GVHRs threatening the lives of Plaintiff's relatives to avoid a loss of U.S. security assistance.

16.  Plaintiff Shawan Jabarin, the Executive Director of Al-Haq, the leading Palestinian human rights organization in the West Bank, resides in Ramallah, the West Bank, with his wife and children. He owns a house there and in Saeer, a neighborhood in Hebron, where his mother and other family members reside. Plaintiff Jabarin fears imminent death, injury or harm by an extrajudicial killing by Israeli security force units that have committed GVHRs at Israeli checkpoints, in nightly raids conducted by Israeli military forces, and in special forces operations that have spiked in the West Bank since October 7, 2023. The number of Palestinians Israel has killed by these means in the West Bank since that date exceeds 500.

17. Plaintiff Jabarin supports an extensive family network throughout the West Bank. His mother lives in Saeer with many other relatives. He has two sisters, four brothers and over 100 relatives, including nieces, nephews, and cousins, residing in Hebron, Jerusalem, Ramallah, and other West B. towns. They also fear imminent death, injury or harm by Israeli security force units that have committed GVHRs, including extrajudicial killings, which threatens Plaintiff with an imminent loss of their consortium.

18. It is reasonably likely that if the Defendant faithfully and fully applied the Leahy Law to U.S.-aided Israeli security force units that threaten imminent harm to Plaintiff through GVHRs, the ability of Israeli security force units to commit GVHRs in Gaza and West Bank would be materially diminished because of the loss of U.S. assistance. It is also reasonably likely that Israeli security force units would be deterred from GVHRS violations to avoid losing U.S. security assistance and thus significantly dispel Plaintiff's alleged imminent injuries.

19. Plaintiffs, collectively, further allege that U.S. assistance directly and significantly enables Israeli security forces to commit GVHRs that cause their imminent harms. These GVHRs affect plaintiffs and their families, as detailed in the individual accounts above. The ongoing provision of assistance under the Leahy Law, notwithstanding credible information that recipient Israeli security units have committed GVHRs, makes it reasonably likely that plaintiffs' harms will endure absent judicial relief. The relief requested by Plaintiffs would be reasonably likely to significantly dispel the imminent, concrete injuries they allege by materially diminishing Israeli security force units' capacity to commit such violations by terminating U.S. assistance and/or by deterring them from GVHRs to avoid a loss of U.S. assistance.

## STATEMENT OF FACTS

**The Leahy Law**

20. The Leahy Law, passed in 1997, prohibits U.S. security assistance to foreign security forces units when there is credible information, they have committed GVHRs. The Leahy Law is a cornerstone of U.S. foreign policy, advancing multiple purposes. It deters units of foreign security forces from committing GVHRs; ensures that foreign governments take effective steps to bring to justice members of the security forces responsible for GVHRs; protects would-be victims of GVHRs; protects the United States from the political, military, and security risks by association with units that have committed GVHRs; curtails the ability of foreign security units to commit GVHRs; and protects the reputation and moral suasion of the United States as an unflinching defender

of human rights. Each of these discrete purposes falls within the zone of interests sought to be protected by the Leahy Law.

21. The Leahy Law requires the State Department to prohibit assistance to a foreign security force unit if it finds a) credible information the unit has committed GVHRs and b) that the government has failed to take effective measures to bring the responsible members of the security force unit to justice, in a process known as "remediation", which allows security force units responsible for GVHRs to again receive assistance.

**Definition of Gross Violations of Human Rights**

22. The Leahy Law is a provision of the Foreign Assistance Act of 1961 (hereinafter, the "FAA"), which defines "gross violation of human rights" in sections 116 and 502B(d)(1). The State Department looks to this definition for guidance on the meaning of the term that is instructive in the understanding and application of the Leahy Law. Those sections both define the term "gross violations of internationally recognized human rights" as:

> ...torture or cruel, inhuman, or degrading treatment or punishment, prolonged detention without charges and trial, causing the disappearance of persons by the abduction and clandestine detention of those persons, and other flagrant denials of the right to life, liberty, or the security of person.

23.    The "deprivation of the right to life" is understood in international jurisprudence to include arbitrary and unlawful killings, including during periods of armed conflict.

Extrajudicial executions, targeted assassinations, indiscriminate, deliberate and disproportionate attacks, as well as the deprivation of items essential to survival, constitute GVHRs.

24. This statutory definition of GVHRs serves to deter and ensure accountability for a broad universe of violations and to prevent U.S. complicity in them, including by aiding and abetting. Although the State Department has most often sanctioned foreign military units for the GVHRs of extrajudicial killings (hereinafter, "EJKs"), torture, rape under color of law, and enforced disappearances, the FAA's definition of GVHRs encompass a broader category of violations. As the State Department explains, although most of its Leahy Law sanctions that it has applied encompass incidents of EJKs, torture, rape, and enforced disappearances, they are "not exhaustive and other types of incidents can be examined on the basis of specific facts to assess whether they are GVHRs."

25. This broad scope of the statutory definition of GVHRs is in line with the intent of the Law's principal architect, Senator Patrick Leahy, to prohibit U.S. assistance to security force units implicated in GVHRs.  On June 25, 2014, Senator Leahy explained on the Senate floor, as recorded in the Congressional Record, Vol. 160, No. 109:

> Mr. President, 18 years ago I wrote a law that has been repeated annually ever since and is now codified as section 620M of the Foreign Assistance Act. It has become widely known as the "Leahy Law" and it has two primary purposes. The first is to prevent U.S. taxpayer-funded training, equipment, or other assistance from going to units of foreign security forces

that have committed heinous crimes. We saw many instances when U.S. aid
ended up in the hands of foreign military or police forces that had engaged
in rape, murder, torture, or other gross violations of human rights, and the
U.S. was tainted by association with those crimes. The second is to
encourage foreign governments to bring to justice the individual members
of units responsible for such atrocities.

26. Under the Leahy Law, a security force unit is ineligible for U.S. assistance if there
is "credible information" that it has committed a GVHR, and the government has failed
to hold accountable the security force members responsible for the violation. The credible
information threshold is intentionally low because of the challenges in obtaining evidence
from victims and witnesses, and predictable foreign government cover-ups of GVHRs.
The standard of "credible information" is not the standard of "proof beyond a reasonable
doubt," nor even "clear and convincing evidence," or "more likely than not," and need
not even be evidence admissible in court. Instead, as the State Department explains,
credible information includes reports from the press, non-governmental organizations,
witness testimony, etc. that it deems to be reliable and accurate.

27. The Department of State annually vets hundreds of thousands of non-Israeli
foreign security force units for compliance with the Leahy Law and ultimately suspends
and deems thousands of them ineligible for U.S. assistance. Since the enactment of the
law in 1997, the Department of State has found tens of thousands of foreign security
force units of countries other than Israel ineligible for assistance, including Bangladesh,

Belize, Bosnia & Herzegovina, Burkina Faso, Burundi, Colombia, Guatemala, Jamaica, Mexico, Nigeria, Turkey, Indonesia, Lebanon, Saint Lucia, Honduras, Iraq, Kyrgyz Republic, Mexico, Pakistan, Nigeria, and Egypt. To date, however, the State Department has not suspended or found ineligible a single Israeli unit despite overwhelming information of widespread GVHRs committed by Israel since 1997.

28. In most cases, the U.S. embassy in the country in question informs the State Department of units proposed for assistance and the State Department vets these units before receipt of assistance. The State Department pre-screens the units to weed out those that have committed GVHRs and failed to remediate.

29. As set forth in greater detail below, the U.S. provides Israel with vast amounts of security assistance, including Foreign Military Financing (hereinafter, "FMF"), subject to the Leahy Law. The State Department provides the country with the entirety of its FMF in the first thirty days of the fiscal year with no front-end vetting of military units for GVHRs or remediation whatsoever. The State department also provides Israel with a substantial portion of its military aid, estimated at 20% in 2024, as untraceable cash through the Overseas Procurement mechanism. Israel allocates U.S. military assistance to its security forces without disclosing the units that will receive the aid. Given the volume and untraceable nature of this FMF and the diversity of security assistance that the U.S. provides Israel, every Israeli security force unit directly or indirectly benefits from it. As a result, the U.S. cannot determine, and therefore does not and cannot vet, the Israeli units that are receiving its aid in advance of transmitting the aid. This omission violates section

620M(d)(1) of the FAA, which requires the State Department to maintain a current list of all units receiving U.S. assistance so it can vet such units in advance.

27. The State Department maintains that it applies the Leahy law equally to every country; this acknowledges that it is a non-discretionary, non-waivable statute that is not subject to political considerations and is therefore not a "political question" outside the scope of judicial review. In an April 22, 2024, press conference, when asked about Leahy Law standards for Israel, Secretary Blinken said "Do we have a double standard? The answer is no." The U.S. government also affirmed its commitment to applying the Leahy Law uniformly across all countries during its review before the United Nations Human Rights Council's (hereinafter, "HRC") Universal Periodic Review (hereinafter, the "UPR").

**2019 Amendment to the Leahy Law**

28. Israel was not the only country receiving untraceable assistance.  In 2019, Congress enacted 22 USC 2378d (c) (1) (hereinafter, the "2019 Leahy Amendment") requiring that, in cases where the Secretary of State is unable to identify prior to the transfer the recipient foreign unit or units receiving United States security assistance (so-called "untraceable assistance"), the Secretary must regularly provide the foreign government a list of Leahy-ineligible units and receive assurances that the foreign government will comply with the Leahy prohibition and block U.S. assistance to these units *in advance* of transferring the assistance.

14

29. The Leahy Amendment provides:

> If assistance to a foreign security force is provided in a manner in which the recipient unit or units cannot be identified prior to the transfer of assistance, the Secretary of State shall regularly provide a list of units prohibited from receiving assistance pursuant to this section to the recipient government and the appropriate congressional committees and, effective December 31, 2022, such assistance shall only be made available subject to a written agreement that the recipient government will comply with such prohibition.

30. In the wake of the 2019 Leahy Amendment, the State Department reviewed security assistance worldwide, and determined that a few nations, including Afghanistan, and Israel, would be subject to the Leahy Amendment requiring the Department to provide lists of prohibited units and receive compliance agreements from the recipient government in advance.

31. The Leahy Amendment requires the State Department to review all credible information of GVHRs by units of Israeli security forces to determine if any should be excluded for unremediated GVHRs, send a list of such excluded units to Israel, and receive assurances that Israel will comply with the prohibition, before sending aid to them.

**The Israel Leahy Vetting Forum**

32. In attempting to review all such credible information of GVHRs committed by Israeli security units and to develop the required list of ineligible units under the 2019 Leahy Amendment, the State Department established the Israel Leahy Vetting Forum (hereinafter, the "ILVF"), which met for the first time in 2020. The ILVF is a working group that reviews reports of GVHRs committed by Israeli security force units and any steps the Israeli government has taken to investigate such incidents and, if warranted, to prosecute and punish the responsible security force members.

33. Multiple State Department bureaus and offices participate in the ILVF, including the Bureau of Democracy, Human Rights, and Labor, the Bureau of Political-Military Affairs, the Bureau of Near Eastern Affairs, the U.S. Embassy in Jerusalem, and the Office of Legal Advisor. The Department of Defense also participates.

34. The onerous procedures of the ILVF are unique and appear to have been designed to impede any prompt and effective determination that Israeli units have committed GVHRs. Unlike the vetting process for any other country subject to the 2019 Leahy Amendment, like Ukraine and Egypt, the ILVF requires periodic in-person meetings at a high official level, which slows the vetting process. Each succeeding step commonly involves even higher, senior-level Department and Embassy Jerusalem approvals of cables needed for the process, which causes further delay.

35. Unlike the vetting process for any other country, ILVF written procedures require that the Deputy Secretary of State authorize any finding that an Israeli unit has committed GVHRs that the Israeli government has not remedied and is therefore prohibited from receiving security assistance. Unlike the vetting process for any other country, even

before the ILVF presents a recommendation to the Deputy Secretary of State to prohibit assistance for an Israeli unit, ILVF procedures require a formal request to the Government of Israel via diplomatic note to respond to the allegations. This entails drafting, clearing, and delivering a written diplomatic note and demarche to Israel's Foreign Ministry, which consumes weeks if not months. Thereafter, unlike the vetting procedures for any other country requiring a response within 14 days, ILVF written procedures permit the request to remain idle for up to 90 days before receiving a response from Israel. After Israel's response, the case returns to the ILVF for another in-person meeting to review the response.

36. The ILVF operates under a unique, complex, lengthy, high-level Leahy vetting process that is arbitrary and capricious, and is not rationally related to advancing the purpose of the Leahy Law. On the contrary, the ILVF appears designed to frustrate the 2019 Leahy Amendment, and avoid designating any Israeli unit ineligible for military assistance. Thus, in over four years, the ILVF has not identified a single ineligible Israeli unit, notwithstanding credible information of tens of thousands of GVHRs by Israeli security forces.

37. On information and belief, no such process exists for any other country, including other countries subject to the 2019 Leahy Amendment, like Ukraine and Egypt. The State Department has never explained the reason for a special process for Israel, nor published the ILVF's written procedures. In contrast to the ILVF, processes under the 2019 Leahy Amendment for other countries receiving untraceable aid, including Egypt and Ukraine, are informal, with no written procedures, and are conducted at the expert working level

by officials well-versed in the Leahy Law and the facts of the specific case. They do not require formal consultation via diplomatic note with the recipient country. And, unlike the ILVF, these processes have worked. For the other countries subject to the 2019 Leahy Amendment, Ukraine and Egypt, the Department has determined units prohibited from receiving assistance, transmitted lists identifying the ineligible unit to the governments in question and received the required assurances that the government in question will comply with the prohibition.

38. In practice, the ILVF does not use the customary "credible information" standard mentioned above for determining a unit's involvement in GVHRs. Instead, the ILVF has erected an extra-statutory insurmountable standard to avoid disqualifying any Israeli security unit under the Leahy Law. Credible information that would cause a security force unit from any other country to be prohibited from receiving assistance is insufficient for the ILVF to render an Israeli unit ineligible for assistance. The ILVF has never made an independent finding that an Israeli unit has committed a GVHR. The ILVF has only concluded that Israeli units have committed GVHRs when Israeli authorities have first done so and in each case, found that Israel had remediated the units based on a unique, forgiving standard that is a far stretch from the clear requirement of the Leahy Law that "the government of such country is taking effective steps to bring the responsible members of the security forces unit to justice." This is a principal reason the Department has never found that any Israeli unit is prohibited from receiving security assistance and never provided Israel a list of ineligible units as required by the 2019 Leahy Amendment.

39. The State Department's calculated failure to apply the Leahy Law is particularly shocking in the face of the unprecedented escalation of Israeli GVHRs since the Gaza War erupted on October 7, 2023. The International Court of Justice has issued provisional orders to Israel to stop depriving Palestinians in Gaza of items essential to their survival, finding that its actions are plausibly genocidal. The International Criminal Court has issued arrest warrants for Israeli Prime Minister Benjamin Netanyahu and former Defense Minister Yoav Gallant for GVHRs they have committed from at least October 8, 2023 until at least May 20, 2024 including forcible displacement, starvation, persecution, and knowing deprivation of items indispensable to the survival of civilian Palestinians in Gaza, including food, water, and medicine and medical supplies, as well as fuel and electricity. The Court found reasonable grounds to believe that Netanyahu and Gallant bear criminal responsibility as civilian superiors for intentionally directing attacks against the population of Gaza.

40. On April 29, 2024, the State Department determined for the first time that five Israeli security units had committed GVHRs: the 92nd Shimshon Battalion, the Israeli National Police Law Enforcement and Traffic Branch Ma'avarim unit (hereinafter "Ma'avarim"), the Coordinator for Government Activities in the Territories (hereinafter, "COGAT") in the West Bank, the Shahar Search and Rescue Battalion, and the Netzah Yehuda Battalion.

41. But the State Department determined that four of the units (all but the Netzah Yehuda Battalion) had effectively remediated these violations. All four of these remediation determinations justifying their continued eligibility for security assistance

simply rubber stamped prior Israeli government declarations that the security units had engaged in misconduct but that it had held the perpetrators accountable. All involved years-old incidents of GVHRs, and none in Gaza.

42. The supposed corrective action in two of the cases, the 92nd Shimshon Battalion and the Shahar Search and Rescue Battalion, would have been insufficient for countries other than Israel. Both involved extrajudicial killings of Palestinians by Israeli security forces. The perpetrators were subject to nominal or no incarceration, in one case, three months of community service. For any other country, the State Department at the expert working level would have deemed insufficient a claim of effective remediation involving no incarceration for an extrajudicial killing and the process would have stopped there, with a determination that the unit was ineligible for assistance.

41. The fifth case involved the Israeli Defense Force's notorious and extremist Netzah Yehuda Battalion. Credible Sources establish its industrial scale GVHRs in the West Bank. Netzah Yehuda soldiers were implicated in the unjustified killings of at least two unarmed Palestinians, Iyad Zakariya Hamed and Qassem Abbasi, as well as numerous cases of torture, assault and sexual abuse between 2015 and 2022. Among the Battalion's GVHRs, in January 2022, Netzah Yehuda members detained without apparent legal authority a 78-year-old American citizen of Palestinian origin, Omar Assad, bound him, gagged him, and left him on the ground at a construction site in the middle of January. Mr. Assad died that evening from a stress-induced heart attack.

43. The government of Israel never criminally charged any member of the Netzah Yehuda Battalion. Instead, the IDF disciplined two officers, reprimanded a commander,

and promised to give the unit a two-week "human rights seminar" and improve screening of prospective unit members. In any country but Israel, the State Department would have immediately rejected such supposed remediation as ineffective, unacceptable, anemic administrative measures, instead of true remediation of criminal responsibility and incarceration – especially for the death of a U.S. citizen.  However, in August, the Defendant found that notwithstanding the black-letter requirements of the Leahy Law, he would allow the unit to receive funds.

44. Pending that belated remediation, the State Department in April 2024 allowed the Netzah Yahuda Battalion to remain eligible for U.S. security assistance. Instead of declaring the unit ineligible because of the failure of the Israeli government to remediate, the ILVF allowed it to remain indefinitely eligible while the State Department engaged with the government of Israel "on identifying a path to effective remediation of this unit," short of remediation itself. That Leahy Law indulgence was *sui generis*: a remediation standard for Israel only.

45. On August 9, 2024, Secretary Blinken found Israel had taken sufficient remediation to address the abuses by Netzah Yehuda and closed the matter. The State Department provided Israel with more time than it provides any other country to show it has remediated the abuses by holding perpetrators accountable. Secretary Blinken claimed the IDF provided "evidence" that it had remediated the behavior of the Battalion and addressed U.S. concerns by reprimanding some leaders of the unit, discharging the involved soldiers from combat missions, giving the unit a human rights seminar, and

changing the vetting process for future soldiers. The State Department would never accept such administrative actions as adequate remediation for any other country.

46. For any country other than Israel, a unit found to have committed a GVHR is immediately ineligible until remediation is complete. Remediation is atypical, and ordinarily is protracted. Immediate ineligibility incentivizes countries to promptly engage in remediation and ensures that units yet to be remediated do not receive assistance.

47. The ILVF's less demanding standard for Israel, combined with the ILVF failure to find any Israeli unit ineligible, permit an inference that ILVF was created as an extra-statutory favor for Israel, to frustrate the purpose of the 2019 Leahy Amendment. If Congress intends for political considerations to influence application of a statutory policy, it typically authorizes the executive branch to waive the provision. The 2019 Leahy Amendment has no such waiver provision, unlike 10 U.S.C. § 22489, the Leahy Law applicable to Defense Department assistance. The absence of a waiver in the Leahy Law applicable to the State Department was intentional, not inadvertent.

## U.S. SECURITY ASSISTANCE TO ISRAEL

48. Israel has historically maintained a substantial military budget, with a baseline defense allocation of approximately NIS 64 billion (around $18 billion) in 2023. Israel's ongoing assault on Gaza since October 2023 has precipitated an unprecedented expansion of Israel's military expenditures in 2024, more than doubling its typical budget. A memo entitled "Draft of Defense Budget - 2024-2033," issued by the Israeli organization Institute for National Security Studies (hereinafter, "INSS") in May 2024 estimated the total military budget, excluding U.S. security assistance, had surged to NIS 151 billion

(approximately $40 billion). This figure includes the base budget of NIS 64 billion and an extraordinary NIS 87 billion for emergency wartime expenditures. These supplementary funds encompass NIS 67 billion for direct combat operations and NIS 20 billion for post-conflict rehabilitation and other related expenses. This historic budgetary climb reflects the vast scale of Israel's ongoing military operations and associated logistical demands in Gaza. Israel's 2024 budget for weapons procurement currently stands at $13.5 billion, which is 33% of its total defense budget of $40 billion.

49. The US is the largest supplier of armaments to Israel, providing most of Israel's foreign-sourced weapons. To date in 2024, the U.S. has provided $17.9 billion in military aid to acquire or supply weapons, effectively providing more than half of Israel's weapons arsenal since October 2023. According to public records and official disclosures, the U.S. provided at least $6.8 billion in military assistance through the FMF program since October 2023, equivalent to nearly half of Israel's $13.5 billion 2024 budget for weapons procurement and related research and development. The remainder of the aid could have been financed through future FMF funds or other sources.

50. Israel could have used FMF assistance to pay even for the $5.4 billion in weapons the United States transferred to Israel in 2024 under mechanisms such as Foreign Military Sales (hereinafter, "FMS") and Direct Commercial Sales (hereinafter, "DCS"); if so, the transfers would also be subject to the Leahy Law.

51. The collective U.S. military assistance to Israel underscores the substantial role of U.S. funding in equipping Israel with weapons and munitions and the centrality of U.S.

military assistance to Israel's ability to carry out military operations, particularly its ongoing offensive campaigns in Gaza.

52. This data aligns with statements made by current and former Israeli officials in the past year, highlighting the critical reliance of Israel on U.S. military support. A senior Israeli Air Force official told *Haaretz* in September 2024, "Without the Americans' supply of weapons to the Israel Defense Forces, especially the air force, Israel would have had a hard time sustaining its war for more than a few months." Similarly, Zohar Palti, a former intelligence director for Israel's Mossad, echoed this sentiment in an interview with *The Washington Post* in October 2024, stating, "Without the U.S. weapons, Israel cannot fight." Former Israeli Defense Minister Yoav Gallant underscored this dependency in October 2023, explaining why he allowed limited humanitarian aid into Gaza by saying, "The Americans insisted and we are not in a place where we can refuse them. We rely on them for planes and military equipment. What are we supposed to do? Tell them no?" Retired Israeli Major General Itzhak Brik provided further confirmation in November 2023, emphasizing, "All of our missiles, the ammunition, the precision-guided bombs, all the airplanes and bombs, it's all from the U.S. The minute they turn off the tap, you can't keep fighting. You have no capability... Everyone understands that we can't fight this war without the United States. Period." These statements collectively illustrate Israel's deep dependence on U.S. military support for its operations.

**Israel's Record of Gross Violations of Human Rights in Gaza and the West Bank**

53. Since-the-passage of the Leahy Law in 1997, Israeli security forces have committed widespread and systematic GVHRs in Gaza and the West Bank, including the specific elements of GVHRs in the FAA's non-exhastive definition of this term: 1) torture and cruel, inhuman, or degrading treatment; 2) prolonged detention without charges or trial; 3) enforced disappearances; and 4) flagrant deprivations of the right to life, liberty, and security of person.

54. These violations are well-documented by the State Department's own annual Human Rights Reports; credible international courts, such as the International Criminal Court and the International Court of Justice; international, Israeli and Palestinian human rights organizations; United Nations agencies, special rapporteurs, and commissions of inquiry mandated by the United Nations' Human Rights Council, Secretary General, High Commissioner for Human Rights, and the U.N. General Assembly; and international media investigations from renowned press organizations such as the *New York Times*, the *BBC*, *CNN*, the *Guardian*, the *Washington Post*, and *Al-Jazeera* (collectively, "Credible Sources"). The State Department has relied on these Credible Sources for information it includes in its annual human rights reports as well as in its determination of GVHRs by security forces units of other countries to determine eligibility for U.S. aid under the Leahy Law.

55. GVHRs have spiked since the beginning of Israel's Gaza genocide in 2023, demonstrating an unprecedented pattern of widespread and systematic human rights violations that implicates the majority, if not all, of Israel's security forces operating in

Gaza and the West Bank. The vast volumes of credible information from Credible Sources that implicate Israeli security units in systematic and widespread GVHRs under the direct orders of the country's political and military commanders justifies the inference that every unit operating in the Occupied Palestinian Territory has reasonably likely committed GVHRs and should be ineligible for U.S. assistance under the Leahy Law.

56. Reports from Credible Sources date back to the initial passage of the Leahy Law in 1997 through 2019, even before passage of the 2019 Leahy Amendment, during which time the State Department could not enforce the Leahy Law with respect to Israel to vet Israeli units receiving U.S. weapons professedly because that military assistance to the country was untraceable.

57. Prior to 2019, the State Department's vetting under the Leahy Law for Israel was limited to units nominated for training assistance because the Department could identify them in advance of giving them the assistance. It did not include those units receiving U.S. equipment and weapons. based on the excuse that such military assistance to Israel was untraceable, making comprehensive vetting challenging. Only a minuscule fraction—approximately 0.05%—of U.S. aid to Israel, which pertains to training, underwent vetting during this time, leaving most Israeli units receiving assistance unpoliced by the Leahy Law.

58. The inadequacy of these vetting procedures was formally documented in a 2011 report by the U.S. Government Accountability Office (hereinafter, the "GAO"), an

independent, nonpartisan agency that audits and evaluates federal operations. The GAO identified critical gaps in the vetting process, particularly concerning military equipment aid in the region covered by the State Department's Bureau of Near East Affairs (hereinafter, the "NEA") where Israel is located. The report specifically highlighted the State Department's failure to apply its International Vetting and Security Tracking (hereinafter, "INVEST") system—a globally utilized tool for comprehensive human rights vetting—to recipients of U.S. military equipment and weapons in the region covered by the NEA, where the State Department limited the use of the system for "traceable units" receiving military training only. The GAO recommended the immediate implementation of the INVEST system for all U.S. military aid, including weapons and equipment, to ensure compliance with the Leahy Law. Despite the Department's agreement with these recommendations, this key reform idled, which left a significant loophole exempting nearly all U.S. military aid to Israel from the required vetting and accountability.

59. From 1997 to 2019, the State Department's annual human rights reports consistently documented credible information across four key categories of the statutorily defined GVHRs committed by Israeli security forces: torture or cruel, inhuman, or degrading treatment; prolonged detention without charges or trial; abductions and clandestine detentions; and other flagrant denials of the right to life, liberty, or security of the person. Every year, its reports highlighted widespread and systemic abuses, including the use of prolonged shackling, sleep deprivation,

and physical abuse during interrogations. Similarly, State Department reports from this period repeatedly noted the practice of prolonged detention without charge or trial, facilitated by a series of Israeli military orders that allow indefinite administrative detention without charge based on secret evidence under vague "security" justifications. Administrative detainees are often held incommunicado without access to lawyers or contact with their families.

60. From 1997 to 2019, Credible Sources consistently presented damning evidence of the most egregious category of GVHRs, involving the denial of the right to life, liberty, and security. Their reports described deliberate and indiscriminate killings of tens of thousands of Palestinians and deliberate attacks on Palestinians protesting against Israeli abuses, injuring thousands and killing hundreds. Additionally, extensive documentation of collective punishment, such as the blockade of Gaza and widespread home demolitions, underscored a deliberate strategy to harm Palestinians. Numerous Credible Sources have documented the impact of the unlawful blockade of Gaza imposed by Israeli security forces since 2016, depriving the nearly two million residents of their right to life, liberty and security by denying them items essential to their survival, and depriving them of liberty by arbitrarily restricting their freedom of movement for nearly two decades, with devastating consequences for health, education, and infrastructure.

61. Similarly, Credible Sources have consistently documented other GVHRs between 1997 and 2019, including torture, prolonged detention, and enforced disappearances, based on meticulous investigations and eyewitness accounts.

62. Since the 2019 Leahy Amendment requiring the State Department to vet all Israeli units for credible information of GVHRs to determine ineligibility for assistance, the State Department's annual Human Rights Reports have continued to consistently find credible reports that Israeli security forces have committed GVHRs in Israel, Gaza, and the West Bank. These reports explicitly refer to arbitrary or unlawful killings, including extrajudicial killings; enforced disappearances; torture or cruel, inhuman, or degrading treatment or punishment by government officials; and other flagrant denials of the rights to life, liberty, and security of person.

63. The 2023 Human Rights Report reaffirmed these findings, stating that "credible reports" of significant human rights issues included "arbitrary or unlawful killings, including extrajudicial killings; enforced disappearances; [and] torture or cruel, inhuman, or degrading treatment or punishment." This record of violations has remained consistent for years in the Department's reports on Israel, Gaza, and the West Bank, underscoring a systematic and widespread pattern of violations. This record aligns with international findings, including the International Court of Justice's provisional orders in the case charging Israel with Genocide, and its ruling considering the legality of Israel's occupation of Occupied Palestinian Territory, ordering Israel to end its occupation because it violates the rights of Palestinians, and the International Criminal Court's arrest warrants for Israeli officials for, among other things, GVHRs that constitute war crimes

and crimes against humanity.

64. Despite these volumes of credible information from Credible Sources and the State Department's own reports since passage of the Leahy Amendment, the State Department has still failed to disqualify a single unit of Israeli forces responsible for GVHR from receiving U.S. aid.

65. The past months, between October 2023 to date, have witnessed an unprecedented spike in violations by Israeli security forces across four categories of GVHRs. Credible Sources have reported unprecedented levels of torture and cruel, inhuman, or degrading treatment or punishment by Israeli forces, with thousands of instances of detainees suffering death, injury and severe physical and psychological abuse. Second, Credible Sources have documented how Israel has exponentially expanded its prolonged detention of Palestinians without charges or trial, holding thousands indefinitely under administrative orders based on secret evidence that is disclosed neither to detainees nor their legal representatives. Third, enforced disappearances have become alarmingly common, with Israeli forces abducting numerous individuals and holding them in clandestine detention facilities, leaving their families unaware of their fate or location. Finally, and most critically, there has been a flagrant denial of the right to life, liberty, or the security of the person, evidenced by widespread unlawful killings, the wanton destruction of civilian infrastructure, systematic attacks on hospitals, schools, and other essential facilities, and deliberate deprivation of food, medicine, fuel, and other items essential to human survival in Gaza. Most significantly, numerous Credible Sources, most recently Amnesty International, have documented that

Israel is committing genocide against Palestinians, the most serious human rights violation, deliberately depriving Palestinians of the right to life.

66. Israeli security forces have routinely subjected thousands of Palestinian detainees to torture and cruel, inhuman, or degrading treatment or punishment, as documented by multiple Credible Sources. Human Rights Watch reported Palestinian healthcare workers detained between November and December 2023 for periods of up to five months without charge. Similarly, B'Tselem's 2024 "Welcome to Hell" report revealed the systematic transformation of Israeli detention facilities into *de facto* torture camps, where 55 detainees provided harrowing testimonies of relentless pain and suffering inflicted by Israeli security forces as a matter of policy. These testimonies underscore deliberate and systematic abuses in detention, constituting GVHRs.

67. Since October 2023, Israeli security forces have regularly engaged in enforced disappearances, abducting and clandestinely detaining Palestinians in Gaza and the West Bank. Credible Sources have documented individuals being taken from their homes, workplaces, and even hospitals without explanation or accountability. Israeli security forces have held many of those detained in undisclosed locations, with families left in anguish over their whereabouts and safety, reflecting systematic GVHRs.

68. The most serious GVHRs since October 2023 have been Israel's flagrant denials of the right to life, liberty, or the security of Palestinians in the West Bank and Gaza. Multiple Credible Sources have documented how Israeli forces have deliberately and indiscriminately killed tens of thousands of Palestinians, targeted and killed hundreds of journalists, doctors, and aid workers, and deprived Gazans of items essential to their

survival, including food, electricity, water and medicine, leading them to conclude that Israel is committing a genocide.

69. Credible Sources have also documented the specific use of U.S. weapons by abusive Israeli forces in numerous reports. For example, Amnesty International's 2024 investigation into Israel's use of U.S.-made munitions revealed their deployment in attacks on schools, hospitals, and refugee camps.

70. Over the past year, Israel has systematically targeted and extrajudicially killed hundreds of journalists, doctors, medical health professionals, and humanitarian workers in Gaza and Lebanon as highlighted in reports by the Committee to Protect Journalists and Al Mezan.

71. Despite this overwhelming record of GVHRs, the Israeli government has taken no meaningful efforts to hold abusive units accountable.

72. Despite this overwhelming record of GVHRs committed by Israel's security forces, the State Department has irresponsibly embraced, "See no evil, hear no evil, speak no evil," in contempt of the Leahy Law.

73. The GVHRs documented by Credible Sources have only increased in the past year and are likely to continue so long as Israel continues to occupy and remains in control of the Occupied Palestinian Territory.

**LEAHY LAW IMPLEMENTATION WILL REDRESS PLAINTIFFS' HARMS**

74. Redressability is an essential component of Plaintiffs' standing to sue under Article III. Redressability requires a reasonable likelihood that the relief requested by Plaintiffs against Defendant will likely reduce or mitigate the concrete actual or imminent harms alleged. Plaintiffs' alleged harms include imminent fear of death, injury, destruction of property, displacement, or loss of consortium with Plaintiffs' families or relatives all caused by Israeli security units that have committed and continue to commit GVHRs that should prohibit them from receiving U.S. assistance under the Leahy Law were it properly applied. Plaintiffs reasonably allege that the relief requested, i.e., mandating Defendant to obey the Leahy Law vis-à-vis Israel in both its procedural and substantive dimensions, is reasonably likely to reduce Israeli security units' capacity to commit GVHRs and/or deter other units from committing GVHRs to avoid loss of United States assistance.

75. If the United States were to fully and faithfully enforce the Leahy Law against Israeli security forces, it is reasonably likely that a substantial number of, if not all, Israeli units operating in Gaza and the West Bank would be prohibited from receiving U.S. assistance due to credible information of unremediated GVHRs.

76. There is extensive evidence that the GVHRs are occurring under the direct orders and command of the leaders of Israel's military forces: the Defense Minister and the Prime Minister, leading the ICC to issue arrest warrants against them. In other cases where the State Department finds a commander responsible for a GVHR, it "taints" the entire unit and all those under his command from U.S. military assistance. An appropriate

State Department finding that the most senior leadership of Israel responsible for directing and overseeing GVHRs, and whom the State of Israel has not and will not hold accountable, should "taint" all Israeli security force units operating in the Occupied Palestinian Territory under their command and prohibit them from receiving U.S. aid.

77. Termination of United States assistance to most, if not all, Israeli units in Gaza and the West Bank who rely on the U.S. for their military arsenal, would dramatically reduce the capacity of these forces to commit GVHRs and thus substantially lessen the imminent harms to Plaintiffs alleged in the Complaint.

78. Plaintiffs further allege that prohibiting assistance to Israeli security force units credibly implicated in GVHRs is reasonably likely to create a significant deterrent effect on the commission of GVHRs by both sanctioned and non-sanctioned units and thereby materially reduce the risk of harm Plaintiffs confront from Israeli military operations. Non-sanctioned Israeli security force units would likely refrain from further GVHRs to avoid jeopardizing their access to U.S. assistance on which they are heavily dependent. Leahy Law implementation to sanction units would also likely incentivize Israeli officials to take effective steps to bring responsible security force members to justice and ensure sanctioned units commit no further GVHRs so that the units can resume receiving U.S. funding., Such remediation and deterrence of further GVHRs are the precise intent of the Leahy Law and if implemented, are reasonably likely to diminish the imminent harms alleged by Plaintiffs.

79. As Plaintiffs allege, Defendant's actions and omissions constitute both procedural and substantive violations of the Leahy Law, undermining its core purpose of preventing U.S. security assistance to foreign security forces that commit GVHRs. The Defendant's failure to implement the law has resulted in Israeli security force units receiving U.S. assistance despite credible information implicating them in GVHRs. The procedural violations, rooted in the uniquely burdensome and arbitrary processes applied to Israel, obstruct the proper application of the law. Substantively, Defendant has failed to disqualify any Israeli units despite substantial credible information of GVHRs, allowing these violations to persist with impunity.

**Administrative Procedure Act**

80. The APA empowers courts to "compel agency action unlawfully withheld" (5 U.S.C. § 706(1)). In this case, the State Department has arbitrarily and capriciously failed to perform non-discretionary duties required under the Leahy Law. These include prohibiting assistance to units implicated in unremediated GVHRs based on credible information; vetting all Israeli security forces to determine if there is credible information that they have committed GVHRs; using uniform standards for determining credible information and remediation instead of arbitrary and capricious standards that do not advance the Leahy Law's purpose or comport with its statutory requirements but instead frustrate that purpose and definition; and identifying and disqualifying Israeli units ineligible for assistance because of credible information that they have engaged in GVHRs. By failing to act on these obligations, the Department has effectively

undermined the enforcement mechanisms of the Leahy Law and allowed continued assistance to units credibly implicated in GVHRs, i.e., *de facto* repealing the Leahy Law as applied to Israel.

81. The plain text of the Leahy Law is notably devoid of any waiver provision granting the Executive Branch discretion to disregard or avoid enforcement of its provisions for foreign policy or national security reasons. Unlike other foreign assistance statutes that explicitly provide such exceptions, including the Leahy Law applicable to the Department of Defense, the Leahy Law reflects a deliberate congressional choice to prioritize adherence to human rights standards irrespective of shifting geopolitical interests. This is a paradigmatic case of statutory interpretation and enforcement. The Leahy Law is a narrow and specific statute prescribing the conditions pursuant to which Congress exercises its power of the purse to require the State Department to allocate taxpayer resources to foreign countries.

## COUNT ONE: SUBSTANTIVE FAILURE TO APPLY THE LEAHY LAW (5 U.S.C. § 706(2)(A))

82. Plaintiffs incorporate by reference paragraphs 1-81 as if fully set forth herein.

83. The Leahy Law prohibits the provision of U.S. security assistance to foreign security force units for which there is credible information of involvement in gross violations of human rights.

84. Despite credible information of gross violations by Israeli security force units, Defendant has failed to prohibit any Israeli units from receiving U.S. assistance and failed to provide Israel with a list of prohibited units due to their commission of unremediated GVHRs.

85. Defendant's actions and omissions undermine the plain language and purpose of the Leahy Law, which is designed to prevent U.S. complicity in human rights abuses and to encourage accountability for violations.

86. This failure constitutes final agency action that is arbitrary, capricious, and not in accordance with law under 5 U.S.C. § 706(2)(A).

## COUNT TWO: ARBITRARY AND CAPRICIOUS PROCEDURES UNDER THE ADMINISTRATIVE PROCEDURE ACT (5 U.S.C. § 706(2)(A))

87. Plaintiffs are incorporated by reference paragraphs 1-86 as if fully set forth herein.

88. The ILVF, established by Defendant to vet Israeli military units for compliance with the Leahy Law, imposes uniquely onerous, prolonged, and senior-level processes that are not applied to other countries and are designed to create a *de facto* exemption of Israel from the Leahy Law.

89. These procedures include excessive delays, diplomatic consultations, and an unreasonably demanding threshold for credible information that contradicts the undemanding standard required by the Leahy Law. It also includes time periods and determinations of remediation that are unique to Israel and significantly depart

from the remediation required by the Leahy Law and demanded from other countries receiving U.S. aid.

90. The ILVF process frustrates the enforcement of the Leahy Law and creates an insurmountable barrier to disqualifying Israeli units, rendering it arbitrary, capricious, and contrary to law under 5 U.S.C. § 706(2)(A).

## COUNT THREE: FAILURE TO PERFORM NON-DISCRETIONARY DUTIES UNDER THE LEAHY LAW (5 U.S.C. § 706(1))

91. Plaintiffs incorporate by reference paragraphs 1–90 as if fully set forth herein.

92. Pursuant to the Leahy Law, as amended, the Secretary of State has mandatory, non-discretionary duties, including:

a. Identifying and disqualifying foreign military units credibly implicated in GVHRs that the foreign country has not effectively remediated from receiving U.S. military assistance in advance to providing such assistance;

b. Providing the relevant foreign governments, including the Government of Israel, with a list of such disqualified units; and

c. Obtaining written assurances from the foreign governments, including the Government of Israel, that these disqualified units will not receive U.S. security assistance.

93. Defendant has failed to fulfill these statutory duties with respect to Israeli military units, despite substantial credible evidence that many such units have engaged in unremediated GVHRs.

94. This failure constitutes agency action unlawfully withheld or unreasonably delayed, in violation of 5 U.S.C. § 706(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment against Defendant on Counts 1, 2, and 3, and grant relief as follows:

    a.  Declare that Defendant's actions and omissions are arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA by failing to substantively and procedurally apply the Leahy Law to Israeli security units credibly implicated in unremediated GVHRs;

    b.  Declare that Defendant's ILVF and its associated procedures are arbitrary and capricious and contrary to law under 5 U.S.C. § 706(2)(A) for failing to advance the purposes of the Leahy Law and creating insurmountable barriers to its enforcement and order these procedures changed consistent with the purposes of the Leahy Law;

    c.  Compel Defendant to furnish the Government of Israel with a list of units determined to be ineligible for U.S. assistance under the Leahy Law pursuant to 22 U.S.C. § 2378d(c)(1) without undue delay, to obtain the required written assurances from the Government of Israel that such units

will not receive U.S. security assistance, and to regularly update the list to

ensure compliance with the statute;

d.  Issue a permanent injunction, pursuant to 22 U.S.C. § 2378d and 5 U.S.C. §

706(1), prohibiting Defendant from providing any U.S. assistance to Israeli

security units which credible information establishes have committed

unremediated GVHRs;

e.  Award Plaintiffs their costs and reasonable attorney fees incurred in

bringing this action, as permitted by applicable law, including the Equal

Access to Justice Act, 28 U.S.C. § 2412(d), as the government's

interpretation or application of the Leahy Law to Israeli is not substantially

justified;

f.   Award Plaintiffs such other relief that this Court finds just and proper.

Respectfully submitted,

*/s/ Bruce Fein*
Law Offices of Bruce Fein
300 New Jersey Avenue, N.W., Suite 300
Washington, D.C. 20001
Phone: 202-465-8728
Email: bruce@feinpoints.com
Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing has been made on all parties of record via this Court's electronic filing system this 31st day of March 2025.

*/s/Bruce Fein*

Bruce Fein