**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMAL GAZA, an
individual, GAZA 2, an
individual, GAZA 3, an
individual,
AHMED MOOR, an individual,
SAID ASSALI, an individual,
HADEEL ASSALI, an
individual,
and SHAWANJABARIN, an individual,

     Plaintiffs,

v.

                                   Case No.: Civil Action 24-cv-03503

UNITED STATES SECRETARY OF STATE
MARCO RUBIO in his official capacity,

     Defendant.

**<u>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS AMENDED COMPLAINT UNDER RULE 12 (B) (1) AND 12 (B) (6) OF
THE FEDERAL RULES OF CIVIL PROCEDURE</u>**

Bruce Fein, Esq.
Law Offices of Bruce Fein
300 New Jersey Avenue, N.W., Suite 300
Washington, D.C. 20001
Phone: 202-465-8728
Email:bruce@feinpoints.com
Counsel for Plaintiffs

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES                                                                                    ii
INTRODUCTION                                                                                               1
COUNTERSTATEMENT                                                                                 6

LEGAL STANDARDS                                                                                     21

ARGUMENT                                                                                                  22
SUBJECT MATTER JURISDICTION UNDER RULE 12 (B) (1)                       22

   1. Concrete Injury.                                                                             22
   2. Causation                                                                                   24
   3. Redressability                                                                              25

   FAILURE TO STATE A CLAIM UNDER RULE 12 (B) (6)         28

   1. Final Agency Action                                                                     28
   2. Agency Discretion                                                                         28

CONCLUSION                                                                                               28

# **TABLE OF AUTHORITIES**

**Cases**

*Abbott Laboratories v.Gardner,*
*387 U.S. 136, 141 (1967)* ............................................. 5

*Ashcroft v. Iqbal,*
556 U.S. 662, 668 (2009) .............................................. 22

*Bell Atlantic v. Twombly,*
550 U.S. 544 (2007) ...................................................... 22

*Bennett v. Spear,* ........................................................... 28
520 U.S. 154 (1997)

*Herbert v. National Academy of Sciences,* ................... 20
974 F. 2d 192, 198 (D.C. Cir. 1992)

*Loper Bright Enterprises v. Raimondo,*
603 U.S. 369 (2024) ...................................................... 5

*Luhan v. Defenders of Wildlife,* ................................... 21
504 U.S. 555, 561 (1992)

*Marbury v. Madison,*
5 U.S. 137, 163 (1803) .................................................. 5

*Republic of Iraq v. Beaty,* ............................................ 2
556 U.S. 848 (2009)

*Scolaro v. D.C. Board of Elections & Ethics,*
104 F. Supp. 18, 22 (D.D.C 2000) ............................... 21

*Zivotofsky v. Clinton,*
566 U.S. 189 (2012) ...................................................... 5

**Statutes**

22 USC 2378d (c) (1) ................................................... 12

**Rules**

12 (b) (6) of the Federal Rules of Civil Procedure ...... 1
Rule 12 (b) (1) of the Federal Rules of Civil Procedure ... 1
Rule 201 (a) (2) of the Federal Rules of Evidence ....... 2

# **INTRODUCTION**

This Memorandum responds to Defendant's motion to dismiss the Amended Complaint (AC) under Rule 12 (b) (1) and 12 (b) (6) of the Federal Rules of Civil Procedure. According to Defendant, no Plaintiff has Article III standing to challenge Defendant's arbitrary, capricious, and extra-legal non-enforcement of the Leahy Law to Israeli security units involved in gross violations of human rights (GVHRs).

Despite this Court's encouragement during the pre-motion hearing that the parties meet to discuss potential settlement, Defendant refused to engage. Plaintiffs sent multiple communications to Defendant to no avail, an arguable earmark of bad faith.

Defendant maintains that no Gaza or West Bank Plaintiff credibly alleges a fear of imminent death, injury, displacement, or destruction of property by Israeli security units involved in GVHRs. Defendant further argues that, assuming arguendo a reasonable fear of imminent concrete injury by the Gaza or West Bank Plaintiffs, they have not demonstrated curtailing massive military assistance to such units from the United States in violation of the Leahy Law and Administrative Procedure Act would reasonably likely diminish their alleged cognizable imminent injuries. Thus, Defendant maintains, subject matter jurisdiction is wanting under Rule 12 (b) (1). Defendant also argues Plaintiffs have failed to allege a viable, plausible claim for relief under the Administrative Procedure Act, thus warranting dismissal under Rule 12 (b) (6). Defendant's arguments are unconvincing. To the extent this Court continues to harbor doubts over subject-matter jurisdiction, Plaintiffs seek jurisdictional discovery and an evidentiary hearing to establish the overwhelming military assistance subject to the Leahy Law that Defendant is supplying to Israeli security forces in their genocidal war against all Palestinians in Gaza; the contribution such assistance makes to the Israeli genocide; and the reasonable probability that application of the Leahy Law to Israel by Defendant would materially diminish the capacity of Israeli security units to commit GVHRs against the Gaza plaintiffs.

1

This Court may take judicial notice under Rule 201 (a) (2) of the Federal Rules of Evidence of Israel's planned military takeover of Gaza and GVHRs acknowledged in the State Deparment's own Annual Human Rights Reports on Israel, the West Bank, and Gaza: torture, prolonged detention without charge, forced disappearances, and flagrant denials of the right to life, liberty, and security, such as genocide, indiscriminate and deliberate killings, and deprivation of the bare necessities essential to survival, including food, water, fuel, and medicine. Virtually every Palestinian in Gaza has been a victim of GVHRs by Israeli security units, including Plaintiffs Amal Gaza, Gaza 2, and Gaza 3. The Law generally prohibits United States assistance to foreign security force units involved in GVHRs. Under Article 2, section 3 of the Constitution, the Department is required to take care that the Leahy Law be faithfully executed. Congress commonly bestows waiver authority on the executive branch in executing laws bearing on foreign relations. See *Republic of Iraq v. Beaty,* 556 U.S. 848 (2009) ("To a layperson, the notion of the President's suspending the operation of avalid law might seem strange. But the practice is well established, at least in the sphere of foreign affairs."). The Leahy Law, in contrast, withholds waiver discretion from the State Department to prevent shortchanging human rights abroad in the name of advancing national security. The Department, however, has illegally conferred *de facto* waiver authority on itself. Despite a long history of GVHRs documented in the Department's own Annual Human Rights Reports, it has refrained from declaring a single Israeli security force unit ineligible to receive U.S. security assistance based on credible information of involvement in GVHRs. It strains credulity to believe Israeli security units have compiled a perfect human rights record over nearly three decades in what may be the most blood-stained region on the planet. Indeed, the contrary is supported by voluminous evidence from credible sources from outside the Department's own Reports, including rulings by the International Court of Justice and the International Criminal Court, findings of global and domestic human rights organizations, the

2

United Nations General Assembly and Security Council, the U.N. Human Rights Council, various U.N. Special Rapporteurs and Commissions of Inquiry, and various domestic courts in the United Kingdom, the Netherlands, and France, finding Israeli security forces implicated in torture, prolonged detention without charge, forced disappearance, and flagrant denials of the right to life, liberty, and security, such as genocide.

Defendant wrongly insinuates that concern over enforcement of the Leahy Law regarding Israel began on October 7, 2023 (Mem. 1). This is a key misrepresentation of Plaintiffs' position. Plaintiffs' concerns are that 1) the Department has failed to comply with the 2019 Amendment to the Leahy Law that requires the Department to provide Israel a list of ineligible units, regularly update the list, and obtain assurances Israel will comply with the prohibition; 2) the Department evaded compliance with the Amendment by creating an arbitrary and capricious process; and 3) in the meantime, the U.S. has flooded Israel with assistance to units credibly implicated in gross violations of human rights. Genocide sits at the summit of gross violations of human rights, the ultimate criminal deprivation of life, which triggers Leahy Law ineligibility. Twin prominent Israeli human rights groups, B'Tselem and Physicians for Human Rights-Israel, as well as international human rights organizations including Amnesty International, Human Rights Watch, and DAWN, have concluded that Israel's post-October 7 retribution against Palestinian civilians in Gaza constitutes genocide.

See https://www.hrw.org/report/2024/12/19/extermination-and-acts-genocide/israel-deliberately-depriving-palestinians gaza,https://www.amnesty.org/en/latest/news/2024/12/amnesty-international-concludes-israel-is-committing-genocide-against-palestinians-in-gaza/, https://dawnmena.org/expert-panel-concludes-israel-committing-genocide-against-palestinians-in-gaza/.

Contrary to Defendant (Mem. 1), this case was not initiated to voice displeasure with the ongoing conflict between Israel and Hamas in Gaza. The case is about honoring the congressional power of the purse and Congress's plenary constitutional authority to withhold security assistance from foreign security force units involved in GVHRs. James Madison, father of the Constitution elaborated in *Federalist* 58: "This power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." See also Article 1, section 9, clause 7 of the Constitution ("No money shall be drawn from the Treasury, but in consequence of appropriations made by law.") Plaintiffs welcome Defendant's assertion that "[r]espect for human rights is a core principle of the United States and promoting respect for human rights is a principal goal of U.S. foreign policy" (Mem. 3).

To advance that objective, Congress frequently enacts laws like the Leahy Law, to remedy the executive branch's chronic dismissal of human rights in the conduct of foreign policy. See Jackson-Vanik Amendment, 19 U.S.C. 2432; Comprehensive Anti-Apartheid Act of 1986, P.L. 99-440, Cuban Liberty and Democratic Solidarity Act of 1996, P.L. 104-114, BURMA.

Act of 2022, H.R. 5497. The Comprehensive Anti-Apartheid Act proved instrumental in South Africa's abandonment of racism. In 1993, *Time* magazine asked Nelson Mandela if economic sanctions helped to bring an end to the apartheid system. Mandela replied "Oh, there is no doubt.". Deference to the State Department's arbitrary and capricious exemption of Israel from the Leahy Law would affront congressional expectations or intent. It is emphatically the province and duty of the judicial department to say what the law is. Foreign affairs are no exception. *Zivotofsky v. Clinton,* 566 U.S. 189 (2012). See also *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369 (2024).

Absent clear, express statutory text to the contrary, judicial review of agency action is presumed. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141 (1967). That presumption aligns with the Constitution's separation of powers, which frowns on unchecked authority.

Defendant's assertion that no party possesses Article III standing to challenge Defendant's alleged, categorical non-enforcement of the Leahy Law as applied to Israel is startling. If the judiciary is AWOL, that means absent the unlikely nuclear option of impeachment and removal of Defendant from office for failure to faithfully execute the Leahy Law is wallpaper as regards Israel. Chief Justice John Marshall famously elaborated in Marbury v. Madison, 5 U.S. 137, 163 (1803): "The Government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right."

5

**COUNTERSTATEMENT**

Defendant sneered at this Court's pre-motion status conference encouragement to meet with Plaintiffs to discuss evenhanded Leahy Law enforcement protocols to end the alleged de facto Israeli exemption. Defendant never explored the meeting idea. It was DOA at the State Department. Defendant's statement, "The parties did not agree to meet" (Mem. 14), is counterfactual. Plaintiffs agreed to meet. Only the Defendant did not. What is Defendant seeking to hide? Plaintiffs were willing to sign an NDA or otherwise pledge confidentiality of any discussions. Plaintiffs are not aiming to litigate this case in the media.

The Leahy Law, section 620M of the Foreign Assistance Act of 1961, P.L. No. 87-195, as amended, (FAA), 22 U.S.C. 2378d, prohibits the United States from providing security assistance under the FAA or Arms Export Control Act (AECA) "to any unit of the security forces of a foreign country if the Secretary of State has credible information that such unit has committed a gross violation of human rights." 22 U.S.C. 2387d(a). An otherwise disqualified unit may be reinstated under subsection (b) "if the Secretary determines and reports to the appropriate congressional committees that the government of such country is taking effective steps to bring the responsible members of the security forces unit to justice," (a process known as remediation).

Congress's intentional withholding of waiver authority from the State Department for Israel (and any other country) emphasizes the importance of human rights in State Department-administered assistance to security forces.  A sister Leahy Law provision applicable to the Defense Department conspicuously bestows waiver discretion. 10 U.S.C. 362 (c).

In enacting the Leahy Law, Congress implicitly expected that foreign security units would be deterred from GVHRs to avoid losing eligibility for United States security assistance, and would engage in accountability to redress GVHRs and restore assistance. Congress also

6

expected that Leahy-ineligible foreign security force units would be materially diminished in their capacities to commit GVHRs by the termination of American security assistance. Senator Leahy explained to The New York Times ("Military Says Law Barring U.S. Aid to Rights Violators Hurts Training Mission," June 20, 2013): "[T]his is a law that works, if it is enforced. We can help reform foreign security forces, but they need to show they are serious about accountability. If not, we are wasting American taxpayers' money and risk prolonging the abusive conduct that we seek to prevent." See also Exhibit 1, Declaration of Tim Rieser.

Plaintiffs sued under the Administrative Procedure Act, alleging Defendant's unique arbitrary, capricious and categorical refusal to enforce the Leahy Law as regards Israel.

The Amended Complaint (AC) alleges to establish Plaintiff Amal Gaza's standing under Article III (AC ¶ 5-6):

"Plaintiff Amal Gaza (a pseudonym used to protect her identity due to security concerns) is a Palestinian resident of Gaza and a mathematics teacher by profession…Since October 7, 2023, U.S.-aided Israeli military units have committed GVHRs that have forced displacement of Amal Gaza and her family seven times. Their indiscriminate attacks also caused property loss and the deaths of 20 of her family members. Amal Gaza fears imminent death, injury, repeated displacement, and property loss at the hands of abusive Israeli security forces units. Amal Gaza also fears imminent loss of consortium with aunts, uncles and multiple other family members or relatives who are threatened with death or injury by abusive Israeli security forces, as detailed below, and benefited from U.S. security assistance provided in violation of the Leahy law.

It is reasonably likely that Amal Gaza's imminent fear of death, injury, destruction of her property, displacement by Israeli security forces or loss of consortium by abusive Israeli forces would be significantly dispelled if Defendant properly

7

enforced the Leahy Law, since it is reasonably likely that the ability of Israeli security units to commit GVHRs in Gaza would be materially diminished if Defendant terminated its assistance subject to the Leahy Law; and/or that they would refrain from GVHRs that threaten the lives and wellbeing of Plaintiff's aunts and uncles to avoid a loss of U.S. security assistance.

Plaintiff Gaza 2 alleges the following to establish Article III standing (AC, ¶ 7):

"Plaintiff Gaza 2 is an IT intern at the Gaza Municipality and volunteer intern at the Gaza Construction Industries Union. Gaza 2 has been traumatized by chronic war in Gaza since the age of six in 2008-2009. After October 7, 2023, border crossings were closed, prices spiraled, and random bombing unfolded. By November 9, 2023, Gaza was like a ghost town devoid of any signs of life…On one occasion, Gaza 2 and his brother sheltered near a Catholic shelter that was struck by incendiary bombs killing six displaced persons at that location, including some of Gaza 2's cousins and his mother. Gaza 2 reasonably fears imminent death, bodily injury, or loss of consortium caused by Israeli military units guilty of GVHRs using military assistance provided by the United States and approved by the Secretary of State in violation of the Leahy Law. Gaza 2 reasonably fears that if his identity were publicly disclosed, he would risk retaliation by Israel including death, and thus is using a pseudonym for security concerns.

Plaintiff Gaza 3 alleges the following to establish Article III standing (AC, ¶ 8):

"Plaintiff Gaza 3 volunteered with a nonprofit organization that provided care to injured and ill children in Gaza in 2023 and volunteered at physical therapy centers in Al-Wusdan in 2021, 2022, and 2023. Gaza 3 works as a physical

casualties since October 7, 2023. Gaza 3's relatives disappeared in an Israeli airstrike in Jabalia on or about October 25, 2023. Gaza 3 and his family have been displaced more than eight times since October 7, and that displacement continues, causing Gaza 3 to lose all his possessions, including his home and car. On information and belief, Gaza 3 has been injured twice in the head and in the leg requiring stitches from bombing by Israeli military units guilty of GVHRs with security assistance provided by the United States with the approval of the Secretary of State in violation of the Leahy Law. Gaza 3 has lost 18 family members since October 7, mostly in indiscriminate and deliberate bombings of civilian neighborhood homes and streets. Gaza 3 reasonably fears imminent death, bodily injury, destruction of property, or loss of consortium caused by Israeli military units guilty of GVHRs using security assistance provided by the United States and approved by the U.S. Secretary of State in violation of the Leahy Amendment.

Gaza 3 is haunted by watching the death of his cousin on January 16, 2025, with blood pooling before his eyes. Gaza 3 reasonably believes that if his identity were publicly disclosed, he would risk retaliation by Israeli military units and thus is using a pseudonym for security concerns.

Plaintiff Shawan Jabarin alleges as follows to establish Article 3 standing (AC, ¶ 16- 18):

"Plaintiff Shawan Jabarin, the Executive Director of Al-Haq, the leading Palestinian human rights organization in the West Bank, resides in Ramallah, the West Bank, with his wife and children. He owns a house there and in Saeer, a neighborhood in Hebron, where his mother and other family members reside. Plaintiff Jabarin fears imminent death, injury or harm by an extrajudicial killing by Israeli security force units that have committed GVHRs at Israeli checkpoints,

9

innightly raids conducted by Israeli military forces, and in special forces operations that have spiked in the West Bank since October 7, 2023. The number of Palestinians Israel has killed by these means in the West Bank since that date exceeds 500.

Plaintiff Jabarin supports an extensive family network throughout the West Bank. His mother lives in Saeer with many other relatives. He has two sisters, four brothers and over 100 relatives, including nieces, nephews, and cousins, residing in Hebron, Jerusalem, Ramallah, and other West B. towns. They also fear imminent death, injury or harm by Israeli security force units that have committed GVHRs, including extrajudicial killings, which threatens Plaintiff with an imminent loss of their consortium. It is reasonably likely that if the Defendant faithfully and fully applied the Leahy Law to U.S.-aided Israeli security force units that threaten imminent harm to Plaintiff through GVHRs, the ability of Israeli security force units to commit GVHRs in Gaza and West Bank would be materially diminished because of the loss of U.S. assistance. It is also reasonably likely that Israeli security force units would be deterred from GVHRS violations to avoid losing U.S. security assistance and thus significantly dispel Plaintiff's alleged imminent injuries.

> ¶ 19 of the AC further bolsters Article III standing for all Plaintiffs by alleging as follows: "Plaintiffs…allege that U.S. assistance directly and significantly enables Israeli security forces to commit GVHRs that cause their imminent harms. These GVHRs affect plaintiffs and their families, as detailed in the individual accounts above. The ongoing provision of assistance under the Leahy Law, notwithstanding credible information that recipient Israeli security units have committed GVHRs, makes it reasonably likely that plaintiffs' harms

10

reasonably likely to significantly dispel the imminent, concrete injuries they allege by materially diminishing Israeli security force units' capacity to commit such violations by terminating U.S. assistance and/or by deterring them from GVHRs to avoid a loss of U.S. assistance.

The Leahy Law provides objective, non-discretionary standards to determine whether credible information incriminates a foreign security unit in GVHRs. Sections 116 and 502B (d) (1) of the FAA define the term to include:

> …torture or cruel, inhuman, or degrading treatment or punishment, prolonged detention without charges and trial, causing the disappearance of persons by the abduction and clandestine detention of those persons,
> and other flagrant denials of the right to life, liberty, or the security of person.

> Congress also defined "credible information" for Leahy Law purposes in

section 7035 (d) (3) of the Further Consolidated Appropriations Act of 2024:

> "For purposes of implementing section 620M of the Foreign Assistance Act of 1961, the term "credible information" means information that, considering the source of such information and the surrounding circumstances, supports a reasonable belief that a violation has occurred, and shall not be determined solely on the basis of the number of sources; whether the source has been critical of a policy of the United States Government or its security partners; whether the source has a personal connection to the information being reported; or whether the United States Government is able to independently verify the information."

In addition, the State Department website's Leahy Law Fact Sheet (https://www.state.gov/bureau-of-democracy-human-rights-and-labor/releases/2025/01/leahy-law-fact-sheet0 )provides detailed guidance on what constitutes "credible information":

When assessing whether information is credible, the following factors should be considered weighing both the credibility of a source and the veracity of an allegation:

- Past accuracy and reliability of the reporting source as well as original source, if known;

- How the source obtained the information (e.g., personal knowledge obtained by a

11

witness, witness interviews collected by a non-governmental organization (NGO), descriptions collected from government records, etc.);

- Known political agenda of a source (both reporting source and/or original source, if known) which might lead to bias in reporting;

- Corroborative information to confirm part or all of the allegation;

- Information that contradicts part or all of the allegation;

- History of unit and known patterns of abuse/professional behavior;

- Level of detail of the GVHR allegation, including detail in identification of the GVHR, perpetrator (or link to an operational unit), and victim.

The Department of State annually vets thousands of non- Israeli foreign security force units for compliance with the Leahy Law. Since the enactment of the law in 1997, the Department has found  thousands of foreign security force units of countries other than Israel ineligible for assistance, including Bangladesh, Belize, Bosnia & Herzegovina, Burkina Faso, Burundi, Colombia, Guatemala, Jamaica, Mexico, Nigeria, Turkiye, Indonesia, Lebanon, Saint Lucia, Honduras, Iraq, Kyrgyz Republic, Mexico, Pakistan, Nigeria, and Egypt. In contrast, the Department has not found a single Israeli unit ineligible despite overwhelming information of widespread GVHRs committed by Israel units since 1997. AC ¶ 27. Most relevant to the Complaint, the Department's malfeasance is stark when it comes to the Leahy vetting required under the 2019 Amendment.  In addition to Israel, this process applies to Egypt, Jordan, and Ukraine. The Department has provided ineligible unit lists to Egypt (three ineligible units) Jordan (nine), and Ukraine (eleven), but never a single Israeli unit. (https://www.gao.gov/assets/gao-25-107077.pdf)

The United States provides Israel with vast security assistance, including Foreign Military Financing (hereinafter, "FMF"), subject to the Leahy Law. The State Department provides Israel with the entirety of its FMF in the first thirty days of the

18Type text here

State Department also provides a substantial portion of Israel's of its military aid, estimated at 20% in 2024, as untraceable cash through the Overseas Procurement mechanism. Israel allocates U.S. assistance to its security forces without disclosing the recipient units. Given the volume and untraceable nature of this FMF and the diversity of United States security assistance to Israel, it is reasonable to infer that all of Israel's security force units are direct or indirect beneficiaries. The State Department is unable to vet these Israeli units before the aid is transmitted. This nonfeasance violates section 620M(d)(1) of the FAA, which requires the StateDepartment to maintain a current list of all units receiving U.S. assistance in order toi vet such units in advance. AC ¶ 29.

In 2019, Congress enacted 22 USC 2378d (c) (1) (hereinafter, the "2019 Leahy Amendment") requiring that in cases where the Secretary of State is unable to identify prior to a transfer the recipient foreign unit or units receiving United States security assistance (so-called "untraceable assistance"), the Secretary must regularly provide the foreign government a list of Leahy-ineligible units and receive assurances that the foreign government will block U.S. assistance to these units *in advance* of the tranfer. The Amendment provides:

"If assistance to a foreign security force is provided in a manner in which the recipient unit or units cannot be identified prior to the transfer of assistance, the Secretary of State shall regularly provide a list of units prohibited from receiving assistance pursuant to this section to the recipient government and the appropriate congressional committees and, effective December 31, 2022, such assistance shall only be made available subject to a written agreement that the recipient government will comply with such prohibition." AC paragraph 28.

To review credible information of GVHRs committed by Israeli security units and to develop the required list of ineligibles under the 2019 Leahy Amendment, the State Department established the Israel Leahy Vetting Forum (hereinafter, the "ILVF"). The ILVF is a working group that reviews reports of GVHRs committed by Israeli security force units and any steps the Israeli government has taken to investigate such incidents

13

and, if warranted, to prosecute and punish the responsible security force members. ILVF procedures are unique to Israel. They are calculated to create head winds against finding any Israeli unit ineligible under the Leahy Law. In contrast to the vetting process for other countries subject to the 2019 Leahy Amendment, the ILVF requires periodic, in-person meetings at a high level up to senior Department and Embassy Jerusalem approvals of cables.  AC ¶ 34.  Unlike the vetting process for any other country, ILVF written procedures require the Deputy Secretary of State to approve any finding that an Israeli unit has committed GVHRs that the Israeli government has not remedied. Even before the ILVF presents an adverse recommendation to the Deputy Secretary of State, a formal request to the Government of Israel via diplomatic note to respond to the allegations is required. That process entails drafting, clearing, and delivering a written diplomatic note and demarche to Israel's Foreign Ministry. Weeks if not months typically elapse. The vetting procedures for any country but Israel require a response within 14 days. ILVF procedures, in contrast, permit the request to idle for up to 90 days before receiving a response from Israel. The case then returns to the ILVF for another in-person meeting to review the response. But most tellingly, the ILVF process requires the Deputy Secretary of State to approve any ineligibility finding of an Israeli unit. This is true of no other country in the world. For all other countries, ineligibility findings are made at the expert level, by officers versed in the Leahy law, the security forces in question, and the specific GVHR allegations in question.

It is no surprise that the ILVF has refrained from identifying a single Israeli unit as Leahy Law ineligible notwithstanding credible information of tens of thousands of GVHRs. The forum is like a Potemkin Village to provide an appearance of Leahy Law compliance to conceal a *de facto* illegal exemption for Israel. AC ¶ 36.

The ILVF has erected an extra-statutory, insurmountable credible information threshold to avoid disqualifying any Israeli security unit. It has never made an independent findingthat an Israeli unit has committed a GVHR. It has only ratified what Israel has previously found. Even then, the ILVF has invariably found Israeli remediation applying an extra- statutory, unique forgiving standard. The Department has never found any Israeli unit ineligible for aid or provided Israel a list of ineligible units as required by the 2019 Leahy Amendment. AC ¶ 38.

The State Department's refusal to apply the Leahy Law to Israel is shocking in the face of the unprecedented escalation of the IDF's GVHRs since the Gaza War erupted on October 7, 2023. The International Court of Justice has issued provisional orders to Israel to cease depriving Palestinians in Gaza of items essential to their survival and found a prima facie case of genocide. The International Criminal Court    issued arrest warrants for Israeli Prime Minister Benjamin Netanyahu and former Defense Minister Yoav Gallant for GVHRs committed from at least October 8, 2023, until at least May 20, 2024, including forcible displacement, starvation, persecution, and knowing deprivation of items indispensable to the survival of civilian Palestinians in Gaza, including food, water, medicine and medical supplies, and fuel and electricity. The Court found reasonable grounds to believe that Netanyahu and Gallant bear criminal responsibility as civilian superiors for intentionally directing attacks against the Palestinian population of Gaza. AC ¶ 39.

15

On April 29, 2024, the State Department determined for the first time that five Israeli security units had committed GVHRs: the 92nd Shimshon Battalion, the Israeli National Police Law Enforcement and Traffic Branch Ma'avarim unit (hereinafter "Ma'avarim"), the Coordinator for Government Activities in the Territories (hereinafter, "COGAT") in the West Bank, the Shahar Search and Rescue Battalion, and the Netzah Yehuda Battalion. The Department, however, determined that four of the units (all but the Netzah Yehuda Battalion) had remediated these violations, and thus remained Leahy Law eligible. The corrective action in two of the cases, the 92nd Shimshon Battalion and the Shahar Search and Rescue Battalion, would have been insufficient for countries other than Israel. Both units were involved in extrajudicial killings of Palestinians. The perpetrators were subject to nominal or no incarceration, in one case, three months of community service. The fifth case involved the Israel Defense Forces' notorious and extremist Netzah Yehuda Battalion.

Credible sources established the Battalion's industrial scale GVHRs in the West Bank. Netzah Yehuda soldiers were implicated in the unjustified killings of at least two unarmed Palestinians, Iyad Zakariya Hamed and Qassem Abbasi, as well as numerous cases of torture, assault and sexual abuse between 2015 and 2022. Among the Battalion's GVHRs, in January 2022, Netzah Yehuda members detained without apparent legal authority a 78- year-old American citizen of Palestinian origin, Omar Assad, bound him, gagged him, and abandoned him at a construction site. Mr. Assad died that evening from a stress- induced heart attack. Israel declined criminal charges against any member of the Netzah Yehuda Battalion. Instead, the IDF disciplined two officers, reprimanded a commander, and promised to offer the unit a two-week "human rights seminar" and improved screening of prospective unit members. For any country but Israel, the State Department would have immediately rejected such anemic remediation as insufficient– especially for the death of a

U.S. citizen. In August, the Defendant nevertheless declined to find the Battalion ineligible under the Leahy Law. Moreover, the State Department in April 2024 allowed the Netzah Yahuda Battalion to remain eligible for U.S. security assistance *before* remediation had been established. In ordinary cases, remediation must be complete before reinstatement of Leahy Law eligibility to incentivize swift action.  AC ¶ 40-46.

17

The Department's violation of customary Leahy remediation standards in these cases is further evidence of the arbitrary and capricious pass it gives to Israel under the Leahy law. All five units remain eligible for U.S. assistance. Thus, six years after its passage, the 2019 Amendment's requirement for a list of ineligible units remains unfulfilled.  Th     The United States is the dominant supplier of armaments to Israel, providing most of Israel's foreign-sourced weapons. In 2024, the U.S. provided $17.9 billion in military aid to acquire or supply weapons. The U.S. provided at least $6.8 billion in military assistance through the FMF program since October 2023, equivalent to nearly half of Israel's $13.5 billion 2024 budget for weapons procurement and related research and development. AC ¶ 48. Israel could have used FMF assistance to pay for the $5.4 billion in weapons the United States transferred to Israel in 2024 under mechanisms such as Foreign Military Sales (hereinafter, "FMS") and Direct Commercial Sales (hereinafter, "DCS"); if so, the transfers would also be subject to the Leahy Law. AC ¶ 50.

The collective U.S. military assistance to Israel underscores the decisive role of U.S. funding in equipping Israel with weapons and munitions and the significance of U.S. military assistance to Israel's ability to carry out military operations, particularly its ongoing genocidal offensive campaigns in Gaza. AC ¶ 51. This data aligns with statements made by current and former Israeli officials in the past year. A senior Israeli Air Force official told *Haaretz* in September 2024, "Without the Americans' supply of weapons to the Israel DefenseForces, especially the air force, Israel would have had a hard time sustaining its war for more than a few months." Similarly, Zohar Palti, a former intelligence director for Israel's Mossad, echoed this sentiment. in an interview with *The Washington Post* in October 2024, stating, "Without the U.S. weapons, Israel cannot fight." Former Israeli Defense Minister Yoav Gallant underscored this dependency in October 2023, explaining why he allowed limited humanitarian aid into Gaza, "The

18

planes and military equipment. What are we supposed to do? Tell them no?" Retired Israeli Major General Itzhak Brik provided further confirmation in November 2023, emphasizing, "All of our missiles, the ammunition, the precision-guided bombs, all the airplanes and bombs, it's all from the U.S. The minute they turn off the tap, you can't keep fighting. You have no capability... Everyone understands that we can't fight this war without the United States. Period." AC ¶ 52.

These statements collectively demonstrate that curtailing security assistance to Israel under the Leahy Law would materially diminish Israel's military capability in Gaza and the West Bank and likelihood of GVHRs, including genocide that imminently threaten the three Gaza Plaintiffs. AC ¶ 53-73 document the State Department's long history of ignoring GVHRs by Israeli security units established by credible sources, including but not limited to, in Gaza and the West Bank. The GVHRs include torture and cruel, inhuman, or degrading treatment; prolonged detention without charges or trial; enforced disappearances; and flagrant deprivations of the right to life, liberty, and security of person. These violations have been amply documented by the State Department's own Annual Human Rights Reports; credible international courts, such as the International Criminal Court and the International Court of Justice; Israeli and Palestinian international human rights organizations; United Nations agencies, special rapporteurs, and commissions of inquiry mandated by the United Nations' Human Rights Council, Secretary General, High Commissioner for Human Rights, and the U.N. General Assembly; and international media investigations from renowned press organizations such as the *New York Times*, the *BBC*, *CNN*, the *Guardian*, the *Washington Post*, and *Al-Jazeera* (collectively, "Credible Sources").

19

The State Department has relied on these credible sources for information it includes in its Annual Human Rights reports as well as in its determination of GVHRs by security forces units of countries other than Israel to determine eligibility for U.S. aid under the Leahy Law.

GVHRs have spiked since the beginning of Israel's Gaza genocide in 2023, implicating the majority, if not all, of Israel's security forces operating in Gaza and the West Bank. Indeed, the vast volumes of information from credible sources makes reasonable the inference that most, if not all, Israeli security force units operating in the Occupied Palestinian Territories likely committed GVHRs and should be ineligible for U.S. assistance under the Leahy Law. The 2023 Human Rights Report stated that "credible reports" of significant human rights issues included "arbitrary or unlawful killings, including extrajudicial killings; enforced disappearances; [and] torture or cruel, inhuman, or degrading treatment or punishment." This record of systematic violations has remained consistent for years in the Department's reports on Israel, Gaza, and the West Bank. Since October 2023, the Occupied Territories have turned into a human rights desert.

Numerous credible sources, most recently Amnesty International, have documented the State Department's finding senior leadership of Israel responsible for directing and overseeing GVHRs, whom the State of Israel has not and will not hold accountable. Under standard Leahy Law practice, that should render ineligible all Israeli security force units operating under their direct command in the Occupied Palestinian Territories.

20

Termination of United States assistance to most, if not all, Israeli units in Gaza and the West Bank who rely on the U.S. for their military arsenals would dramatically reduce the capacity of these forces to commit GVHRs and thus substantially lessen the imminent harms feared by the Gaza and West Bank Plaintiffs. They further allege prohibiting assistance to Israeli security force units credibly implicated in GVHRs is reasonably likely to create a significant deterrent to the commission of GVHRs by both sanctioned and non- sanctioned units and thereby materially reduce the risk of imminent harm Plaintiffs confront from Israeli military operations. Non- sanctioned Israeli security force units would likely refrain from further GVHRs to avoid jeopardizing their access to U.S. assistance on which they are heavily dependent. Leahy Law implementation to sanction units would also likely incentivize Israeli officials to take effective steps to hold security force members accountable and ensure sanctioned units refrain from further GVHRs to enable a resumption of U.S. funding. Such remediation and deterrence are what the Leahy Law intended and expected and would reasonably likely diminish the imminent harms alleged by Plaintiffs.

## **LEGAL STANDARDS**

The United States Supreme Court explained in *Luhan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992) regarding a motion to dismiss under Rule 12 (b) (1):

"The party invoking federal jurisdiction bears the burden of establishing these elements [of standing, i.e., concrete injury, causation, and redressability]. [citations omitted]. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e*.,* with the manner and degree of evidence required at the successive stages of the litigation. [citations omitted]. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." [Citation omitted].

21

The Court may consider materials outside the pleadings as appropriate to resolve jurisdictional issues. *Scolaro v. D.C. Board of Elections & Ethics,* 104 F. Supp. 18, 22 (D.D.C. 2000). These materials may include affidavits, declarations, exhibits, government reports or documents, or adjudicative facts judicially noticed under Rule 201 (b) (2) of the Federal Rules of Evidence. The United States Court of Appeals elaborated in *Herbert v. National Academy of Sciences,* 974 F. 2d 192, 198 (D.C. Cir. 1992):

> "[S]hould the trial court look beyond the pleadings, it must bear in mind what procedural protections could be required to assure that a full airing of the facts pertinent to a decision on the jurisdictional question may be given to all parties. Indeed, this Court has previously indicated that ruling on a Rule 12(b) (1) motion may be improper before the plaintiff has had a chance to discover the facts necessary to establish jurisdiction. Collins v. New York Central System, 327 F.2d 880 (D.C. Cir. 1963). In many instances it may be necessary to hold evidentiary hearings in resolving particularly complicated factual disputes rather than to rely on affidavits alone. See Williamson, 645 F.2d at 414. (Footnote omitted)."

As regards a motion to dismiss for failure to state a claim under Rule 12 (b) (6), the facts alleged in the complaint must be accepted as true, reasonable inferences should be drawn in favor of the non-moving party, and the claims must satisfy a "plausibility" threshold based, among other things, on common sense and judicial experience. *Bell Atlantic v. Twombly,* 550 U.S. 544 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 668 (2009).

## ARGUMENT

## SUBJECT MATTER JURISDICTION UNDER RULE 12 (B) (1)

**A.  Concrete Injury.** The Gaza and West Bank Plaintiffs have more than amply alleged fear of imminent, concrete harm, i.e., death, physical injury, displacement, or the destruction of property. Judicial notice can be taken under Rule 201(a) of the Federal Rules of Evidence that since October 2023, more than 60,000 Palestinian civilians, including 18,00 children

have been killed by Israeli security forces operating in Gaza; more than 150,000 have been injured; 90 percent or more of the entire 2.1 million civilian population in Gaza has been displaced; that Gaza has been reduced to rubble by Israeli security units deliberately destroying civilian residences, commercial buildings, churches, and mosques; and that Israel's military is planning to displace every Palestinian civilian residing in Gaza. Defendant's own website warns Americans to refrain from travel to Gaza as a war zone. https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/israel-west-bank-and-gaza-travel-advisory.html. Indeed, it can be said without exaggeration that every Palestinian in Gaza has been adversely affected by Israel's post-October 7, 2023, industrial scale GVHRs and reasonably fears more to come. Israeli Prime Minister Benjamin Netanyahu, accused of war crimes by the International Criminal Court, insists the war in Gaza will continue until Hamas is "destroyed," a term of infinite elasticity to suit Mr. Netanyahu's political ambitions.

There is nothing hypothetical about the Sword of Damocles that hangs over the heads of the Gaza and West Bank Plaintiffs. Indeed, they would be delusional if they did not fear for their lives, liberty, and property 24 hours a day. Their fears are not subjective. They are objective and shared by the entire Palestinian population in Gaza. Defendant's dismissive refrain that Plaintiffs' allegations of fear of imminent death, injury, displacement, or destruction of property are speculative is absurd, like asserting Anne Frank's fear of discovery in Amsterdam and death by the Third Reich was hypothetical.

The Declarations of Amal Gaza, Gaza 2, and Gaza 3 (Exhibit 1) establish that all three are constantly terrified that Israeli military units implicated in GVHRs, including genocide, will kill or injure them as they have done to hundreds of thousands of their Palestinian cohorts in Gaza.

Their sleep is fitful. They have been in a state of high anxiety and stress ever since October 7, 2023.

Cases relied upon by Defendant concerned plaintiffs whose alleged imminent injuries were vastly more remote than living in an active and indiscriminate war zone like Gaza. As of May 2025, estimates from Euro-Med Human Rights Monitor put the total Israeli bombing of Gaza at approximately 100,000 tons of explosives, more than the collective bombings of Dresden, Hamburg, and London during World War II.

**B.**    **Causation.** The AC adequately alleges the Gaza and West Bank Plaintiffs' credible fears of imminent concrete injuries are traceable to Defendant's violation of the Leahy Law and APA. The AC alleges that Israeli security units involved in GVHRs, which imminently threaten Plaintiffs with concrete injury, i.e., death, physical harm, displacement, or destruction of property, substantially rely on U.S. weapons subject to the Leahy Law. Without such weapons, the foreign security units would be materially disabled from committing GVHRs that imminently threaten Plaintiffs. The military assistance the United States supplies to Israel in violation of the Leahy Law have no substitute. All Israel's jets, which are responsible for air-to-ground attacks, are US-origin. Even U.S cutoff of spare parts would have a significant impact. There are no alternative suppliers. Defendant's speculation that Israel could continue its GVHRs even if the State Department enforced the Leahy Law by replacing U.S. weapons with weapons from another country ignores arms embargoes over its human rights violations imposed by Germany and Italy, Israel's second and third largest providers of weapons. Many other countries have also imposed arms embargoes for Israeli's ongoing GVHRs in Gaza.

To repeat what was elaborated above: A senior Israeli Air Force official told *Haaretz* in September 2024, "Without the Americans' supply of weapons to the Israel Defense Forces,

especially the air force, Israel would have had a hard time sustaining its war for more than a few months." Similarly, Zohar Palti, a former intelligence director for Israel's Mossad, echoed this sentiment. in an interview with *The Washington Post* in October 2024, stating, "Without the U.S. weapons, Israel cannot fight." Former Israeli Defense Minister Yoav Gallant underscored this dependency in October 2023, explaining why he allowed limited humanitarian aid into Gaza, "The Americans insisted and we are not in a place where we can refuse them. We rely on them for planes and military equipment. What are we supposed to do? Tell them no?" Retired Israeli Major General Itzhak Brik provided further confirmation in November 2023, emphasizing, "All of our missiles, the ammunition, the precision-guided bombs, all the airplanes and bombs, it's all from the U.S. The minute they turn off the tap, you can't keep fighting. You have no capability... Everyone understands that we can't fight this war without the United States. Period."

C. **Redressability.** AC ¶ 74-78 relate:

Redressability is an essential component of Plaintiffs' standing to sue under Article III. Redressability requires a reasonable likelihood that the relief requested by Plaintiffs against Defendant will likely reduce or mitigate the concrete actual or imminent harms alleged. Plaintiffs' alleged harms include imminent fear of death, injury, destruction of property, displacement, or loss of consortium with Plaintiffs' families or relatives all caused by Israeli security units that have committed and continue to commit GVHRs that should prohibit them from receiving U.S. assistance under the Leahy Law. Plaintiffs reasonably allege that the relief requested, i.e., mandating Defendant to obey the Leahy Law vis- à-vis Israel in both its procedural and substantive dimensions, is reasonably likely to reduce Israeli security units' capacity to commit GVHRs and/or deter other units from committing GVHRs to avoid loss of U.S. assistance.

If the United States were to enforce the Leahy Law against Israeli security forces, it is reasonably likely that a substantial number if not all Israeli units operating in Gaza and the West Bank would be prohibited from receiving U.S. assistance due to credible information of unremediated GVHRs. Extensive evidence supports the finding that the GVHRs are occurring under the direct orders and command of the leaders of Israel's military forces: the Defense Minister and the Prime Minister, leading the ICC to issue arrest warrants against them. In other cases where the State Department finds a commander responsible for a GVHR, it "taints" the entire unit and all those under his command from U.S. military assistance. An appropriate State Department finding that the most senior leadership of Israel is responsible for directing and overseeing GVHRs, and whom the State of Israel has not and will not hold accountable, should "taint" all Israeli security force units operating in the Occupied Palestinian Territories under their command and prohibit them from receiving U.S. assistance.

Termination of U.S. assistance to most, if not all, Israeli units in Gaza and the West Bank that rely on the United States for their military arsenal would dramatically reduce the capacity of these forces to commit GVHRs and thus substantially lessen the imminent harms to the Gaza and West Bank Plaintiffs alleged in the Complaint.

Plaintiffs further allege that prohibiting assistance to Israeli security force units credibly implicated in GVHRs is reasonably likely to create a significant deterrent effect on the commission of GVHRs by both sanctioned and non- sanctioned units and thereby materially reduce the risk of harm Plaintiffs confront from Israeli military operations. Non-sanctioned Israeli security force units would likely refrain from further GVHRs to avoid jeopardizing their access to U.S. assistance on which they are heavily dependent. Leahy Law implementation to sanction units would also likely incentivize Israeli officials to take effective steps to hold responsible security force members accountable and ensure sanctioned units desist from further GVHRs to reinstate eligibility.

Such remediation and deterrence of further GVHRs are the precise intent and expectation of the Leahy Law. If it were implemented regarding Israel, it would reasonably likely diminish the imminent harms alleged by Plaintiffs.

Should this Court harbor any doubt regarding the adequacy of Plaintiffs' allegations establishing the three elements of Article III standing, Plaintiffs respectfully request jurisdictional discovery pursuant to Rule 12(b) (1) and an evidentiary hearing to develop the factual record necessary to resolve jurisdictional questions.

Jurisdictional discovery is available when facts going to jurisdiction are genuinely in dispute. As established in *Herbert v. National Academy of Sciences*, 974 F.2d 192, 198 (D.C. Cir. 1992), "ruling on a Rule 12(b)(1) motion may be improper before the plaintiff has had a chance to discover the facts necessary to establish jurisdiction" and "it may be necessary to hold evidentiary hearings in resolving particularly complicated factual disputes rather than to rely on affidavits alone."

Specifically, Plaintiffs seek discovery to establish: (1) the overwhelming military assistance subject to the Leahy Law that Defendant provides to Israeli security forces; (2) the material contribution such assistance makes to Israeli security units' capacity to commit gross violations of human rights threatening Plaintiffs; and (3) the reasonable probability that faithful enforcement of the Leahy Law would materially diminish Israeli units' capacity to commit such violations and would deter future violations. These facts are known to the State Department, Defense Department, or the Office of the Director of National Intelligence, among other federal government agencies.

### FAILURE TO STATE A CLAIM UNDER RULE 12 (B) (6)

**A.     Final Agency Action.** Contrary to Defendant (Mem. 22-29), Plaintiffs' challenge final agency action under the APA according to the two-part test announced by the Supreme Court in *Bennett v. Spear,* 520 U.S. 154 (1997).

Plaintiffs maintain that Defendant *de facto* has made a final decision categorically to exempt Israel from the Leahy Law. The decision is not interlocutory or provisional. Further, direct and appreciable legal consequences flow from that decision, i.e., U.S. security assistance is provided to Israeli security force units involved in GVHRs notwithstanding the absence of remediation in violation of the Leahy Law.

**B.     Agency Discretion.** Defendant has no discretion to create an Israel exemption from the Leahy Law. Congress withheld such an exemption in denying the executive branch waiver authority. Article II, section 3 of the Constitution saddles the Defendant with an obligation to take care that the Leahy Law is faithfully executed, not circumvented. Defendant does not make individualized, unit-by-unit determinations as regards Israeli security forces and GVHRs.  Instead, Israeli units are exempted by Defendant in advance of any individualized determinations irrespective of the facts and law and then Defendant concocts pretexts for exoneration. The rigged process has all the suspense of a marriage ceremony.

### CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss should be denied. Alternatively, the Court should authorize jurisdictional discovery and conduct an evidentiary hearing to resolve material factual disputes.

Respectfully submitted,

Bruce Fein, Esq.
Law Offices of Bruce Fein
300 New Jersey Avenue, N.W., Suite 300

28

Washington, D.C. 20001
Phone: 202-465-8728; 703-963-4968
Email: bruce@feinpoints.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2025, I caused the foregoing Plaintiffs'

Memorandum in Opposition to Defendant's Motion to Dismiss Amended Complaint under

Rule 12(b)(1) and 12(b)(6) to be filed with the Clerk of the Court using the CM/ECF system,

which will send notification of such filing to all counsel of record registered to receive

CM/ECF notices.

*/s/Bruce Fein*
Law Offices of Bruce Fein
300 New Jersey Avenue, N.W., Suite 300
Washington, D.C. 20001
Phone: 202-465-8728; 703-963-4968
Email: bruce@feinpoints.com

# EXHIBIT 1

Authentisign ID: 727C8566-E587-4415-87AC-57EE2029582E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMAL GAZA, et al.,

     Plaintiffs,

v.                               Case No.: 1:24-cv-3503-ACR

MARCO RUBIO, in his official capacity as
U.S. Secretary of State,

     Defendant.

---

## DECLARATION OF TIMOTHY RIESER

1. I served for 33 years as former United States Senator Patrick Leahy's foreign policy advisor. In that capacity, in 1997 I drafted what is customarily referred to as the Leahy Law. I also drafted all subsequent amendments to the Leahy Law.

2. The Leahy Law, 22 U.S.C. 2378d, is predicated on the intent and expectation of the United States Congress that units of security forces of foreign countries will cease or materially diminish committing gross violations of human rights in order to prevent the loss of United States assistance under the statute, and that by bringing to justice those who commit such abuses units of such forces will be deterred from committing gross violations in the future.

Pursuant to 28 U.S.C. 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this ___24th___ day of August 2025

Authentisign
Timothy Rieser
8/24/2025 11:21:19 AM EDT

_____

Timothy Rieser

Authentisign ID: 727C8566-E587-4A1D-A7AC-57FF20295822