**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMAL GAZA, *et al.* )<br><br>Plaintiffs, )<br>v. )<br><br>MARCO RUBIO, in his official capacity as )<br>U.S. Secretary of State, )<br><br>Defendant. ) | No. 1:24-cv-3503-ACR |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

On October 30, 2025, *The Washington Post* reported that the State Department's Inspector General (IG) has found that "Israeli military units committed '*many hundreds'* of potential violations of U.S. human rights law in the Gaza Strip that would take the State Department '*multiple years'* to review…." [Emphasis supplied]. Exhibit 1. The IG's finding marked "the first time a U.S. government report has acknowledged the scale of Israeli actions in Gaza that fall under the purview of Leahy Laws…." Id.

Plaintiffs' Amended Complaint, among other things, alleges violations of the Administrative Procedure Act, i.e., that Defendant arbitrarily and capriciously and contrary to law categorically refuses to apply the Leahy Law, 22 U.S.C. 2387d, to Israeli security force units about which credible information has been assembled demonstrating they have committed gross violations of human rights (GVHR). Amended Complaint, paragraphs 80-90. In contrast to companion foreign policy laws, the Leahy Law does not endow the State Department with discretion to waive its prohibition on United States assistance to any foreign security unit engaged in GVHRs.

1

A motion to dismiss a complaint under Rule 12 (b) (6) of the Federal Rules of Civil Procedure should be denied if the Plaintiff's claim is "plausible." See *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007). The State Department's IG finding reported by *The Washington Post* fortifies the plausibility as alleged in the Amended Complaint that Defendant has arbitrarily and capriciously and contrary to law waived application of the Leahy Law to Israel in violation of the APA. The IG finding is consistent with the undisputed fact that no Israeli security unit has been disqualified from United States assistance under the Leahy Law since its birth in 1997 some 28 years ago.

Respectfully submitted,

*/s/Bruce Fein*
Law Offices of Bruce Fein
300 New Jersey Avenue, N.W., Suite
300, Washington, D.C. 20001
Phone: 202-465-8728; 703-963-4968
Email: bruce@feinpoints.com

CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2025, I caused the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record registered to receive CM/ECF notices.

*/s/Bruce Fein*
Law Offices of Bruce Fein
300 New Jersey Avenue, N.W., Suite
300, Washington, D.C. 20001
Phone: 202-465-8728; 703-963-4968
Email: bruce@feinpoints.com

# EXHIBIT 1

# STATE DEPARTMENT IG REPORT

*Democracy Dies in Darkness*

EXCLUSIVE

# Classified U.S. report finds backlog of hundreds of possible Israeli human rights violations

The State Department's watchdog says it will take years to review credible allegations against Israeli military units in Gaza, according to officials, raising doubts about future accountability.

Updated October 30, 2025

 By John Hudson

A classified report by a U.S. government watchdog has found that Israeli military units committed "many hundreds" of potential violations of U.S. human rights law in the Gaza Strip that would take the State Department "multiple years" to review, according to two U.S. officials who relayed the details to The Washington Post.

The findings by the State Department's Office of Inspector General mark the first time a U.S. government report has acknowledged the scale of Israeli actions in Gaza that fall under the purview of Leahy Laws, the landmark legislation that bars U.S. security assistance to foreign military units credibly accused of gross human rights abuses.

U.S. officials, who discussed details of the report on the condition of anonymity because the contents were classified, said the watchdog findings raised doubts about the prospects for accountability for Israel's actions given the large backlog of incidents and the nature of the review process, which is deferential to the Israel Defense Forces.

"What worries me is that accountability will be forgotten now that the noise of the conflict is dying down," said Charles Blaha, a former State Department official in charge of the office that implements the Leahy Laws, who was told about the report.

The office of the inspector general declined to comment for this article but has acknowledged the report's existence on its website. "This report contains information that is Classified and is not available for public viewing," the webpage says.

The State Department and the IDF did not respond to requests for comment.

The report was completed just days before Israel and Hamas entered into a ceasefire agreement that saw the release of the remaining living Israeli hostages in exchange for Palestinian prisoners, a partial withdrawal of Israeli forces and the resumption of some humanitarian aid into war-ravaged Gaza.

Though the ceasefire technically remains in effect, Tuesday marked the deadliest day since the accord was struck, with Israeli airstrikes killing at least 104 Palestinians, according to local health authorities, after Israel accused militants of killing an Israeli soldier.

The Leahy Laws are named after former senator Patrick J. Leahy (D-Vermont), who sponsored legislation to impose consequences on foreign military units that receive funding from the United States and commit extrajudicial killings, torture and other atrocities.

Israel's two-year military campaign in Gaza, which has killed nearly 70,000 Palestinians since Hamas's Oct. 7, 2023, surprise attack on southern Israel, has tested the Leahy Laws' effectiveness. High-profile incidents in Gaza pending a determination are numerous, including the killing of seven World Central Kitchen workers by Israel in April 2024 and the killing of more than 100 Palestinians and wounding of 760 others gathered around aid trucks near Gaza City in February 2024, according to local health authorities.

The Biden administration flagged both incidents in a report to Congress last year, saying the United States had not yet reached "definitive conclusions" on whether U.S. weapons were used in the killings.

The U.S. provides at least $3.8 billion in aid to Israel every year — and in recent years tens of billions of dollars more — making the country the largest cumulative recipient of U.S. aid in the world.

The classified report explains the protocol for reviewing human rights violations by foreign militaries that receive U.S. assistance, said the two U.S. officials. In the case of Israel, it spells out how a bespoke bureaucratic process put in place by successive Republican and Democratic administrations advantages Israel over other countries facing similar allegations of human rights violations.

The protocol, known as the Israel Leahy Vetting Forum, involves higher-level U.S. officials and a lengthier process than reviews for other countries, the report says.

Under normal vetting, a single objection from an official is sufficient to withhold assistance from a military unit, said Josh Paul, a former State Department official and critic of U.S. policy in the Middle East. For Israel, a U.S. working group must "come to a consensus on whether a gross violation of human rights has occurred," Paul said.

That working group includes representatives of the U.S. Embassy in Jerusalem and the Bureau of Near Eastern Affairs, two entities that often advocate for Israel within the U.S. system. The Israeli government is then consulted on the incident and asked if it has taken any actions to address the matter. If the group finds that a unit has committed a gross violation of human rights, it can recommend that unit be found "ineligible" for U.S. assistance. The secretary of state then must approve the finding of ineligibility.

That byzantine system has created predictable results, Paul said. "To date the U.S. has not withheld any assistance to any Israeli unit despite clear evidence," he said.

The Biden administration came under criticism for refusing to halt aid to Israeli units accused of gross violations of human rights, including one implicated in the killing of American Omar Assad, a 78-year-old former grocery store owner from Milwaukee who had been detained at a West Bank checkpoint in 2022.

Assad was reported to have suffered a stress-induced heart attack after being bound, gagged and held by Israeli forces, the IDF said in a statement at the time. The IDF added that his death was the result of "moral failure and poor decision-making" by the soldiers who had detained him.

Though members of the Israeli unit ultimately faced no criminal penalties, the Biden administration said it was satisfied with the measures taken by the Israeli government and noted that the individuals in question no longer serve in the military.

The Trump administration has pursued a similar hands-off approach to the IDF but without reciting the previous administration's bromides about putting "human rights at the center of U.S. foreign policy."

"I don't see any difference between the Biden administration and the Trump administration on this issue," said Blaha.

Since coming into office, Trump has gone to war with the federal government's independent watchdogs, firing 17 presidentially appointed inspectors general, a breach of historic norms. The inspectors are watchdogs of Washington's vast federal bureaucracy, tasked with identifying and stopping waste, fraud and abuse and saving taxpayers tens of billions of dollars.

Trump has called the firings "a very common thing to do," and said that the watchdogs "were unfair." But the work of the watchdogs often doesn't result in predictable partisan outcomes.

Recent work by the watchdog overseeing the now-defunct U.S. Agency for International Development, for instance, has focused on an issue important to the Trump administration: the diversion of humanitarian aid for Gaza by Hamas.

The watchdog is currently gathering evidence from U.N. whistleblowers and other aid workers about Hamas and other militant groups stealing aid, said a U.S. official who spoke on the condition of anonymity because they were not authorized to speak publicly about the watchdog's investigation.

The probe is attempting to make sure "not one cent of taxpayer dollars should fund the salaries of terrorists moonlighting as humanitarian aid workers at the U.N.," the official said.