IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA


AMAL GAZA,                        ) CIVIL NO.:
                                  ) 24-3503-ACR
          Plaintiff,              )
     vs.                          )
                                  )
MARCO RUBIO,                      )
                                  ) November 24, 2025
          Defendant.             ) Washington, D.C.
_____ )


Transcript of Motions Hearing
Before the Honorable Ana C. Reyes
United States District Judge


APPEARANCES:

For the Plaintiff:   Bruce Fein, Esquire
                     Law Offices of Bruce Fein
                     300 New Jersey NW
                     Suite 300
                     Washington, DC 20001



For the Defendant:   Garry D. Hartlieb, Esquire
                     Stephen Elliott, Esquire
                     U.S. Department of Justice
                     Civil Division, Federal Programs Branch
                     1100 L Street, NW
                     Washington, DC 20005




Reported by:   Christine T. Asif, RPR, FCRR
               Federal Official Court Reporter
               333 Constitution Avenue, NW
               Washington, D.C. 20001
               (202) 354-3247


Proceedings recorded by machine shorthand; transcript produced
by computer-aided transcription


Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

P R O C E E D I N G S

THE COURT:  Good morning, everyone.  Please be seated.

Ms. White, could you please call the case.

THE CLERK:  This is civil action 24-3503, Amal Gaza, et al., versus Marco A. Rubio.

Would the parties please identify themselves for the record, beginning with plaintiff's counsel.

MR. FEIN:  This is Mr. Bruce Fein for the plaintiff.

THE COURT:  Good after- -- good morning, Mr. Fein.

MR. FEIN:  Thank you, Your Honor.

MR. HARTLIEB:  Good morning, Your Honor. Garry Hartlieb on behalf of the State Department.  And I am joined at counsel table by Stephen Elliott, an assistant director at the Federal Programs Branch of the Department of Justice.

THE COURT:  All right.  Mr. Hartlieb, did you write the briefing in this case?

MR. HARTLIEB:  I did, Your Honor.

THE COURT:  I thought it was exceptionally well done.  Very well done.

MR. HARTLIEB:  Thank you.

THE COURT:  So, Mr. Fein, could I see you, please.

So I read through all the briefing, and suffice it

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

to say, of course, that I am, as I'm sure everybody is,

sympathetic to the plight of individuals in Gaza who, through

no fault of their own, have been impacted by the events of the

last couple of years and even before then.

I don't see, however, how the plaintiffs here have

standing to sue.  And let me just go over some of what I think

some of the issues are.  And I read your papers, and I'm

not -- and I understand sort of the concerns you have raised.

I'm just not sure that a court is, you know, where you can get

those concerns redressed.  And I understand that -- you know,

I was hopeful that State would hear you out, and I guess that

hasn't happened.  And I'll talk to the government about that

when we get to the government.

But so it sounds like you have individuals in Gaza

and one individual in the West Bank, and I guess some

individuals in the U.S., and so far as I understand it, none

of the plaintiffs have been personally sort of tortured or

have faced, directly, human rights violations, other than a

question, I guess, as to whether or not displacement consists

of a human rights violation, and I'm not sure that it does.

And to the extent that they're concerned about future harm, it

seems to me like they have sort of the same generalized fear

as anybody in Gaza or the West Bank might have.

So my main concern is that I don't see that your

particular plaintiffs have a harm or a perceived or feared

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

harm that is different from what anyone else might feel in Gaza or potentially the West Bank. And that is before we get to whether or not whatever fear they have, whether it's imminent, whether it can be linked to military units of Israel that allegedly commit gross human rights violations, that even if it can be somehow connected to those particular units, that the money that they were using came from the U.S. and/or that the units hadn't remediated. As I understand, the State Department has found that five of them had concerns or gross human rights violations, but that the Secretary of State determined that they had remediated. And, you know, even if I thought we could get all the way there, I don't see how it's my role to tell the Secretary of State that he got it right or wrong.

So, you know, I'll let you go, but I have -- I just think that there is a number of steps of concern before we can get to even plausibly alleging standing.

MR. FEIN: Thank you, Your Honor. One, I don't believe that the generalized harm applies in this examination of standing. I think that the generalized harm that the U.S. Supreme Court has adverted to in requiring concrete injury relates to taxpayer standing.

Here, if you could contemplate maybe a class action by all those in Gaza, if they've all suffered a concrete harm, simply because the harm applies to everyone doesn't mean that

it's any less a harm.  So I don't -- I think that reliance is misplaced, because you're taking the taxpayer standing issue in the United States and, I think, applying it abroad where a huge number of persons are suffering concrete injury.

THE COURT:  But they're not all suffering concrete injury from the same unit or the same units; right?  So some of them would be suffering even if you could -- even if I got to where I could say, okay, you know, everybody is harmed, which I don't think we could do, I mean, I'm certain this would not survive a Rule 23 class action lawsuit, because there would be such individualized determinations.  But even assuming that we could get there, they're certainly not all being harmed by the same unit or group of units.  And even if they were, there's nothing tying those specific units that were doing the harm to units that have committed gross human rights violations.

MR. FEIN:  Well, we submit that on the merits, we would be able to establish that all or virtually all of the IDF are engaged in gross violations of human rights.  But that's something to prove; it's a factual question.

THE COURT:  So but in order to get there -- well, it's not just a factual question.  I mean, you have to allege it.  So I certainly can't take it as an allegation, I don't think, that all Israeli units commit gross human rights violations.  You can't possibly make that allegation.

MR. FEIN:  No, well, we have the State Inspector General -- State Department's Inspector General stating that there are literally hundreds of allegations of credible information of human rights violations by Israeli security forces, not one or two hundreds.  We don't have the exact number.

THE COURT:  It could be --

MR. FEIN:  That's why you have jurisdictional discovery when there are factual disputes.  We're entitled to at least have our day in court, even if that means we do the discovery with protective orders, with security clearances, with making clear that we're not trying to have this case adjudicated in the public, but when there are factual disputes.

And certainly, the scope of the magnitude of the violations is a factual issue, and the nature of the harm is a factual issue.  We may lose, ultimately, but you can't expect that we're going to go to Times Square and see it out on the sidewalk there.  That's why we're entitled to factual jurisdictional discovery.

THE COURT:  But what discovery would you want?

MR. FEIN:  Thank you, Your Honor.  We identified the areas of discovery properly.  And it's not all across the board discovery, just related to jurisdiction.  So we need discovery demonstrating what is the reliance of the IDF forces

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

operating in Gaza and the West Bank on U.S. weapons, U.S. military assistance.  Are there any alternate suppliers that Israel could turn to if we cut off that assistance.  And these are factual questions.

And --

THE COURT:  Well, but --

MR. FEIN:  And if we can establish, if we can establish that cause-and-effect relationship, the standard we have to prove for causation is it would substantially diminish the risk of additional displacements, maybe being killed, property destroyed, and things of that sort.  This is not a legal question, it's factual questions that we're entitled to delve into during discovery.

THE COURT:  Well, you're not entitled just to sort of go full borne into discovery without making -- so the first allegation you would have to make is you would have to identify which unit was committing whatever happened with respect to your particular plaintiffs, right, because without that, you can't possibly know if that unit had been receiving funds from the U.S., how much funds from the U.S., whether that unit was engaged in gross human rights violations, I mean, whether there was more than one unit involved, like what unit might happen in the future.

I don't see how we tie it -- I mean, if you had a situation where, you know, let's say, there was the unit

Yellow Pad, and the unit Yellow Pad was committing -- you know, was known to have committed gross human rights violations, and the unit Yellow Pad has a calling card.  They have -- they drop yellow leaflets when they commit their gross human rights violations.  And you have a plaintiff who's been tortured, and there's a yellow pad next to them and you can say I was tortured, I know it was the Yellow Pad group, and I know the State Department has given money to the Yellow Pad group.  I mean, then maybe, maybe you might have a claim.  But you don't have anything near that right now.

MR. FEIN:  Well, we're alleging -- this is systematic violations, gross violations of human rights, including genocide.  And I think it's fair to say you could take judicial notice of the scope and magnitude of the killings and the horrors.  This is not an isolated even Lieutenant Calley My Lai massacre.

THE COURT:  I don't -- I don't think a district court -- I mean, I can only imagine the headlines.  I mean, I don't think a district court can say I'm going to take judicial notice that the -- that the Israeli military forces all commit gross human rights violations.

MR. FEIN:  You can certainly take judicial notice of the International Court of Justice ruling finding that, provisionally, there's genocide ongoing.  That's something within your jurisdiction.

THE COURT: All right. I mean --

MR. FEIN: Then again --

THE COURT: We still have to tie it though to whatever State Department is giving the particular units or the particular Israeli groups. I mean, I'm not even sure if that's how State sets it up. I mean, I don't know if State says you get -- these weapons go to this unit and those weapons go to that unit. I mean, I'll hear from the government on that, but --

MR. FEIN: Well, we think that virtually all of the Israeli units are highly dependant on U.S. weapons and military assistance. And that's something that even if the State Department wants to stipulate that, if they want to avoid discovery, that's fine. But that is, I believe, a very critical element of establishing standing here; what is the dependency level. Because we also believe that there are not alternate sources of supply.

Most European governments have said because of the Gaza issue, they're not selling weapons anymore to Israel. It oftentimes takes years, if not generations, to switch suppliers of highly sophisticate military equipment. You don't get spare parts, your military arsenal could become obsolete very quickly.

These all are factual issues, Your Honor, that we may be able to establish or not with proper protective orders.

We don't necessarily win, but I think it's putting us in an impossible burden to suggest we don't have all these details, granular details, in advance. I don't think --

THE COURT: I don't think it's an impossible burden. It's putting you to a Rule 12(b)(6) burden of you can't just bring a case and I say I'm going to go ask the State Department for a bunch of discovery and if I get the discovery I think I'll get, then I have standing.

MR. FEIN: No, I understand. I understand. It's matters of degree, Your Honor. You're correct. It's got to be plausible, is our narrative plausible. And remember, we have a former defense minister of Israel saying, hey, without U.S. weapons, we can't do anything, so if they want us to do more humanitarian aid, we have to do what they want to -- ask us to do. That's not just our fantasy or a dream. These are concrete statements made by the highest levels of the Israeli government.

THE COURT: But if I -- let's say that you win, you totally win, you win everything, and I'm saying what -- what remedies do you want? What would you want the Court to do?

MR. FEIN: We want a remedy that requires the State Department to have a genuine rather than what we think is rather a Potemkin Village approach to examining gross violations of human rights where there's credible evidence to Israeli units, and we think the State Department's recent

report IG report suggests that is not happening.  They are not giving any examination at all.  Hundreds -- they say hundreds of reported Leahy violations sit on the doldrums of the State Department floor.  And we believe it's not fantastical to suggest that, de facto, the State Department has given Israel an exemption from the Leahy Law.  They're not entitled to it.  There's no waiver provision in there.

Now, that is a plausible, I think, argument to be made, since we have -- no Israeli unit has ever been disqualified in 20-some -- 28 years --

THE COURT:  But they have five, I guess, recently that they've said -- was it five?  Five, I guess, they suggested were having issues and that they remediated, and the Secretary of State says you've reviewed it.

MR. FEIN:  But they didn't --

THE COURT:  I can't second-guess the Secretary of State on remediation.

MR. FEIN:  We didn't ask -- whether there was remediation or not, the fact is no Israeli unit has ever been disqualified in 28 years.  Now, that suggests you can draw reasonable inference, well, maybe there's a de facto exemption here because Israeli military units are involved in very, very incendiary activities in the Middle East and not a single violation or every one of them has been remediated?  Again, maybe they can win their case, but we're at the discovery

stage.  I don't believe that what we're suggesting is some kind of fantastical nightmare that we dreamed, you know, in our sleep.  These are facts on the ground.

THE COURT:  Well, I don't -- I'm not suggesting that you dreamed a nightmare in your sleep.  I'm suggesting that, you know, you keep -- the problem is, is that when I try to nail -- this isn't a criticism of you.  This is just the nature of the case, this is not a criticism.  If we get to it's been 28 years and they haven't had any violations, then something must be going on, we've lost all tether to your plaintiffs; right?  If we focus on your plaintiffs, we've lost all tether to whatever unit might be doing this.  And the problem that I'm having is that there has to be some through line, and I don't see a single through line.

Again, if you had an individual that you could say was actually tortured by an Israeli unit in a way that amounted to a gross human rights violation, and we could sort of trace the funding of that unit potentially back to the State Department, then you'd have my full attention.  But just to writ large, Israeli units are committing gross human rights violations, and so, therefore, I'm going to give you discovery as to how much money Israel is getting and how dependant they are on arms from money from the U.S., I don't think gets you there.

Again, I'm not even sure that the complaint,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

horrific as what has happened has been, for whatever reason it has happened, and I'm not suggesting any way, shape or form why it has happened or that anyone has done anything. I'm just saying horrific as it has been what happened, in terms of people going hungry, whatever, I don't just think that any person in Gaza can come into court and say, I've been displaced, I fear being displaced or tortured in the future, therefore, I have standing to sue with respect to what the State Department is doing in terms of reviewing what money goes to Israel and to what units. Because then every single person in Gaza could come up here and do the same thing, and I'm quite confident that that is not permitted.

MR. FEIN: Well, Your Honor, I think -- and you're a litigator. It's very arduous to get anyone with the courage and boldness to file suit from Gaza. The idea that there would be tsunami of Gaza plaintiffs, I think, is fantastical.

THE COURT: Well, whether it's fantastical or not, I mean, logically, it could happen. The problem is, it's not that we're talking about a parade of horribles, it's a question how expansive do we want standing to be. I just don't think -- I mean, I understand this was with respect to the Supreme Court cases with respect to taxpayers, but it's not that different. I mean, understanding that someone who has concerns about their taxes, obviously, is a lot less harm

than someone in Gaza.  The two aren't even remotely close. With respect to logic and standing, the two are actually quite similar.

The point is, is that we don't want an individual and a society that's complaining about society-wide harms to be able to come and drag the government into court.  I mean, whether it's a taxpayer concerned about how the government is spending taxpayer funds, or whether it's someone concerned about how the State Department was allocating its resources, we still have sort of the same logical standing issue.

MR. FEIN:  Your Honor, I believe that being displaced nine, ten times, not knowing whether you'll survive the next morning given the scope of the violence in the West Bank, is a concrete injury by any yardstick, if we were considering a plaintiff in the United States.  I don't believe you could find any case domestically where, if that allegation was made, they say sorry, that's just speculative.

And I go back again to underscore, this is not a fishing expedition.  We now have the State Department's own inspector general saying there are hundreds, hundreds of credible allegations, credible information of Leahy Law violations that have been totally unattended to.  So I think the idea that this would be, you know, the slippery slope to, you know, Your Honor having hundreds of Gaza plaintiffs is not really very --

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

THE COURT: It's not -- I just want to make sure -- I just want to make sure I'm clear. It's not a slippery slope argument. I'm not suggesting that hundreds of Gazans are going to come into court, although, who knows. What I'm suggesting is, is that as a logical matter, if I say your plaintiffs have standing, there's no basis to claim that not every single person in Gaza has standing. And that should tell you something about the standing analysis not being correct, because that can't possibly be something that the U.S. standing law would contemplate.

Go ahead.

MR. FEIN: Are you letting me speak? I don't want to interrupt.

THE COURT: No, go ahead.

MR. FEIN: So anyway, I do think that we have alleged concrete injury. And if there's many concrete injuries, I don't think that it wipes out the concrete injury that, in the domestic context, would clearly satisfy, I believe, any element of Article III standing.

So -- but, Your Honor -- you're deciding that fact. I don't think that there's anything comparable in a domestic setting that would suggest if you're displaced from your home, you have to be worried, you know, about a threat and being killed the next day. That's not a concrete injury.

I think the Supreme Court has suggested even in the

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

declaratory judgment context that just fear of being arrested for an alleged speech violation, you know, justifies standing to stop or get an injunction against the prosecution. That's -- I think the law is pretty clear on that score.

THE COURT:  All right.  One second, please.

What was the date of the inspector general report?

MR. FEIN:  What was the date of the report?

THE COURT:  Yeah.

MR. FEIN:  It was attached, I believe, to our supplemental memorandum.  I think it was sometime in -- published in early November.

THE COURT:  Yeah.  Okay.

MR. FEIN:  But it should be Exhibit No. 1, Your Honor, to our supplemental memorandum.

THE COURT:  Yeah.  Okay.  Thank you.  That's where I was trying to find it from.

Okay.  So then the question I had on the inspector general report is, I'm not sure -- I mean, I understand, obviously, why you're citing it and why it's of concern to you.  But doesn't that just tell me that the State Department is going through the process it needs to go through and that it would be premature for me to weigh in on those findings?

MR. FEIN:  No, I think it shows, Your Honor, the State Department is not processing.  The report is that they're just sitting there.  That despite the fact that at

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

least subordinates in the office have provided credible information of gross violations of human rights, there's no action, they just sit there.  That's what the report states.

THE COURT:  All right.  Thank you.

Can I hear from the government.

MR. FEIN:  Your Honor --

THE COURT:  Go ahead.

MR. FEIN:  -- could I -- if you would just indulge me, just an observation about the so-called meetings where he's trying to work out something amicably with the State Department.  I want to underscore, Your Honor, and I'm not fault finding, that after your statement that you wanted us to try to get together and meet, we approached on several occasions without conditions.  We're willing to talk.  The gist of it, we got stonewalled.

THE COURT:  Who did you reach out to?

MR. FEIN:  No response at all of any sort.

THE COURT:  Who did you reach out to?

MR. FEIN:  We talked to Mr. Hartlieb.  He was the one that I spoke to on the other side.  I don't know who talked with the State Department.  There was no response at all.  It was complete stonewall.  To my mind, it was a farce. No engagement whatsoever as to how we might be able to work out a process we feel confident the Leahy Law was being applied even-handedly, nothing.

18

I don't want to find fault, but Your Honor should know that despite the fact that you were very explicit in what you expected.

THE COURT:  Yeah, I'm not usually subtle.  Okay.  Thank you.

Mr. Hartlieb, why didn't you guys get back to him if you didn't?

MR. HARTLIEB:  Good morning, Your Honor.  With -- well, I ultimately did get back to Mr. Fein with the State Department's determination on whether or not it would sit down with plaintiffs to have a listening session.  I'm not going to divulge confidential communications with my client, but I will represent that I took Your Honor's ask seriously and that it was considered, and a decision was reached that it was not going to be possible.  And that was communicated --

THE COURT:  Why is it not possible?  I mean, just sit down with the people and hear them out.  What's the big deal?  I mean, here's what's the big deal.  I'll tell you what would be a big deal to your client is if I order jurisdictional discovery.

MR. HARTLIEB:  I understand that that pressure is certainly there.  Part of the context of what was happening at the same time as this request to meet with plaintiffs occurred is there was a reorganization of the relevant functions and during an active reorganization, it was difficult to find the

right people.

But just speaking more broadly, just as you alluded to with respect to standing, that finding standing here opens up the floodgates. The State Department sitting down and having a meeting with every plaintiff that had a concern about some form of international conflict would overwhelm the State Department --

THE COURT: Would it really? I mean, how many cases are there? And if it did overwhelm the government, so what? Like there are -- I mean, the State Department works for taxpayers. Some of his clients are American taxpayers, as I understand it. I mean, they should be allowed to go to their government and ask for a meeting. It would be great if the State Department was flooded with people so concerned about what was happening that they were having to meet with them. I mean, that's what our government is there for; right?

MR. HARTLIEB: Yes, Your Honor.

I also want to make one additional point about the context of those discussions clear. At the last hearing before Your Honor, I thought the record was clear that this was to be a nonbinding meeting --

THE COURT: Yeah, sure.

MR. HARTLIEB: And the immediate request from plaintiffs was we are prepared to sit down and enter into a binding memorandum and settlement agreement with respect to

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

our claims.

THE COURT:  Okay.  Well, that was not what I was asking for.

Is that how you presented it, Mr. Fein?

MR. FEIN:  No, that's not true --

THE COURT:  Okay.  All right.  I'm not going to get into a back-and-forth as to what was asked and what wasn't.

All right.  Talk to me about this inspector general report.

MR. HARTLIEB:  Your Honor, the only thing I can say with respect to the inspector general report is that it exists.  And if you go to the State Department inspector general's website, there's a link to the report.  The report is classified.  I have not seen the contents, and I can't speak to the contents.  All I can confirm --

THE COURT:  How is it getting reported on?

MR. HARTLIEB:  I don't know how it made it to the *New York Times*, but I'm not in a position to be able to discuss this.

THE COURT:  Well, I'm allowed to review classified information, aren't I?  I mean, I can look at it in a SCIF; right?  I mean, I know I can.  That's not a question.  I can.

MR. HARTLIEB:  Yes.

THE COURT:  So the plaintiffs haven't seen it --

MR. HARTLIEB:  But the report itself is not public.

So if Mr. Fein has seen it, I don't know how he obtained the classified report.

THE COURT:  No, I'm just wondering if I can see it. I mean, can I order it produced to the SCIF?

MR. HARTLIEB:  I would -- if that is what Your Honor's inclined to do, I would respect a reasonable opportunity to confer with my clients and to --

THE COURT:  Sure.

MR. HARTLIEB:  -- explore the procedures and concerns about that.

THE COURT:  I mean, someone's seen it because it's being published -- because it's getting talked about.

And, Mr. Fein, is your information coming from news reports, or have you seen the report?

MR. FEIN:  No, I haven't been privy to the actual report itself.

MR. HARTLIEB:  If I may, Your Honor, I think that the report is -- while it may present intrigue, I don't believe that that is going to, you know, remedy the overarching problems with --

THE COURT:  I don't know.  I mean, it might remedy some of the standing questions I have.  It might remedy whether or not I order discovery for jurisdictional purposes. It might allow him to file an amended complaint if he's somehow able to look at it.  I'm not sure that he will be able

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

to.

I'm telling you right now, I'm not comfortable just dismissing this without knowing what's in that report given what the press is saying about it. I mean, but for that report, this would seem to be a lay down for me. But it's not nothing. It would be quite odd for a judge to look at a report that neither of the sides have seen. On the other hand, clearly, it's relevant to their cause of action.

And if -- I mean, I'm just looking at some of the reports, but -- I mean, this is -- this is a -- you know, a news article. Apparently, there was a *Washington Post* report. The inspector general found, quote, Many hundreds of potential human rights violations committed by Israel in Gaza. Report was completed just a few days before the cease fire.

Marked the first time a U.S. Government report has acknowledged the scale of Israeli actions in Gaza, the *Post* said.

"Watchdog findings raise doubt about the prospects for accountability for Israel's actions given the large backlog of incidents and the nature of the review process which is deferential to the Israeli defense forces."

Again, I'm not taking any view on this whatsoever. I have no idea if any of this is accurate. So I have no clue, I don't know, I'm just looking at what I'm seeing. That's a dumb way to put it. I'm just reading what I'm seeing. It

specifically apparently mentions the Leahy Laws.

I mean, what classification is it under?  You said it's classified?

MR. HARTLIEB:  I don't have knowledge of that.  I'd have to consult my client.

THE COURT:  You said -- I'm sorry, you said it was cited in what -- you said it was referred to in some department website?

MR. HARTLIEB:  Sure.  The State Department inspector general acknowledges the report exists -- I believe the website is stateoig.gov/report/isp-s-25-08, and it's entitled "Classified Review of the Department of State's Implementation of Leahy Nontraceable Assistance Requirements."

But if I may, Your Honor, the point I wanted to make was just, stepping back broadly to the context of this suit, I think there's two issues that still permeate.  And I don't want to get ahead of Your Honor's thinking, but I think these are two important things to keep in mind.

First, Your Honor mentioned a recent cease fire.  And in the context of standing, where plaintiffs seek an injunction that seeks prospective, forward-looking relief, they need to allege certainly impending future injury.  And the mere fact of a change in conflict, the mere fact of a cease fire itself is suggesting -- would suggest, on its face, a lower likelihood of an imminent injury.

The fact is this suit has been pending for a year. There's been no notice of supplemental authority or supplemental allegations about any harm that these specific plaintiffs have suffered. And these specific plaintiffs need to allege an imminent actual and concrete particularized injury. So first, I think the future injury remains an uncertainty and that remains a standing defect.

And second, I also want to highlight what it means with respect to the APA based on the colloquy you had with Mr. Fein recently. The remedy he seeks is for a broad follow-the-law injunction, and that's not proper relief in an APA claim. An APA claim looks at a specific agency action on a specific date and time. And you can compile an administrative record that looks at whether or not the agency's action complied with the law or was arbitrary and capricious.

THE COURT: Well, what if he amended his complaint to say something to the effect of, you know, I don't know, on X date, U.S. sent funds to Israel notwithstanding the Leahy Law, you know, that the Leahy Law should have prevented the sending of the funds. I mean, the sending of the funds, notwithstanding what the Leahy Law required, would be a concrete agency action; right? I mean, I understand it would be retrospective and wouldn't provide for future injunctive relief, but that would certainly be something that he could

allege; right?  And certainly, given what's in this potential report, is something that he could make out, no?

MR. HARTLIEB:  I think the question of whether that is a discrete final agency action, I don't know if I could say that because what the Leahy Law does allow is for advance funds to be sent with ongoing monitoring and review pursuant to an agreement entered into with the receiving country that receives that aid --

THE COURT:  Well, he would say the advance funds were set without that agreement for monitoring, because I'm guessing that no agreement was reached.

MR. HARTLIEB:  I know in -- this was discussed in our brief that Israel had signed, the Memorandum of Understanding at least in 2021.  I can pull and look for other agreements, but I would have to believe that those agreements had been made with every subsequent congressional funding authorization or appropriation.

But stepping back more broadly, my point was simply that as plaintiff's counsel was up here, he was challenging conduct over 28 years and referred to a de facto exception. Neither of those things lend themselves well to review under the APA as final action --

THE COURT:  No, I agree with that.  That's clearly true.  But I'm just wondering whether there's a complaint -- there's an amended complaint possible here.  And, I mean,

again, you had an excellent brief.  I didn't think this was going to be a particularly close call, until I saw the inspector general report.  And that's my only hesitancy right now.

MR. HARTLIEB:  If I may, Your Honor, I think the fact that -- I'd still go back to standing again.  And now let's focus on the injury and your Yellow Pad example.  The plaintiffs in this case have not alleged the factual predicates that would even make some of those inquiries into what the State Department did or didn't do relevant.  There's no identification of a particular Israeli unit that is alleged to have committed gross violations of human rights as defined in the statute, as applied to these particular plaintiffs.

This isn't a question in the abstract.  And so because they don't even have the factual predicates to even identify, okay, I would like discovery into the source or the appropriation or the decision about the arms transfer to this particular unit on this particular date, that continues -- that standing issue continues to be a defect, even if there was some sort of inquiry, but that inquiry wouldn't solve that these people haven't identified what specific future injury they will suffer or why.  It's undifferentiated harm.

And, you know, the case I cited, *New York Center for Foreign Policy Affairs*, that concerned U.S. Provision of F35 -- fifty F35 jets to the UAE, and the Court found that the

plaintiffs were alleging undifferentiated harm insofar as they were trying to talk about what those jets would be used for. It rested upon chain upon chain of speculation and inquiry.

THE COURT: Well, let me just ask you about the

The problem in this case is it's not one aspect of discovery into one thing is going to remedy it. There are multiple, multiple chains that have to be resolved in order just to try to tether an injury to plaintiffs. And even plaintiffs aren't alleging specific injuries that they themselves will suffer. The underlying claim is that it's going to be loss of consortium via a distant relative, an aunt, an uncle, a cousin.

THE COURT: But not the people in Gaza. There are plaintiffs actually in Gaza; right?

MR. HARTLIEB: There are some plaintiffs in Gaza, but they are alleging primarily claims of speculative injury relating to how future relatives or themselves may be harmed.

THE COURT: Well, let me just ask you about the forced displacement. I mean, you say in your brief that forced displacement isn't a gross human rights violation. Is that -- I mean, I don't think I can say that as a matter of law, can I? Or is that more of a matter of fact?

MR. HARTLIEB: Well, so the Leahy Law, for its definition of gross violations of human rights, pulls that definition from a different aspect of the Foreign Assistance

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Act of 1961.  And if you give me just a moment, I will give you the citation.

It pulls from 22 U.S.C. 2340(d), and it expressly defines the term as "torture, cruel, inhumane or degrading treatment or punishment, prolonged detention without charges in trial" --

THE COURT:  Sorry.  You need to slow down for her. When you read, people go faster.  So can you just start again and go slower.

MR. HARTLIEB:  Happy to, Your Honor.

This citation is 22 U.S.C. 2340(d), and it expressly lists, within the definition of gross violation of human rights, the following:  Torture or cruel, inhumane or degrading treatment or punishment, prolonged detention without charges and trial, causing the disappearance by abduction and clandestined detention of persons.

And then there's a catch-all of "broader":  Other flagrant denial of the right to life, liberty or the security of the person.

THE COURT:  I mean, getting bombed out of your house nine or ten times would seem to count.

MR. HARTLIEB:  Pardon me?

THE COURT:  Getting bombed out of your house nine to ten times would seem to count.  I mean, I think one of them alleges that she was -- or he was bombed out repeatedly.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Again, this is a motion to dismiss, and so I have to, you know, obviously take the allegations as true.  I mean, one of them was in a shelter that was struck in November of 2023.  One of them was not only displaced but lost all of his or her possessions.

You know, I mean, so -- so Plaintiff 1 has forced displacement, property loss, and the death of 20 family members.  Certainly, I mean, I think being traumatized by the death of people getting killed around you would be an issue.  Another one claims, you know, they were traumatized -- that, in and of itself, might not be enough, but were struck in a shelter.  Maybe, maybe not.  Somebody displaced and losing all of their possessions, I just -- all right.

MR. HARTLIEB:  So my response, and I --

THE COURT:  Sure.  Go ahead.

MR. HARTLIEB:  -- recognize Your Honor's understanding and recognition of the difficult situation in Gaza.  The difficulty with looking at past incidents is this complaint seeks prospective relief.  It's seeking --

THE COURT:  Well, I was about to ask, though, I mean, under the APA -- and I'm not being facetious or -- I'm not being falsely modest.  Under the APA, I assume that people can seek retroactive relief, right, or they can seek some sort of damages, or no?  Are we just talking about injunctions?

MR. HARTLIEB:  You certainly cannot seek monetary

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

damages under the APA.  That's not allowed.

THE COURT:  Okay.  That would be a tort claim.  Right.

MR. HARTLIEB:  There's no tort claim in this suit, and there's no private cause of action under the two applicable statutes related to the Leahy Law.  So the Foreign Assistance Act of 1961 and the Arms Export Control Act, AECA, there's no private cause of action there, there's no tort claim here, there's no monetary --

THE COURT:  But can I enter a declaration that said that -- maybe not granting injunctive relief, but can I enter a declaration as to sort of failures in the past?  Could I say the State Department violated the Leahy Act by doing X, Y or Z?  Not that they did.  I'm not suggesting they did.  I'm just asking the sort of legal question.

And I'll hear from Mr. Fein on this.

MR. HARTLIEB:  I think --

THE COURT:  Because I tend to agree with you that I don't -- I mean, short of -- and I'm still very concerned about this inspector general report.  But putting that aside, I tend to agree with you that I can't order prospective relief.  I certainly can't order the State Department to stop sending -- or the government to stop sending aid to Israel.  That, I'm pretty sure I can't do.

But I'm wondering if there's something else that

Mr. Fein would want -- or that I could do retrospectively if -- if, if -- if he had standing and if I found a violation. I'm just trying to think this through.

MR. HARTLIEB:  So by --

THE COURT:  And part of thinking it through, to figure out whether or not I should order briefing on whether I can look at this report.  That's why I'm thinking this out loud, just so you know.

MR. HARTLIEB:  By definition, APA actions are always looking backward at an agency decision.  And the remedy, traditionally, under an APA decision, if it's found to be arbitrary and capricious, would be to set it aside and to remand to the agency for further decision-making.

But by definition, if you actually had a discrete final agency action for which you could put together an administrative record, which, to be clear, you cannot do on this case on this complaint with the facts that are alleged with the breadth of this complaint.  So, you know, the Court, in any APA case, would be looking backwards and would be declaring or setting aside some sort of action.

The problem here is that --

THE COURT:  I can't -- yeah, I'm not going to set aside a funding; right.  I'm not going to set aside the U.S. decision to send funds to Israel.

MR. HARTLIEB:  And that's where I was going to take

it, is that leads us right back to redressable injury. So insofar as plaintiffs have been injured in the past, is there anything that this Court could do that would redress that fear of future injury. Again, it's not a past injury, it would be a future injury, and the question is what can the Court do to redress it.

And even in an extreme situation where no aid was provided to Israel at all, and the Court made that finding to cut off all aid to Israel, that doesn't even resolve the question of redressability because there's still a question: Is Israel going to pursue domestic manufacturing. Is it still going to pursue a conflict despite having recently entered into a cease fire. Is Israel going to cozy up to another foreign nation that maybe doesn't have the same concerns about human rights as the United States and obtain arms from there.

Those are all speculative questions for future injury that are not solved even if the Court looks backwards and says, well, in this particular time, maybe we could have done it a little bit better. It's just the tough reality of these claims.

THE COURT: Okay. All right. Thank you.

MR. HARTLIEB: Thank you, Your Honor.

THE COURT: Mr. Fein, just a couple questions for you. One, on the cease fire, I mean, there was a question I had for you, and he reminded me I wanted to ask it, which is,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

so far as I understand, there's a cease fire.  So what does that do to the sort of imminent harm concern?

MR. FEIN:  Well, since the announced cease fire, there have been hundreds of continued killings in Gaza.  Also it does not address the West Bank, and we have West Bank plaintiffs.

THE COURT:  We have one West Bank plaintiff; right?  And that plaintiff, I felt like, had the least standing.  That plaintiff lives in the West Bank, has a leading Palestinian human rights organizations in the West Bank and fears imminent attack.  But that, to me, is -- I mean, that, to me, is -- of a bunch of questionable standing claims, that's certainly the most questionable; right?  You just can't have somebody in the West Bank saying I fear injury.

MR. FEIN:  No, I understand.  The standard would apply within the West Bank and Gaza in terms of the reasonableness of concrete fear of being injured.

THE COURT:  Okay.  So the answer on the cease fire is that, notwithstanding the cease fire, people keep getting attacked.

MR. FEIN:  Yeah, hundreds.  It's not one stray bullet, Your Honor.  So that's the first thing.

THE COURT:  Okay.

MR. FEIN:  Go ahead.  I don't want to.

THE COURT:  No, no, go ahead.

MR. FEIN:  I want to underscore as well, with regard to what we believe was stonewalling, we never placed any preconditions and said we're only going to meet if you agree to settle on X, Y, Z terms.  That's simply a complete gross misrepresentation of the facts.  We took your guidance --

THE COURT:  I believe both of you.  Clearly, there was a miscommunication.  I have no reason to doubt Mr. Hartlieb.  I have no reason to doubt you.  Understand there must have been a miscommunication, with respect to redressability.

MR. FEIN:  Okay.  So, now, with regard to what Mr. Hartlieb has said is the absence of any final agency action, what we have alleged is there, as supported by the AIG report, de facto, a de facto --

THE COURT:  But we don't know -- hold on.  We don't know that the State IG report supports you because no one has seen the State IG report.

MR. FEIN:  Well, the State IG report, assuming we could look at it and it's accurately reported by the *Washington Post*, says that there are references to information indicating Leahy Law violations that just sit and go nowhere.  Now, you have a very interesting prospect of looking at the report in camera and deciding for yourself.

But the allegations that we're making in terms of an APA violation are a de facto exemption that the State

Department, in fact, has made a preconceived decision.  We are not going to disqualify any Israeli unit.  Whatever else happens, there's not going to be any disqualification.

THE COURT:  But clearly --

MR. FEIN:  That's across the board, Your Honor.

THE COURT:  But clearly -- but there's no allegation there's a memo out there.  I mean, I can't believe anyone would be stupid enough to put that in a piece of paper.  But like, you know, a concrete -- final concrete agency action can't just be in the ether.

MR. FEIN:  Well, Your Honor --

THE COURT:  Right?  I mean, if there was a memo that said that, then, yeah, would you have -- I still don't know you would have standing, but then definitely you would have a final agency action.

MR. FEIN:  No, because you know how Washington, D.C. works.  When Colin Powell was Secretary of State --

THE COURT:  If I knew how Washington, D.C. works, I'd be a gazillionaire, because I would tell everybody.

MR. FEIN:  All right.  I retract the statement, but it was intended as flattery.

THE COURT:  No, I hear you.  I hear you.

MR. FEIN:  Okay.  But Colin Powell himself, in his memoir, says he ordered everybody not to write anything down because you'd get a FOIA request.  So we can't expect them to

confess, on paper, a violation.

And I don't want to exaggerate the comparison, but it's a little bit like during Jim Crow in the South. Did you really have to write a memo, no black is going to drink at the drinking fountain or no black is going to vote?

THE COURT: Well, they did write it.

MR. FEIN: No black is going on the trolley car? It was just understood because of the culture. And we're saying that if you put all -- the AIPAC, the Israeli lobby, the culture, over long, long periods of time, that it's a plausible argument that there is operating a de facto exception supported at least by two things: One, not a single ineligible unit in 28 years; and, two, now we have something, once you can look at, the State Department IG report, and give yourself a sense of whether there's a de facto exemption that's applied here.

But one of the reasons for jurisdictional discovery, of course, or the merits discovery, is ask somebody who is responsible for processing allegations of gross violations of human rights with Israel and put them under oath. Well, is there -- are you told, basically, under the -- sotto voce? No, if it's Israel, they get a pass. That's the gist. And it's not an implausible theory that we've adduced here on.

THE COURT: I mean, let's say that I look at this report -- and again, I'm going to say this a gazillion times

because I don't want to be quoted out of context.  I don't want people flipping out.  Let's say I look at the report and, hypothetically, it supports your view, and, hypothetically, it says the State Department made a determination to give money to Israel notwithstanding the Leahy Act.  Let's just say it just says exactly what you just said to me.  Right?  I look at it, it's classified.  You can't look at it.  Defense counsel can't look at it.

I'm not sure what I can do at that point.  I mean, I guess I could order attorneys to enter appearances who have access to classified information and I can sort of have a classified amended complaint.  But, seems kind of odd.  I mean, I still would have to find there's enough in your complaint to allow the discovery.

I mean, I guess if you had an amended complaint that alleged -- that made allegations concerning -- I mean, right now there's no allegation in your complaint about the inspector general report, for obvious reasons.  It was filed after your complaint was filed.

MR. FEIN:  Your Honor, we can obviously look at documents and SCIFs.  We can get security clearances.  We're not trying to jeopardize any genuine State secrets or executive privilege.

But I would wanted to go, if I could, briefly, Your Honor, to discuss a possible remedy.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

THE COURT:  Oh, yeah, I want to get to remedies.

MR. FEIN:  When we know that in the labor context, the -- if there's not a showing of good-faith bargaining, you can get an injunction ordering the parties to engage in good-faith bargaining.  And you can imagine a similar order saying, going forward, you have an injunction, you have to have a good-faith examination of the credible information of human rights violations.

THE COURT:  But then isn't there case law that -- I thought Mr. Hartlieb quoted to me some case law that says I can't just enter an order that says, State Department, yo have to follow the law, because they're just supposed to be following the law.  And if there's an order saying you have to follow the law, then they're stuck with potentially violating a court order when interpreting the law and applying it, and I think that's something that Courts don't allow or contemplate.

MR. FEIN:  No, I think -- I'm not exactly sure that would be the complete picture here, because you could imagine in the labor situation where the employer is under injunction to engage in good-faith bargaining, there still has to be good faith, not stonewalling.  So the injunction would simply state, not in a particular case, you have to find a violation or not, but there's sufficient evidence that in the past, that there's been a wholesale of what we call a de facto exemption

of Israeli units from examination of the Leahy Law supported by the State IG report, and, going forward, we have an order that you have to examine the credible information of gross violations of human rights by Israeli units.

Doesn't necessarily have to be a carbon copy of everybody else, but it has to be a good-faith examination, not what the State IG report indicates.  We don't look at them at all.  They come in, we know Israel is never going to be disqualified.  It's a decision made in advance, before they even look at it.  That's a remedy.  Maybe it's not the perfect remedy, but I think it avoids the kind of nightmare suggested by the State Department.

THE COURT:  Am I allowed, under the APA, to just make a declaration that the agency has not followed the law in the past and not say anything else?  Is that something --

MR. FEIN:  I think -- I think you could issue a declaratory judgment, Your Honor.  I think -- and that you would expect that a declaratory judgment, at that stage, is not an injunction, would be followed by the State Department. They have a good-faith obligation to take care that the laws being faithfully executed, not always honored most recently. But that's in Article II Section 3:  Take care that the laws be faithfully executed.  And you can trust, based upon that obligation, that issue a declaratory judgment would have an impact.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

THE COURT:  All right.  Here's what I'm inclined to do.  And I'll hear both counsel out on this.  I'm sure Mr. Hartlieb and Mr. Elliott will want to have some say in this.  What I'm inclined to do is deny the motion to dismiss as moot and give you leave to amend your complaint to account for everything in the motion, to try to buttress the standing issues that are discussed in the motion, and to allege, if you would like, what you have learned, or at least from the *Post* what you have learned with respect to the inspector general report.

And to the extent that, you know, you can make allegations based on news report -- and you'd have to look at the law on that.  I don't know the law on that.  I'm not sure you can.  But if you feel -- and again, I'm not saying that you're legally allowed to do this.  I don't know.  I haven't looked at it.  I'm just throwing it out there, that I will give you an opportunity to amend your complaint in light of the initial motions and the inspector general report, should you wish to reference it, if the inspector general -- if you're able to amend your complaint to add the inspector general report.  And if you do that, then what I would be inclined to do is to get briefing from the parties as to whether or not I'm entitled to look at the inspector general report myself in a SCIF.  And then I don't know what I would do from that point forward.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

But I'm stuck between a rock and a hard place, because I have serious concerns about standing.  On the other hand, I have a document that, at least based on what someone is saying, you know, would be directly relevant to everything that's being stated in the complaint and might actually address some -- if not some, maybe all of the standing issues. I don't know that it would, but I'm just loathe to just dismiss this with that hanging out there.

So let me hear from the government on what I should do.

I assume that would be fine with you, Mr. Fein.

MR. FEIN:  Yes, Your Honor.

THE COURT:  As opposed to just me dismissing it. Okay.

Do you want some time to talk with Mr. Elliott about this?  Should I take a break?

MR. HARTLIEB:  I think that's a good idea.  Thank you, Your Honor.

THE COURT:  Okay.  Why don't we take a 14-minute break.  Let's come back at 12:10.

I haven't made a final decision about what I've just said.  It just seems to me that that's the most cautious way to proceed.  But I'm -- you know, I'm willing to hear things out.  I mean, what I don't want -- here's what I don't want. I don't want to be in a situation where I dismiss the case on

12(b)(6) grounds where I can later be accused of not giving inferences to the plaintiffs and not allowing them to amend in light of a motion to dismiss, particularly with this, you know, document out there.

Now, it may be that they amend and they're not able to put in the document because, I don't know, legally, you can't file a complaint based on newspaper reports. I don't know that that's the case. I'm just saying that as a hypothetical. In that case, then we know you -- we wouldn't have to replead everything. I could just then retake up your motion at that point. Or if they do amend to add the complaint, then we could have discussions as to what I can do from that point forward. But I'll let you discuss that.

And let's actually -- let's come back at 12:15. Okay.

MR. HARTLIEB:  Thank you, Your Honor.

(A recess was taken.)

MR. HARTLIEB:  So when we broke, Your Honor had asked about a suggestion of denying the motion to dismiss as moot and granting leave to amend and, secondarily, what to do about this inspector general report. So I'm going to take those two points in turn.

I would like to try to emphasize why denying the motion to dismiss as moot would not resolve the remaining issues in this case. I don't see this complaint as one for

which leave to amend is going to resolve the numerous standing deficiencies at every level. And I want to be clear, right, this case has been pending for over a year. Plaintiff has amended the complaint once. So this would be a second leave to amend.

But the standing deficiencies that we've outlined occur at three levels. There's the injury in fact, which is plaintiff's reporting about what imminent injury they themselves are going to experience in the imminent future. And there's been no factual pleading about any of these particular plaintiffs alleging what is going to happen. And since the case has been conducted, in response to the motion to dismiss that was briefed this fall, there were no declarations by these plaintiffs providing any further color into those facts or circumstances about the imminent nature of their injury. That repeats with causation and redressability.

THE COURT: So is it your position that because they don't -- that that alone, I could just dismiss the entire case, that alone. They don't have an imminent fear of future injury, irrespective of whatever injury they might have had in the past.

MR. HARTLIEB: Yes. And the cases cited in our brief have dismissed claims like this involving U.S. foreign assistance to other countries, foreign military assistance,

including by both sides of this conflict.  There's *Halley v. Blinkin*.  There's *Bernstein v. Kerry*.  Both of those cases found lack of standing in this very same conflict between Israel and Hamas, challenging different sides of that funding issues.  So -- but it's all three levels there.

But the standing issues are not just then what happened to plaintiffs.  There's also the, okay, what did the State Department do with respect to the Leahy Law side of it.

But we haven't even talked about the other factors here which are the foreign sovereign, who's not a party to this court, that is an independent actor.  And courts routinely find claims of this nature.  Plaintiffs don't have standing, and their claims are not redressable where the actions of the government are then in the hands of an independent third party who can do what it or -- whatever it will or won't do.  And that is ultimately the direct cause of the plaintiff's injuries.

So even if we resolved this one inquiry about was the Leahy Law complied with in its entirety over a period of 28 years, which, again, is not a reasonable inquiry and is a fishing expedition, that is not limited to a discrete agency action or inaction, you still have redressability concerns.  The standing concerns are still there.

And so -- and I think it's important -- I'd go back to the colloquy that you have with Mr. Fein recently and to

think about, you know, fundamentally, *Ashcroft v. Iqbal*, what is speculative and what's conclusory allegation.  What he said is that there's no document that's going to have a State policy that says we're not going to enforce it, yet there is this unwritten policy, and somehow that's existed over 28 years, across multiple different presidential administrations, and that policy, unwritten policy, has never come out.  That smacks of conclusory allegations that are not supported by fact.  And to get discovery based on that is an unwarranted fishing expedition.

And so I would respectfully contend that the Court should grant the motion to dismiss as it is now.  And there's numerous deficiencies.  The Court can pick any one of the numerous standing issues.

THE COURT:  They haven't -- have they -- when they amended their complaint, did they amend it in response to a motion to dismiss?

MR. HARTLIEB:  They amended sua sponte.

THE COURT:  So, I mean, even if I dismissed the complaint, I'd be hard pressed to do it with prejudice; right?  I'd have to let them have leave to amend anyway.  I mean, particularly -- I mean, I think it would be -- that probably would be reversible error, to dismiss a complaint with prejudice where they haven't yet seen the motion to dismiss.

MR. HARTLIEB:  Hearing Your Honor's concerns on that

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

front, what I would then propose is we start to talk about next steps is, if Your Honor's inclined to grant them leave to amend, that the amended complaint first be filed, and we have an opportunity to brief and see if they have cured all of the numerous chain upon chain of speculation to establish standing.  And if the last remaining piece is the Leahy Law and the inspector general, that the Court conduct further proceedings and that then we revisit how to proceed with this article at that point.

But I would not lead with that article, because I still think that there are numerous other issues regarding plaintiff's standing.  And I don't believe that those will be able to be cured by an amended complaint.  But I certainly appreciate Your Honor's concerns about reversibility if they don't have leave to amend.

So if they want leave to amend, I think that we should first see what that is, see what their factual allegations are, see if we're even talking about a narrow and discrete agency action.  But if we're left with another, the State Department has de facto not done something for an extended period of time, I would expect that I would file a substantially similar motion to dismiss and, you know, we'd discuss that at that point.

So if the concern is that they need to amend and they've got other factual evidence -- and to be clear, I

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

haven't heard anything from Mr. Fein that there are specific new facts that are going to resolve these things.  I think that's an important thing Your Honor should also consider, if you're concerned about prejudice of not granting leave to amend, do you have actual knowledge from plaintiffs that they do have factual pleading that is going to remedy the standing. If that exists, I completely understand granting leave to amend.  If that doesn't exist, then it does strike me as something that could be denied.  If there were motion to amend, that it would be denied on futility grounds.  I would certainly oppose it on futility grounds absent that additional factual information.

So, again, with respect to the newspaper article, my counsel and I have and can obtain the necessary clearances to look at it, but I think we should just address that much later on.  In the meantime, opposing counsel is welcome to submit a FOIA request to see if any bit of the report is public or can be released.  But I would remind Your Honor that security clearances are -- reside within the President's plenary authority.  The President has, and the executive, has sole exclusive control over who and whether to issue those, so there's no indication that those -- that access or clearance would be issued in this case.

Again, I think we can table all that --

THE COURT:  Can't take away my clearance.  That, I

know.

MR. HARTLIEB:  Not yours.  Certainly not yours, Your Honor.

THE COURT:  That's the one thing I know.

Okay.  All right.  I mean, I had suggested focusing, after the amended complaint, on the inspector general issue just to save you additional briefing.  But obviously, if you want to do it, it makes sense the way you've laid it out.  I think that makes a lot of sense, to, you know, go through the process.

Assuming you want leave to amend.  I mean, do you want leave to amend?

MR. FEIN:  Yes, Your Honor.

THE COURT:  Okay.

So why don't we do this.  I'm going to deny the motion as moot, without prejudice.

I will grant you leave to amend.  How much time would you like?  I don't care, it's up to you.

MR. FEIN:  If you could give me --

THE COURT:  Well, why don't you guys just come up with a briefing schedule that doesn't interrupt his holidays or your holidays.  You just put together a briefing schedule for the amended motion -- amended complaint motion.

But, Mr. Fein, I urge you -- he's right.  I mean, if you're just going to come back with they haven't done this for

28 years, he has a lot of good points.  So I would suggest that you carefully review the motion and this transcript and see if we can get more specificity on this, to the extent you can.

MR. FEIN:  Could I address the Court?

THE COURT:  Sure.

MR. HARTLIEB:  Before I cede the podium, Your Honor.

THE COURT:  Sure.

MR. HARTLIEB:  Just a question in terms of the path forward.  I think we've talked about fully rebriefing this and the amount of paper that we're going to put before Your Honor.  I don't know if you have suggestions about ways, either supplemental facts and briefing on supplemental facts, if you want something --

THE COURT:  Yeah, I mean, if you just -- yeah, when you get his amended complaint, if you want to say my brief stands, I'm just going to reissue the brief, but I'm just going to add, like, this supplement at the end, or, I'm just going to, like, take the exact same brief but pepper in new things, I will read whatever you put in front of me.  I don't want to create extra work on your part.

MR. HARTLIEB:  Okay.  Well, I'm sure that I can work with Mr. Fein, and we can figure out a path that makes sense for us both.

THE COURT:  And it makes sense after you've seen the

amended complaint.  Yeah.  Okay.

MR. HARTLIEB:  Okay.  Thank you, Your Honor.

MR. FEIN:  Thank you, Your Honor.  Just a couple of points.  I think you need to at least examine the 28-year hiatus without any reporting of a single Israeli unit being ineligible, with literally, the hundreds of thousands of other units that have been found in violation of the Leahy Law and have remedied.  That just puts in context what inference there is.

THE COURT:  I mean, that might put it in context for me, but I still need a concrete agency action.

MR. FEIN:  Correct.  That is correct.

THE COURT:  Okay.

MR. FEIN:  And we do not think it's speculative.  I don't believe that it's ever been contested that Colin Powell, the Secretary of State, said we don't put things in writing to avoid FOIA requests.  So to expect a smoking gun like White House tapes is not reasonable here.  And I don't think that's speculation.  Those are the words of the former Secretary of State.

THE COURT:  Right.  But you had some funds that went to Israel at some point that would have had to have passed the Leahy Law, or would have had to have, you know -- not passed it.  I mean, at some point you say they weren't applying the Leahy Law.  At some point funds went to Israel.  Right?  So as

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

opposed to just saying 28 years, they've sent funds to Israel, you can say -- I assume.  It's up to you; I don't know -- they issued this amount of funds in 2023, you know, or, you know, in 2023 -- I forget the years -- you know, things happened in Gaza in 2024.  Notwithstanding that, they continued to give -- like, something.

MR. FEIN:  No, I think, Your Honor, is what we have alleged is that virtually all the Israeli military units receive funds --

THE COURT:  What I'm telling you -- okay, maybe you're not listening to me.

MR. FEIN:  Sorry.

THE COURT:  What you've alleged so far is too nebulous and too far-reaching and not concrete enough.  So what I urge you to do -- if you can.  And if you can't, you can't, and then you are where you are -- is to provide some more specificity.

MR. FEIN:  Okay.  We will -- we will --

THE COURT:  I would also, you know, suggest that you look into whether or not a remedy can be that I issue a declaration that what happen in the past violated the APA and it violated the Leahy Law, because they also have a solid point you have to address, you know --

MR. FEIN:  The nature of the relief, yes, Your Honor.

THE COURT:  -- whether they're concerned -- there are actually legitimate concerns about future harm.

MR. FEIN:  Yes, we understand that, Your Honor.

So we will then go back, and I'll work with my opposing counsel and come up with a briefing schedule.

THE COURT:  Okay.  All right.

Anything else?

MR. HARTLIEB:  Yes, Your Honor.  I just wanted to respond briefly to some of the points there and to drive home a point that the State Department vigorously contests the --

THE COURT:  Yeah, yeah, of course.

MR. HARTLIEB:  -- assertion that it is wholly abdicating its obligations under the Leahy Law.

THE COURT:  Absolutely.

MR. HARTLIEB:  But we're at a motion to dismiss and not fighting that factually.

But what I would point Your Honor to is the amended complaint itself before the Court alleges that the State Department had identified credible information of alleged gross violations of human rights committed by Israel and worked with Israel to remediate those.  The complaint itself alleges that.  So the complaint has not alleged the complete abdication that was just asserted before --

THE COURT:  Yup.

MR. HARTLIEB:  Before Your Honor.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

THE COURT: Yup.

MR. FEIN: I don't want to prolong this, Your Honor.

THE COURT: By all means, prolong it.

MR. FEIN: The law requires that if there's been remediation, it be alerted to Congress, and that was never done. Ever.

THE COURT: All right. Okay.

You'll get the last word because you had such a good brief.

MR. HARTLIEB: That's it. Thank you very much, Your Honor.

THE COURT: Okay. I suggest that you go back to your client, and it would make me very, very happy if your client would sit down with these people. Okay?

MR. HARTLIEB: Understood, Your Honor. I will convey that.

THE COURT: Okay. Thank you.

All right. Mr. Elliott, again, Mr. Hartlieb did an exceptionally good job today and on his brief. I've seen a lot of briefs from the government, and this is one of the better ones.

MR. HARTLIEB: Thank you, Your Honor.

THE COURT: All right.

(The proceedings were concluded at 12:30 p.m.)

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

I, Christine Asif, RPR, FCRR, do hereby certify that the foregoing is a correct transcript from the stenographic record of proceedings in the above-entitled matter.

_____/s/_____
Christine T. Asif
Official Court Reporter

< Dates >.
November 24, 1:11.
November of 2023. One of 29:3.
.
.
< 1 >.
1 16:13, 29:6.
10 41:20.
1100 1:35.
12 41:20, 42:14, 53:25.
12(b)(6 10:5, 42:1.
14-minute 41:19.
15 42:14.
1961 28:1, 30:7.
.
.
< 2 >.
20 29:7.
20-some 11:10.
20001 1:27, 1:44.
20005 1:36.
202 1:45.
2021 25:14.
2023 51:3, 51:4.
2024 51:5.
2025 1:11.
22 28:3, 28:11.
23 5:10.
2340(d 28:3, 28:11.
24-3503 2:5.
24-3503-ACR 1:6.
28 11:10, 11:20, 12:9, 25:20, 36:13,

44:20, 45:6, 49:1, 51:1.
28-year 50:4.
.
.
< 3 >.
3 39:22.
30 53:25.
300 1:25, 1:26.
333 1:43.
354-3247 1:45.
_____/s/__
_____
54:5.
.
.
< A >.
A. 2:6.
abdicating 52:13.
abdication 52:23.
abduction 28:15.
able 5:18, 9:25, 14:6, 17:23, 20:18, 21:25, 40:20, 42:5, 46:13.
above-entitled 54:3.
abroad 5:3.
absence 34:12.
absent 47:11.
Absolutely 52:14.
abstract 26:14.
access 37:11, 47:22.
account 40:5.

accountability 22:19.
accurate 22:23.
accurately 34:19.
accused 42:1.
acknowledged 22:16.
acknowledges 23:10.
across 6:23, 35:5, 45:6.
Act 28:1, 30:7, 30:13, 37:5.
action 2:5, 4:23, 5:10, 17:3, 22:8, 24:12, 24:15, 24:23, 25:4, 25:22, 30:5, 30:8, 31:15, 31:20, 34:13, 35:9, 35:15, 44:22, 46:19, 50:11.
actions 22:16, 22:19, 31:9, 44:14.
active 18:25.
activities 11:23.
actor 44:11.
actual 21:15, 24:5, 47:5.
actually 12:16, 14:2, 27:13, 31:14, 41:5, 42:14, 52:2.
add 40:20,

42:11, 49:18.
additional 7:10, 19:18, 47:11, 48:7.
address 33:5, 41:6, 47:15, 49:5, 51:23.
adduced 36:23.
adjudicated 6:13.
administrations 45:7.
administrative 24:14, 31:16.
advance 10:3, 25:5, 25:9, 39:9.
adverted 4:21.
AECA 30:7.
Affairs 26:24.
after- 2:11.
agency 24:12, 24:15, 24:23, 25:4, 31:10, 31:13, 31:15, 34:12, 35:9, 35:15, 39:14, 44:21, 46:19, 50:11.
agree 25:23, 30:18, 30:21, 34:3.
agreement 19:25, 25:7, 25:10, 25:11.
agreements 25:15.

56

ahead 15:11, 15:14, 17:7, 23:17, 29:15, 33:24, 33:25.
aid 10:14, 25:8, 30:23, 32:7, 32:9.
AIG 34:13.
AIPAC 36:9.
al 2:6.
alerted 53:6.
allegation 5:23, 5:25, 7:16, 14:16, 35:6, 37:17, 45:2.
allegations 6:3, 14:21, 24:3, 29:2, 34:24, 36:19, 37:16, 40:12, 45:8, 46:18.
allege 5:22, 23:22, 24:5, 25:1, 40:7.
alleged 15:16, 16:2, 26:8, 26:11, 31:17, 34:13, 37:16, 51:8, 51:13, 52:19, 52:22.
allegedly 4:5.
alleges 28:25, 52:18, 52:22.
alleging 4:17, 8:11, 27:1, 27:8, 27:15, 43:11.

allocating 14:9.
allow 21:24, 25:5, 37:14, 38:16.
allowed 19:12, 20:20, 30:1, 39:13, 40:15.
allowing 42:2.
alluded 19:2.
alone 43:19, 43:20.
alternate 7:2, 9:17.
although 15:4.
Amal 2:5.
AMAL GAZA 1:5.
amend 40:5, 40:17, 40:20, 42:2, 42:5, 42:11, 42:20, 43:1, 43:5, 45:16, 45:21, 46:3, 46:15, 46:16, 46:24, 47:5, 47:8, 47:10, 48:11, 48:12, 48:17.
amended 21:24, 24:17, 25:25, 37:12, 37:15, 43:4, 45:16, 45:18, 46:3, 46:13, 48:6, 48:23, 49:16, 50:1, 52:17.
American 19:11.
amicably

17:10.
amount 49:11, 51:3.
amounted 12:17.
an injury 27:7.
Ana C. Reyes 1:17.
analysis 15:8.
and/or 4:7.
announced 33:3.
answer 33:18.
anybody 3:23.
anyway 15:15, 45:21.
APA 24:9, 24:12, 25:22, 29:21, 29:22, 30:1, 31:9, 31:11, 31:19, 34:25, 39:13, 51:21.
Apparently 22:11, 23:1.
APPEARANCES 1:21, 37:10.
applicable 30:6.
applied 17:25, 26:13, 36:16.
applies 4:19, 4:25.
apply 33:16.
applying 5:3, 38:15, 50:24.
appreciate 46:14.
approach

10:23.
approached 17:13.
appropriation 25:17, 26:17.
arbitrary 24:15, 31:12.
arduous 13:14.
areas 6:23.
argument 11:8, 15:3, 36:11.
Arms 12:23, 26:17, 30:7, 32:15.
around 29:9.
arrested 16:1.
arsenal 9:22.
Article 15:19, 22:11, 39:22, 46:9, 46:10, 47:13.
Ashcroft 45:1.
aside 30:20, 31:12, 31:20, 31:23.
Asif 1:41, 54:1, 54:6.
aspect 27:4, 27:25.
asserted 52:23.
assertion 52:12.
Assistance 7:2, 7:3, 9:12, 23:13, 27:25, 30:7, 43:25.
assistant 2:15.

assume 29:22, 41:11, 51:2.
Assuming 5:12, 34:18, 48:11.
attached 16:9.
attack 33:11.
attacked 33:20.
attention 12:19.
attorneys 37:10.
aunt 27:11.
authority 24:2, 47:20.
authorization 25:17.
Avenue 1:43.
avoid 9:14, 50:17.
avoids 39:11.
away 47:25.

.
.
< B >.
back 12:18, 14:18, 18:6, 18:9, 23:15, 25:18, 26:6, 32:1, 41:20, 42:14, 44:24, 48:25, 52:4, 53:13.
back-and-forth 20:7.
backlog 22:20.
backward 31:10.
backwards 31:19, 32:17.
Bank 3:15,

3:23, 4:2, 7:1, 14:14, 33:5, 33:7, 33:9, 33:10, 33:14, 33:16.
bargaining 38:3, 38:5, 38:21.
based 24:9, 39:23, 40:12, 41:3, 42:7, 45:9.
basically 36:21.
basis 15:6.
become 9:22.
beginning 2:8.
behalf 2:14.
believe 4:19, 9:14, 9:16, 11:4, 12:1, 14:11, 14:15, 15:19, 16:9, 21:19, 23:10, 25:15, 34:2, 34:6, 35:7, 46:12, 50:15.
Bernstein 44:2.
better 32:19, 53:22.
big 18:17, 18:18, 18:19.
binding 19:25.
bit 32:19, 36:3, 47:17.
black 36:4, 36:5, 36:7.
Blinkin 44:2.

board 6:24, 35:5.
boldness 13:15.
bombed 28:20, 28:23, 28:25.
borne 7:15.
Branch 1:34, 2:16.
breadth 31:18.
break 41:16, 41:20.
brief 25:13, 26:1, 27:19, 43:24, 46:4, 49:16, 49:17, 49:19, 53:10, 53:20.
briefed 43:13.
briefing 2:19, 2:25, 31:6, 40:22, 48:7, 48:21, 48:22, 49:13, 52:5.
briefly 37:24, 52:9.
briefs 53:21.
bring 10:6.
broad 24:10.
broader 28:17.
broadly 19:2, 23:15, 25:18.
broke 42:18.
Bruce 1:23, 1:24, 2:9.
bullet 33:22.
bunch 10:7, 33:12.
burden 10:2,

10:4, 10:5.
buttress 40:6.
.
.
< C >.
C. 1:12, 1:44, 28:3, 28:11, 35:16, 35:18.
call 2:4, 26:2, 38:25.
Calley 8:16.
calling 8:3.
camera 34:23.
capricious 24:16, 31:12.
car 36:7.
carbon 39:5.
card 8:3.
care 39:20, 39:22, 48:18.
carefully 49:2.
case 2:4, 2:19, 6:12, 10:6, 11:25, 12:8, 14:16, 26:8, 26:23, 27:4, 31:17, 31:19, 38:9, 38:10, 38:23, 41:25, 42:8, 42:9, 42:25, 43:3, 43:12, 43:20, 47:23.
cases 13:23, 19:8, 43:23, 44:2.
catch-all 28:17.
causation 7:9, 43:16.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

cause 22:8, 30:5, 30:8, 44:16.
cause-and-effect 7:8.
causing 28:15.
cautious 41:22.
cease 22:14, 23:19, 23:24, 32:13, 32:24, 33:1, 33:3, 33:18, 33:19.
cede 49:7.
Center 26:23.
certain 5:9.
Certainly 5:12, 5:23, 6:15, 8:22, 18:22, 23:22, 24:25, 25:1, 29:8, 29:25, 30:22, 33:12, 46:13, 47:11, 48:2.
certify 54:1.
chain 27:3, 46:5.
chains 27:6.
challenging 25:19, 44:4.
change 23:23.
charges 28:5, 28:15.
Christine 1:41, 54:1, 54:6.
circumstances 43:15.
citation 28:2,

28:11.
cited 23:7, 26:23, 43:23.
citing 16:19.
Civil 1:5, 1:34, 2:5.
claim 8:9, 15:6, 24:12, 27:9, 30:2, 30:4, 30:9.
claims 20:1, 27:15, 29:10, 32:20, 33:12, 43:24, 44:12, 44:13.
clandestined 28:16.
class 4:23, 5:10.
classification 23:2.
Classified 20:14, 20:20, 21:2, 23:3, 23:12, 37:7, 37:11, 37:12.
clear 6:12, 15:2, 16:4, 19:19, 19:20, 31:16, 43:2, 46:25.
clearance 47:22, 47:25.
clearances 6:11, 37:21, 47:14, 47:19.
Clearly 15:18, 22:8, 25:23, 34:6, 35:4, 35:6.

CLERK 2:5.
client 18:12, 18:19, 23:5, 53:14, 53:15.
clients 19:11, 21:7.
close 14:1, 26:2.
clue 22:23.
Colin 35:17, 35:23, 50:15.
colloquy 24:9, 44:25.
color 43:14.
COLUMBIA 1:2.
comfortable 22:2.
coming 21:13.
commit 4:5, 5:24, 8:4, 8:21.
committed 5:15, 8:2, 22:13, 26:12, 52:20.
committing 7:17, 8:1, 12:20.
communicated 18:15.
communications 18:12.
comparable 15:21.
comparison 36:2.
compile 24:13.
complaining 14:5.
complete 17:22, 34:4, 38:19, 52:22.
completed

22:14.
completely 47:7.
complied 24:15, 44:19.
computer-aided 1:49.
concern 3:24, 4:16, 16:19, 19:5, 33:2, 46:24.
concerned 3:21, 14:7, 14:8, 19:14, 26:24, 30:19, 47:4, 52:1.
concerning 37:16.
concerns 3:8, 3:10, 4:9, 13:25, 21:10, 32:14, 41:2, 44:22, 44:23, 45:25, 46:14, 52:2.
concluded 53:25.
conclusory 45:2, 45:8.
concrete 4:21, 4:24, 5:4, 5:5, 10:16, 14:14, 15:16, 15:17, 15:24, 24:5, 24:23, 33:17, 35:9, 50:11, 51:14.
conditions 17:14.
conduct 25:20, 46:7.

conducted 43:12.
confer 21:7.
confess 36:1.
confident 13:12, 17:24.
confidential 18:12.
confirm 20:15.
conflict 19:6, 23:23, 32:12, 44:1, 44:3.
Congress 53:6.
congressional 25:16.
connected 4:6.
consider 47:3.
considered 18:14.
considering 14:15.
consists 3:19.
consortium 27:10.
Constitution 1:43.
consult 23:5.
contemplate 4:23, 15:10, 38:17.
contend 45:11.
contents 20:14, 20:15.
contested 50:15.
contests 52:10.
context 15:18, 16:1, 18:22,

19:19, 23:15, 23:20, 37:1, 38:2, 50:8, 50:10.
continued 33:4, 51:5.
continues 26:18, 26:19.
Control 30:7, 47:21.
convey 53:17.
copy 39:5.
Correct 10:10, 15:9, 50:12, 54:2.
counsel 2:8, 2:15, 25:19, 37:7, 40:2, 47:14, 47:16, 52:5.
count 28:21, 28:24.
countries 43:25.
country 25:7.
couple 3:4, 32:23, 50:3.
courage 13:14.
course 3:1, 36:18, 52:11.
Courts 38:16, 44:11.
cousin 27:11.
cozy 32:13.
create 49:21.
credible 6:3, 10:24, 14:21, 17:1, 38:7, 39:3,

52:19.
critical 9:15.
criticism 12:7, 12:8.
Crow 36:3.
cruel 28:4, 28:13.
culture 36:8, 36:10.
cured 46:4, 46:13.
cut 7:3, 32:9.
.
.
< D >.
D. 1:31.
damages 29:24, 30:1.
date 16:6, 16:7, 24:13, 24:19, 26:18.
day 6:10, 15:24.
days 22:14.
DC 1:27, 1:36.
de 11:5, 11:21, 25:20, 34:14, 34:25, 36:11, 36:15, 38:25, 46:20.
deal 18:18, 18:19.
death 29:7, 29:9.
deciding 15:20, 34:23.
decision 18:14, 26:17, 31:10,

31:11, 31:24, 35:1, 39:9, 41:21.
decision-makin g 31:13.
declaration 30:10, 30:12, 39:14, 51:21.
declarations 43:14.
declaratory 16:1, 39:17, 39:18, 39:24.
declaring 31:20.
defect 24:7, 26:19.
Defendant 1:12, 1:31.
Defense 10:12, 22:21, 37:7.
deferential 22:21.
deficiencies 43:2, 43:6, 45:13.
defined 26:12.
defines 28:4.
definitely 35:14.
definition 27:24, 27:25, 28:12, 31:9, 31:14.
degrading 28:4, 28:14.
degree 10:10.
delve 7:13.
demonstrating

6:25.
denial 28:18.
denied 47:9, 47:10.
deny 40:4, 48:15.
denying 42:19, 42:23.
dependant 9:11, 12:22.
dependency 9:16.
despite 16:25, 18:2, 32:12.
destroyed 7:11.
details 10:2, 10:3.
detention 28:5, 28:14, 28:16.
determination 18:10, 37:4.
determinations 5:11.
determined 4:11.
different 4:1, 13:24, 27:25, 44:4, 45:6.
difficult 18:25, 29:17.
difficulty 29:18.
diminish 7:9.
direct 44:16.
directly 3:18, 41:4.
director 2:16.
disappearance 28:15.

discovery 6:9, 6:11, 6:20, 6:21, 6:23, 6:24, 6:25, 7:13, 7:15, 9:14, 10:7, 11:25, 12:21, 18:20, 21:23, 26:16, 27:5, 36:17, 36:18, 37:14, 45:9.
discrete 25:4, 31:14, 44:21, 46:19.
discuss 20:19, 37:25, 42:13, 46:23.
discussed 25:12, 40:7.
discussions 19:19, 42:12.
dismiss 29:1, 40:4, 41:8, 41:25, 42:3, 42:19, 42:24, 43:13, 43:19, 45:12, 45:17, 45:23, 45:24, 46:22, 52:15.
dismissed 43:24, 45:19.
dismissing 22:3, 41:13.
displaced 13:7, 14:12,

15:22, 29:4, 29:12.
displacement 3:19, 27:19, 27:20, 29:7.
displacements 7:10.
disputes 6:9, 6:14.
disqualificati on 35:3.
disqualified 11:10, 11:20, 39:9.
disqualify 35:2.
distant 27:10.
District 1:1, 1:2, 1:18, 8:18, 8:19.
Division 1:34.
divulge 18:12.
document 41:3, 42:4, 42:6, 45:3.
documents 37:21.
doing 5:15, 12:12, 13:9, 30:13.
doldrums 11:3.
domestic 15:18, 15:21, 32:11.
domestically 14:16.
done 2:22, 13:3, 32:19, 46:20, 48:25, 53:7.
doubt 22:18,

34:7, 34:8.
down 18:10, 18:17, 19:4, 19:24, 22:5, 28:7, 35:24, 53:15.
drag 14:6.
draw 11:20.
dream 10:15.
dreamed 12:2, 12:5.
drink 36:4.
drinking 36:5.
drive 52:9.
drop 8:4.
dumb 22:25.
during 7:13, 18:25, 36:3.

.

.

< E >.
early 16:11.
East 11:23.
effect 24:18.
either 49:12.
element 9:15, 15:19.
Elliott 1:32, 2:15, 40:3, 41:15, 53:19.
emphasize 42:23.
employer 38:20.
end 49:18.
enforce 45:4.
engage 38:4, 38:21.
engaged 5:19, 7:21.
engagement 17:23.
enough 29:11,

| | | | |
|---|---|---|---|
| 35:8, 37:13, 51:14. | 46:25. | 39:18, | 46:20. |
| enter 19:24, 30:10, 30:11, 37:10, 38:11. | exact 6:5, 49:19. | 46:21, 50:17. | factors 44:9. |
| entered 25:7, 32:12. | exactly 37:6, 38:18. | expected 18:3. | facts 12:3, 31:17, 34:5, 43:15, 47:2, 49:13. |
| entire 43:19. | exaggerate 36:2. | expedition 14:19, 44:21, 45:10. | factual 5:20, 5:22, 6:9, 6:13, 6:16, 6:17, 6:19, 7:4, 7:12, 9:24, 26:8, 26:15, 43:10, 46:17, 46:25, 47:6, 47:12. |
| entirety 44:19. | examination 4:19, 11:2, 38:7, 39:1, 39:6. | experience 43:9. | |
| entitled 6:9, 6:19, 7:12, 7:14, 11:6, 23:11, 40:23. | examine 39:3, 50:4. | explicit 18:2. | |
| | examining 10:23. | explore 21:9. | |
| | example 26:7. | Export 30:7. | |
| | excellent 26:1. | expressly 28:3, 28:11. | |
| equipment 9:21. | exception 25:20, 36:12. | extended 46:21. | factually 52:16. |
| error 45:23. | | extent 3:21, 40:11, 49:3. | failures 30:12. |
| Esquire 1:23, 1:31, 1:32. | exceptionally 2:21, 53:20. | extra 49:21. | fair 8:13. |
| establish 5:18, 7:7, 7:8, 9:25, 46:5. | exclusive 47:21. | extreme 32:7. | faith 38:22. |
| | executed 39:21, 39:23. | . | faithfully 39:21, 39:23. |
| establishing 9:15. | | . | fall 43:13. |
| et 2:6. | executive 37:23, 47:20. | < F >. | falsely 29:22. |
| ether 35:10. | | F35 26:25. | family 29:7. |
| European 9:18. | exemption 11:6, 11:21, 34:25, 36:15, 38:25. | face 23:24. | fantastical 11:4, 12:2, 13:17, 13:18. |
| | | faced 3:18. | |
| even-handedly 17:25. | | facetious 29:21. | |
| events 3:3. | | fact 11:19, 15:20, 16:25, 18:2, 23:23, 24:1, 26:6, 27:22, 35:1, 43:7, 45:9. | fantasy 10:15. |
| everybody 3:1, 5:8, 35:19, 35:24, 39:6. | Exhibit 16:13. | | far 3:16, 33:1, 51:13. |
| | exist 47:8. | | far-reaching 51:14. |
| everyone 2:2, 4:25. | existed 45:5. | facto 11:5, 11:21, 25:20, 34:14, 34:25, 36:11, 36:15, 38:25, | farce 17:22. |
| everything 10:19, 40:6, 41:4, 42:10. | exists 20:12, 23:10, 47:7. | | faster 28:8. |
| | | | fault 3:3, 17:12, 18:1. |
| | expansive 13:21. | | FCRR 1:41, 54:1. |
| evidence 10:24, 38:24, | expect 6:17, 35:25, | | fear 3:22, |

4:3, 13:7, 16:1, 32:3, 33:14, 33:17, 43:20.
feared 3:25.
fears 33:10.
Federal 1:34, 1:42, 2:16.
feel 4:1, 17:24, 40:14.
FEIN 1:23, 1:24, 2:9, 2:11, 2:24, 6:8, 16:13, 18:9, 20:4, 21:1, 21:13, 24:10, 30:16, 31:1, 32:23, 33:24, 35:23, 41:11, 44:25, 47:1, 48:24, 49:23, 50:14.
felt 33:8.
few 22:14.
fifty 26:25.
fighting 52:16.
figure 31:6, 49:23.
file 13:15, 21:24, 42:7, 46:21.
filed 37:18, 37:19, 46:3.
final 25:4, 25:22, 31:15, 34:12, 35:9, 35:15, 41:21.
find 14:16, 16:16, 18:1,

18:25, 37:13, 38:23, 44:12.
finding 8:23, 17:12, 19:3, 32:8.
findings 16:22, 22:18.
fine 9:14, 41:11.
fire 22:14, 23:19, 23:24, 32:13, 32:24, 33:1, 33:3, 33:18, 33:19.
First 7:15, 22:15, 23:19, 24:6, 33:22, 46:3, 46:17.
fishing 14:19, 44:21, 45:10.
Five 4:9, 11:11, 11:12.
flagrant 28:18.
flattery 35:21.
flipping 37:2.
flooded 19:14.
floodgates 19:4.
floor 11:4.
focus 12:11, 26:7.
focusing 48:5.
FOIA 35:25, 47:17, 50:17.
follow 38:12, 38:14.

follow-the-law 24:11.
followed 39:14, 39:19.
following 28:13, 38:13.
forced 27:19, 27:20, 29:6.
forces 6:5, 6:25, 8:20.
forces. 22:21.
foregoing 54:2.
Foreign 26:24, 27:25, 30:6, 32:14, 43:24, 43:25, 44:10.
forget 51:4.
form 13:2, 19:6.
former 10:12, 50:19.
forward 38:6, 39:2, 40:25, 42:13, 49:10.
forward-lookin g 23:21.
found 4:9, 22:12, 26:25, 31:2, 31:11, 44:3, 50:7.
fountain 36:5.
front 46:1, 49:20.
full 7:15, 12:19.
fully 49:10.
functions 18:24.
fundamentally

45:1.
funding 12:18, 25:16, 31:23, 44:4.
funds 7:20, 14:8, 24:19, 24:21, 25:6, 25:9, 31:24, 50:21, 50:25, 51:1, 51:3, 51:9.
futility 47:10, 47:11.
future 3:21, 7:23, 13:7, 23:22, 24:6, 24:24, 26:21, 27:16, 32:4, 32:5, 32:16, 43:9, 43:20, 52:2.

.

.

< G >.
Garry 1:31, 2:14.
Gaza 2:5, 3:2, 3:14, 3:23, 4:2, 4:24, 7:1, 9:19, 13:6, 13:11, 13:15, 13:16, 14:1, 14:24, 15:7, 22:13, 22:16, 27:12, 27:13, 27:14, 29:18, 33:4, 33:16, 51:5.
Gazans 15:3.
gazillion 36:25.
gazillionaire

35:19.
General 6:2, 14:20, 16:6, 16:18, 20:8, 20:11, 20:13, 22:12, 23:10, 26:3, 30:20, 37:18, 40:9, 40:18, 40:19, 40:21, 40:23, 42:21, 46:7, 48:6.
generalized 3:22, 4:19, 4:20.
generations 9:20.
genocide 8:13, 8:24.
genuine 10:22, 37:22.
gets 12:23.
Getting 12:22, 20:16, 21:12, 28:20, 28:23, 29:9, 33:19.
gist 17:15, 36:22.
give 12:21, 28:1, 36:14, 37:4, 40:5, 40:17, 48:19, 51:5.
given 8:8, 11:5, 14:13, 22:3, 22:19, 25:1.
giving 9:4, 11:2, 42:1.
good-faith 38:3, 38:5, 38:7, 38:21,

39:6, 39:20.
Government 3:12, 3:13, 9:9, 10:17, 14:6, 14:7, 17:5, 19:9, 19:13, 19:16, 22:15, 30:23, 41:9, 44:14, 53:21.
governments 9:18.
grant 45:12, 46:2, 48:17.
granting 30:11, 42:20, 47:4, 47:7.
granular 10:3.
great 19:13.
gross 4:5, 4:9, 5:15, 5:19, 5:24, 7:21, 8:2, 8:4, 8:12, 8:21, 10:23, 12:17, 12:20, 17:2, 26:12, 27:20, 27:24, 28:12, 34:4, 36:19, 39:3, 52:20.
ground 12:3.
grounds 42:1, 47:10, 47:11.
group 5:13, 8:7, 8:9.
groups 9:5.
guess 3:11, 3:15, 3:19, 11:11, 11:12,

37:10, 37:15.
guessing 25:11.
guidance 34:5.
gun 50:17.
guys 18:6, 48:20.
.
.
< H >.
Halley 44:1.
Hamas 44:4.
hand 22:8, 41:3.
hands 44:14.
hanging 41:8.
happen 7:23, 13:19, 43:11, 51:21.
happened 3:12, 7:17, 13:1, 13:2, 13:3, 13:4, 44:7, 51:4.
happening 11:1, 18:22, 19:15.
happens 35:3.
Happy 28:10, 53:14.
hard 41:1, 45:20.
harm 3:21, 3:25, 4:1, 4:19, 4:20, 4:24, 4:25, 5:1, 5:15, 6:16, 13:25, 24:3, 26:22, 27:1, 33:2, 52:2.
harmed 5:8, 5:13, 27:17.
harms 14:5.

HARTLIEB 1:31, 2:14, 2:18, 17:19, 18:6, 29:16, 34:8, 34:12, 38:10, 40:3, 52:15, 53:19, 53:23.
headlines 8:18.
hear 3:11, 9:8, 17:5, 18:17, 30:16, 35:22, 40:2, 41:9, 41:23.
heard 47:1.
Hearing 1:16, 19:19, 45:25.
hereby 54:1.
hesitancy 26:3.
hiatus 50:5.
highest 10:16.
highlight 24:8.
highly 9:11, 9:21.
hold 34:15.
holidays 48:21, 48:22.
home 15:22, 52:9.
Honorable 1:17.
honored 39:21.
hopeful 3:11.
horribles 13:20.
horrific 13:1, 13:4.
horrors 8:15.

House 28:20, 28:23, 50:18.
huge 5:4.
human 3:18, 3:20, 4:5, 4:10, 5:15, 5:19, 5:24, 6:4, 7:21, 8:2, 8:5, 8:12, 8:21, 10:24, 12:17, 12:20, 17:2, 22:13, 26:12, 27:20, 27:24, 28:12, 32:15, 33:10, 36:20, 38:8, 39:4, 52:20.
humanitarian 10:14.
Hundreds 6:3, 6:5, 11:2, 14:20, 14:24, 15:3, 22:12, 33:4, 33:21, 50:6.
hungry 13:5.
hypothetical 42:9.
hypothetically 37:3.

< I >.
idea 13:15, 14:23, 22:23, 41:17.
identification 26:11.
identified 6:22, 26:21, 52:19.

identify 2:7, 7:17, 26:16.
IDF 5:19, 6:25.
IG 11:1, 34:16, 34:17, 34:18, 36:14, 39:2, 39:7.
II 39:22.
III 15:19.
imagine 8:18, 38:5, 38:19.
immediate 19:23.
imminent 4:4, 23:25, 24:5, 33:2, 33:10, 43:8, 43:9, 43:15, 43:20.
impact 39:25.
impacted 3:3.
impending 23:22.
implausible 36:23.
Implementation 23:12.
important 23:18, 44:24, 47:3.
impossible 10:2, 10:4.
inaction 44:22.
incendiary 11:23.
incidents 22:20, 29:18.
inclined 21:6, 40:1, 40:4,

40:22, 46:2.
including 8:13, 44:1.
independent 44:11, 44:15.
indicates 39:7.
indicating 34:21.
indication 47:22.
individual 3:15, 12:15, 14:4.
individualized 5:11.
individuals 3:2, 3:14, 3:16.
indulge 17:8.
ineligible 36:13, 50:6.
inference 11:21, 50:8.
inferences 42:2.
information 6:4, 14:21, 17:2, 20:21, 21:13, 34:20, 37:11, 38:7, 39:3, 47:12, 52:19.
inhumane 28:4, 28:13.
initial 40:18.
injunction 16:3, 23:21, 24:11, 38:4, 38:6, 38:20, 38:22, 39:19.

injunctions 29:24.
injunctive 24:24, 30:11.
injured 32:2, 33:17.
injuries 15:17, 27:8, 44:17.
injury 4:22, 5:4, 5:6, 14:14, 15:16, 15:17, 15:24, 23:22, 23:25, 24:6, 26:7, 26:21, 27:15, 32:1, 32:4, 32:5, 32:17, 33:14, 43:7, 43:8, 43:16, 43:21.
inquiries 26:9.
inquiry 26:20, 27:3, 44:18, 44:20.
insofar 27:1, 32:2.
Inspector 6:1, 6:2, 14:20, 16:6, 16:17, 20:8, 20:11, 20:12, 22:12, 23:9, 26:3, 30:20, 37:18, 40:9, 40:18, 40:19, 40:20, 40:23, 42:21, 46:7, 48:6.
intended 35:21.
interesting 34:22.

International 8:23, 19:6.
interpreting 38:15.
interrupt 15:13, 48:21.
intrigue 21:18.
involved 7:22, 11:22.
involving 43:24.
Iqbal 45:1.
irrespective 43:21.
isolated 8:15.
Israel 4:4, 7:3, 9:19, 10:12, 11:5, 12:22, 13:10, 22:13, 22:19, 24:19, 25:13, 30:23, 31:24, 32:8, 32:9, 32:11, 32:13, 36:20, 36:22, 37:5, 39:8, 44:4, 50:22, 50:25, 51:1, 52:20, 52:21.
Israeli 5:24, 6:4, 8:20, 9:5, 9:11, 10:16, 10:25, 11:9, 11:19, 11:22, 12:16, 12:20, 22:16, 22:21,

26:11, 35:2, 36:9, 39:1, 39:4, 50:5, 51:8.
issue 5:2, 6:16, 6:17, 9:19, 14:10, 26:19, 29:9, 39:16, 39:24, 47:21, 48:6, 51:20.
issued 47:23, 51:3.
issues 3:7, 9:24, 11:13, 23:16, 40:7, 41:6, 42:25, 44:5, 44:6, 45:14, 46:11.
itself 20:25, 21:16, 23:24, 29:11, 52:18, 52:21.
.
.
< J >.
jeopardize 37:22.
Jersey 1:25.
jets 26:25, 27:2.
Jim 36:3.
job 53:20.
joined 2:15.
Judge 1:18, 22:6.
judgment 16:1, 39:17, 39:18, 39:24.
judicial 8:14, 8:20, 8:22.
jurisdiction 6:24, 8:25.

jurisdictional 6:8, 6:20, 18:20, 21:23, 36:17.
Justice 1:33, 2:17, 8:23.
justifies 16:2.
.
.
< K >.
keep 12:6, 23:18, 33:19.
Kerry 44:2.
killed 7:10, 15:24, 29:9.
killings 8:15, 33:4.
kind 12:2, 37:12, 39:11.
knowing 14:12, 22:3.
knowledge 23:4, 47:5.
known 8:2.
knows 15:4.
.
.
< L >.
labor 38:2, 38:20.
lack 44:3.
Lai 8:16.
laid 48:8.
large 12:20, 22:19.
last 3:4, 19:19, 46:6, 53:9.
later 42:1, 47:15.
Laws 23:1, 39:20, 39:22.

lawsuit 5:10.
lay 22:5.
lead 46:10.
leading 33:9.
leads 32:1.
leaflets 8:4.
Leahy 11:3, 11:6, 14:21, 17:24, 23:1, 23:13, 24:20, 24:22, 25:5, 27:23, 30:6, 30:13, 34:21, 37:5, 39:1, 44:8, 44:19, 46:6, 50:7, 50:23, 50:25, 51:22, 52:13.
learned 40:8, 40:9.
least 6:10, 17:1, 25:14, 33:8, 36:12, 40:8, 41:3, 50:4.
leave 40:5, 42:20, 43:1, 43:4, 45:21, 46:2, 46:15, 46:16, 47:4, 47:7, 48:11, 48:12, 48:17.
left 46:19.
legal 7:12, 30:15.
legally 40:15, 42:6.
legitimate 52:2.
lend 25:21.
less 5:1, 13:25.
letting

15:12.
level 9:16,
  43:2.
levels 10:16,
  43:7,
  44:5.
liberty
  28:18.
Lieutenant
  8:16.
life 28:18.
light 40:17,
  42:3.
likelihood
  23:25.
limited
  44:21.
line 12:14.
link 20:13.
linked 4:4.
listening
  18:11,
  51:11.
lists 28:12.
literally 6:3,
  50:6.
litigator
  13:14.
little 32:19,
  36:3.
lives 33:9.
loathe 41:7.
lobby 36:9.
logic 14:2.
logical 14:10,
  15:5.
logically
  13:19.
long 36:10.
look 20:21,
  21:25, 22:6,
  25:14, 31:7,
  34:19,
  36:14,
  36:24, 37:2,
  37:6, 37:7,
  37:8, 37:20,
  39:7, 39:10,
  40:12,
  40:23,

47:15,
  51:20.
looked
  40:16.
looking 22:9,
  22:24,
  29:18,
  31:10,
  31:19,
  34:22.
looks 24:12,
  24:14,
  32:17.
lose 6:17.
losing
  29:12.
loss 27:10,
  29:7.
lost 12:10,
  12:11,
  29:4.
lot 13:25,
  48:9, 49:1,
  53:21.
loud 31:8.
lower 23:25.
.
.
< M >.
machine
  1:48.
magnitude
  6:15,
  8:14.
main 3:24.
manufacturing
  32:11.
Marco 2:6.
MARCO RUBIO
  1:10.
Marked
  22:15.
massacre
  8:16.
matter 15:5,
  27:21,
  27:22,
  54:3.
matters
  10:10.

means 6:10,
  24:8,
  53:4.
meantime
  47:16.
meet 17:13,
  18:23,
  19:15,
  34:3.
meeting 19:5,
  19:13,
  19:21.
meetings
  17:9.
members
  29:8.
memo 35:7,
  35:12,
  36:4.
memoir
  35:24.
Memorandum
  16:10,
  16:14,
  19:25,
  25:13.
mentioned
  23:19.
mentions
  23:1.
mere 23:23.
merits 5:17,
  36:18.
Middle
  11:23.
military 4:4,
  7:2, 8:20,
  9:12, 9:21,
  9:22, 11:22,
  43:25,
  51:8.
mind 17:22,
  23:18.
minister
  10:12.
miscommunicati
  on 34:7,
  34:9.
misplaced
  5:2.

misrepresentat
  ion 34:5.
modest
  29:22.
moment 28:1.
monetary
  29:25,
  30:9.
money 4:7,
  8:8, 12:22,
  12:23, 13:9,
  37:4.
monitoring
  25:6,
  25:10.
moot 40:5,
  42:20,
  42:24,
  48:16.
morning 2:2,
  2:11, 2:13,
  14:13,
  18:8.
motion 29:1,
  40:4, 40:6,
  40:7, 42:3,
  42:11,
  42:19,
  42:24,
  43:12,
  45:12,
  45:17,
  45:24,
  46:22, 47:9,
  48:16,
  48:23, 49:2,
  52:15.
Motions 1:16,
  40:18.
Ms 2:4.
multiple 27:6,
  45:6.
myself
  40:24.
.
.
< N >.
nail 12:7.
narrative
  10:11.

narrow 46:18.
nation 32:14.
nature 6:16, 12:8, 22:20, 43:15, 44:12, 51:24.
near 8:10.
nebulous 51:14.
necessarily 10:1, 39:5.
necessary 47:14.
need 6:24, 23:22, 24:4, 28:7, 46:24, 50:4, 50:11.
needs 16:21.
Neither 22:7, 25:21.
New 1:25, 20:18, 26:23, 47:2, 49:19.
news 21:13, 22:11, 40:12.
newspaper 42:7, 47:13.
next 8:6, 14:13, 15:24, 46:2.
nightmare 12:2, 12:5, 39:11.
nine 14:12, 28:21, 28:23.
No. 1:5, 16:13.
nonbinding 19:21.
none 3:16.

Nontraceable 23:13.
nothing 5:14, 17:25, 22:6.
notice 8:14, 8:20, 8:22, 24:2.
Notwithstandin g 24:19, 24:22, 33:19, 37:5, 51:5.
November 16:11.
nowhere 34:21.
number 4:16, 5:4, 6:6.
numerous 43:1, 45:13, 45:14, 46:5, 46:11.
NW 1:25, 1:35, 1:43.
.
.
< O >.
oath 36:20.
obligation 39:20, 39:24.
obligations 52:13.
observation 17:9.
obsolete 9:23.
obtain 32:15, 47:14.
obtained 21:1.
obvious 37:18.
obviously 13:25, 16:19, 29:2, 37:20, 48:7.
occasions

17:14.
occur 43:7.
occurred 18:23.
odd 22:6, 37:12.
office 17:1.
Offices 1:24.
Official 1:42, 54:7.
oftentimes 9:20.
once 36:14, 43:4.
One 3:15, 4:18, 6:5, 7:22, 11:24, 16:5, 17:20, 19:18, 27:4, 27:5, 28:24, 29:2, 29:10, 32:24, 33:7, 33:21, 34:16, 36:12, 36:17, 42:25, 44:18, 45:13, 48:4, 53:21.
ones 53:22.
ongoing 8:24, 25:6.
opens 19:3.
operating 7:1, 36:11.
opportunity 21:7, 40:17, 46:4.
oppose 47:11.
opposed 41:13, 51:1.
opposing 47:16, 52:5.
order 5:21, 18:19, 21:4, 21:23, 27:6,

30:21, 30:22, 31:6, 37:10, 38:5, 38:11, 38:13, 38:15, 39:2.
ordered 35:24.
ordering 38:4.
orders 6:11, 9:25.
organizations 33:10.
outlined 43:6.
overarching 21:20.
overwhelm 19:6, 19:9.
own 3:3, 14:19.
.
.
< P >.
p.m. 53:25.
Pad 8:1, 8:3, 8:6, 8:7, 8:8, 26:7.
Palestinian 33:9.
paper 35:8, 36:1, 49:11.
papers 3:7.
parade 13:20.
Pardon 28:22.
Part 18:22, 31:5, 49:21.
particular 3:25, 4:6, 7:18, 9:4, 9:5, 26:11, 26:13, 26:18,

32:18, 38:23, 43:11.
particularized 24:5.
particularly 26:2, 42:3, 45:22.
parties 2:7, 38:4, 40:22.
parts 9:22.
party 44:10, 44:15.
pass 36:22.
passed 50:22, 50:23.
past 29:18, 30:12, 32:2, 32:4, 38:24, 39:15, 43:22, 51:21.
path 49:9, 49:23.
pending 24:1, 43:3.
people 13:5, 18:17, 19:1, 19:14, 26:21, 27:12, 28:8, 29:9, 29:22, 33:19, 37:2, 53:15.
pepper 49:19.
perceived 3:25.
perfect 39:10.
period 44:19, 46:21.
periods 36:10.
permeate 23:16.
permitted 13:12.
person 13:6,

13:11, 15:7, 28:19.
personally 3:17.
persons 5:4, 28:16.
pick 45:13.
picture 38:19.
piece 35:8, 46:6.
place 41:1.
placed 34:2.
Plaintiff 1:7, 1:23, 2:8, 2:10, 8:5, 14:15, 19:5, 25:19, 29:6, 33:7, 33:8, 33:9, 43:3, 43:8, 44:17, 46:12.
Plaintiffs 3:5, 3:17, 3:25, 7:18, 12:11, 13:16, 14:24, 15:6, 18:11, 18:23, 19:24, 20:24, 23:20, 24:4, 26:8, 26:13, 27:1, 27:7, 27:8, 27:13, 27:14, 32:2, 33:6, 42:2, 43:11, 43:14, 44:7, 44:12, 47:5.
plausible 10:11, 11:8, 36:11.
plausibly 4:17.
pleading 43:10, 47:6.

Please 2:2, 2:4, 2:7, 2:24, 16:5.
plenary 47:19.
plight 3:2.
podium 49:7.
point 14:4, 19:18, 23:14, 25:18, 37:9, 40:25, 42:11, 42:13, 46:9, 46:23, 50:22, 50:24, 50:25, 51:23, 52:10, 52:17.
points 42:22, 49:1, 50:4, 52:9.
Policy 26:24, 45:4, 45:5, 45:7.
position 20:18, 43:18.
possessions 29:5, 29:13.
possible 18:15, 18:16, 25:25, 37:25.
possibly 5:25, 7:19, 15:9.
Post 22:11, 22:16, 34:20, 40:8.
Potemkin 10:23.
potential 22:12,

25:1.
potentially 4:2, 12:18, 38:14.
Powell 35:17, 35:23, 50:15.
preconceived 35:1.
preconditions 34:3.
predicates 26:9, 26:15.
prejudice 45:20, 45:24, 47:4, 48:16.
premature 16:22.
prepared 19:24.
present 21:18.
presented 20:4.
President 47:19, 47:20.
presidential 45:6.
press 22:4.
pressed 45:20.
pressure 18:21.
pretty 16:4, 30:24.
prevented 24:20.
primarily 27:15.
private 30:5, 30:8.
privilege 37:23.
privy 21:15.
probably 45:22.
problem 12:6,

12:13, 13:19, 27:4, 31:21.
problems 21:20.
procedures 21:9.
proceed 41:23, 46:8.
Proceedings 1:48, 46:8, 53:25, 54:3.
process 16:21, 17:24, 22:20, 48:10.
processing 16:24, 36:19.
produced 1:48, 21:4.
Programs 1:34, 2:16.
prolong 53:2, 53:4.
prolonged 28:5, 28:14.
proper 9:25, 24:11.
properly 6:23.
property 7:11, 29:7.
propose 46:1.
prosecution 16:3.
prospect 34:22.
prospective 23:21, 29:19, 30:21.
prospects 22:18.
protective 6:11, 9:25.

prove 5:20, 7:9.
provide 24:24, 51:16.
provided 17:1, 32:8.
providing 43:14.
Provision 11:7, 26:24.
provisionally 8:24.
public 6:13, 20:25, 47:17.
published 16:11, 21:12.
pull 25:14.
pulls 27:24, 28:3.
punishment 28:5, 28:14.
purposes 21:23.
pursuant 25:6.
pursue 32:11, 32:12.
put 22:25, 31:15, 35:8, 36:9, 36:20, 42:6, 48:22, 49:11, 49:20, 50:10, 50:16.
puts 50:8.
putting 10:1, 10:5, 30:20.
.
.
.
< Q >.
question 3:19, 5:20, 5:22, 7:12, 13:21, 16:17,

20:22, 25:3, 26:14, 30:15, 32:5, 32:10, 32:24, 49:9.
questionable 33:12, 33:13.
questions 7:4, 7:12, 21:22, 32:16, 32:23.
quickly 9:23.
quite 13:12, 14:2, 22:6.
quote 22:12.
quoted 37:1, 38:10.
.
.
< R >.
raise 22:18.
raised 3:8.
rather 10:22, 10:23.
reach 17:16, 17:18.
reached 18:14, 25:11.
read 2:25, 3:7, 28:8, 49:20.
reading 22:25.
reality 32:19.
really 14:25, 19:8, 36:4.
reason 13:1, 34:7, 34:8.
reasonable 11:21, 21:6, 44:20, 50:18.
reasonableness

33:17.
reasons 36:17, 37:18.
rebriefing 49:10.
receive 51:9.
receives 25:8.
receiving 7:19, 25:7.
recent 10:25, 23:19.
recently 11:11, 24:10, 32:12, 39:21, 44:25.
recess 42:17.
recognition 29:17.
recognize 29:16.
record 2:8, 19:20, 24:14, 31:16, 54:2.
recorded 1:48.
redress 32:3, 32:6.
redressability 32:10, 34:10, 43:17, 44:22.
redressable 32:1, 44:13.
redressed 3:10.
reference 40:19.
references 34:20.
referred 23:7,

25:20.
regard 34:1, 34:11.
regarding 46:11.
reissue 49:17.
related 6:24, 30:6.
relates 4:22.
relating 27:16.
relationship 7:8.
relative 27:10.
relatives 27:16.
released 47:18.
relevant 18:24, 22:8, 26:10, 41:4.
reliance 5:1, 6:25.
relief 23:21, 24:11, 24:25, 29:19, 29:23, 30:11, 30:22, 51:24.
remaining 42:24, 46:6.
remains 24:6, 24:7.
remand 31:13.
remediate 52:21.
remediated 4:8, 4:11, 11:13, 11:24.
remediation 11:17,

11:19, 53:6.
remedied 50:8.
remedies 10:20, 38:1.
remedy 10:21, 21:19, 21:21, 21:22, 24:10, 27:5, 31:10, 37:25, 39:10, 39:11, 47:6, 51:20.
remember 10:11.
remind 47:18.
reminded 32:25.
remotely 14:1.
reorganization 18:24, 18:25.
repeatedly 28:25.
repeats 43:16.
replead 42:10.
Reported 1:41, 11:3, 20:16, 34:19.
Reporter 1:42, 54:7.
reporting 43:8, 50:5.
reports 21:14, 22:10, 42:7.
represent 18:13.
request 18:23, 19:23, 35:25,

47:17.
requests 50:17.
required 24:22.
Requirements. 23:13.
requires 10:21, 53:5.
requiring 4:21.
reside 47:19.
resolve 32:9, 42:24, 43:1, 47:2.
resolved 27:6, 44:18.
resources 14:9.
respect 7:18, 13:8, 13:22, 13:23, 14:2, 19:3, 19:25, 20:11, 21:6, 24:9, 34:9, 40:9, 44:8, 47:13.
respectfully 45:11.
respond 52:9.
response 17:17, 17:21, 29:14, 43:12, 45:16.
responsible 36:19.
rested 27:3.
retake 42:10.
retract 35:20.
retroactive 29:23.
retrospective 24:24.

retrospectively 31:1.
reversibility 46:14.
reversible 45:23.
Review 20:20, 22:20, 23:12, 25:6, 25:21, 49:2.
reviewed 11:14.
reviewing 13:9.
revisit 46:8.
rights 3:18, 3:20, 4:5, 4:10, 5:16, 5:19, 5:24, 6:4, 7:21, 8:2, 8:5, 8:12, 8:21, 10:24, 12:17, 12:20, 17:2, 22:13, 26:12, 27:20, 27:24, 28:13, 32:15, 33:10, 36:20, 38:8, 39:4, 52:20.
risk 7:10.
rock 41:1.
role 4:13.
routinely 44:12.
RPR 1:41, 54:1.
Rubio 2:6.
Rule 5:10, 10:5.
ruling 8:23.
.
.

< S >.
S. 1:33, 3:16, 4:7, 4:21, 7:1, 7:20, 9:11, 10:13, 12:23, 15:10, 22:15, 24:19, 26:24, 31:23, 43:24.
satisfy 15:18.
save 48:7.
saw 26:2.
saying 10:12, 10:19, 13:4, 14:20, 22:4, 33:14, 36:8, 38:6, 38:13, 40:14, 41:4, 42:8, 51:1.
says 9:7, 11:14, 32:18, 34:20, 35:24, 37:4, 37:6, 38:10, 38:11, 45:4.
scale 22:16.
schedule 48:21, 48:22, 52:5.
SCIF 20:21, 21:4, 40:24.
Scifs 37:21.
scope 6:15, 8:14, 14:13.
score 16:4.
seated 2:3.
second 16:5, 24:8, 43:4.
second-guess

11:16.
secondarily 42:20.
Secretary 4:10, 4:13, 11:14, 11:16, 35:17, 50:16, 50:19.
secrets 37:22.
Section 39:22.
security 6:4, 6:11, 28:18, 37:21, 47:18.
seeing 22:24, 22:25.
seek 23:20, 29:23, 29:25.
seeking 29:19.
seeks 23:21, 24:10, 29:19.
seem 22:5, 28:21, 28:24.
seems 3:22, 37:12, 41:22.
seen 20:14, 20:24, 21:1, 21:11, 21:14, 22:7, 34:17, 45:24, 49:25, 53:20.
selling 9:19.
send 31:24.
sending 24:21, 30:23.
sense 36:15, 48:8, 48:9, 49:23,

49:25.
sent 24:19, 25:6, 51:1.
serious 41:2.
seriously 18:13.
session 18:11.
set 25:10, 31:12, 31:22, 31:23.
sets 9:6.
setting 15:22, 31:20.
settle 34:4.
settlement 19:25.
several 17:13.
shape 13:2.
shelter 29:3, 29:12.
short 30:19.
shorthand 1:48.
showing 38:3.
shows 16:23.
side 17:20, 44:8.
sides 22:7, 44:1, 44:4.
sidewalk 6:19.
signed 25:13.
similar 14:3, 38:5, 46:22.
simply 4:25, 25:18, 34:4, 38:22.
single 11:23, 12:14, 13:10, 15:7, 36:12,

50:5.
sit 11:3, 17:3, 18:10, 18:17, 19:24, 34:21, 53:15.
sitting 16:25, 19:4.
situation 7:25, 29:17, 32:7, 38:20, 41:25.
sleep 12:3, 12:5.
slippery 14:23, 15:2.
slope 14:23, 15:2.
slow 28:7.
slower 28:9.
smacks 45:8.
smoking 50:17.
so-called 17:9.
society 14:5.
society-wide 14:5.
sole 47:20.
solid 51:22.
solve 26:20.
solved 32:17.
Somebody 29:12, 33:13, 36:18.
somehow 4:6, 21:25, 45:5.
someone 13:24, 14:1, 14:8, 21:11, 41:3.
sometime 16:10.
sophisticate

9:21.
Sorry 14:17, 23:6, 28:7, 51:12.
sort 3:8, 3:17, 3:22, 7:11, 7:14, 12:17, 14:10, 17:17, 26:20, 29:23, 30:12, 30:15, 31:20, 33:2, 37:11.
sotto 36:21.
sounds 3:14.
source 26:16.
sources 9:17.
South 36:3.
sovereign 44:10.
spare 9:22.
speaking 19:2.
specific 5:14, 24:3, 24:4, 24:12, 24:13, 26:21, 27:8, 47:1.
specifically 23:1.
specificity 49:3, 51:17.
speculation 27:3, 46:5, 50:19.
speculative 14:17, 27:15, 32:16, 45:2, 50:14.
speech 16:2.
spending 14:8.

spoke 17:20.
sponte 45:18.
Square 6:18.
stage 12:1, 39:18.
standard 7:8, 33:15.
stands 49:17.
start 28:8, 46:1.
stated 41:5.
statement 17:12, 35:20.
statements 10:16.
stateoig.gov/r eport/isp-s- 25-08 23:11.
States 1:1, 1:18, 5:3, 14:15, 17:3, 32:15.
stating 6:2.
statute 26:13.
statutes 30:6.
stenographic 54:2.
Stephen 1:32, 2:15.
stepping 23:15, 25:18.
steps 4:16, 46:2.
stipulate 9:13.
stonewall 17:22.
stonewalled 17:15.
stonewalling 34:2, 38:22.
stop 16:3,

30:22, 30:23.
stray 33:21.
Street 1:35.
strike 47:8.
struck 29:3, 29:11.
stuck 38:14, 41:1.
stupid 35:8.
sua 45:18.
submit 5:17, 47:16.
subordinates 17:1.
subsequent 25:16.
substantially 7:9, 46:22.
subtle 18:4.
sue 3:6, 13:8.
suffer 26:22, 27:9.
suffered 4:24, 24:4.
suffering 5:4, 5:5, 5:7.
suffice 2:25.
sufficient 38:24.
suggest 10:2, 11:5, 15:22, 23:24, 49:1, 51:19, 53:13.
suggested 11:13, 15:25, 39:11, 48:5.
suggesting 12:1, 12:4, 12:5, 13:2, 15:3, 15:5, 23:24, 30:14.
suggestion

42:19.
suggestions 49:12.
suggests 11:1, 11:20.
suit 13:15, 23:15, 24:1, 30:4.
Suite 1:26.
supplement 49:18.
supplemental 16:10, 16:14, 24:2, 24:3, 49:13.
suppliers 7:2, 9:21.
supply 9:17.
supported 34:13, 36:12, 39:1, 45:9.
supports 34:16, 37:3.
supposed 38:12.
Supreme 4:21, 13:23, 15:25.
survive 5:10, 14:12.
switch 9:20.
sympathetic 3:2.
systematic 8:12.
.
.
< T >.
T. 1:41, 54:6.
table 2:15, 47:24.
taken. 42:17.
talked 17:19, 17:21, 21:12, 44:9,

49:10.
tapes 50:18.
taxes 13:25.
taxpayer 4:22,
  5:2, 14:7,
  14:8.
taxpayers
  13:23,
  19:11.
ten 14:12,
  28:21,
  28:24.
tend 30:18,
  30:21.
term 28:4.
terms 13:4,
  13:9, 33:16,
  34:4, 34:24,
  49:9.
tether 12:10,
  12:12,
  27:7.
themselves
  2:7, 25:21,
  27:9, 27:16,
  43:9.
theory
  36:23.
they've 4:24,
  11:12,
  46:25,
  51:1.
thinking
  23:17, 31:5,
  31:7.
third 44:15.
though 9:3,
  29:20.
thousands
  50:6.
threat
  15:23.
three 43:7,
  44:5.
throwing
  40:16.
tie 7:24,
  9:3.
today 53:20.
together

17:13,
  31:15,
  48:22.
took 18:13,
  34:5.
tort 30:2,
  30:4,
  30:8.
Torture 28:4,
  28:13.
tortured 3:17,
  8:6, 8:7,
  12:16,
  13:7.
totally 10:19,
  14:22.
tough 32:19.
trace 12:18.
traditionally
  31:11.
Transcript
  1:16, 1:48,
  49:2,
  54:2.
transcription
  1:49.
transfer
  26:17.
traumatized
  29:8,
  29:10.
treatment
  28:5,
  28:14.
trial 28:6,
  28:15.
trolley
  36:7.
true 20:5,
  25:24,
  29:2.
trust 39:23.
try 12:6,
  17:13, 27:7,
  40:6,
  42:23.
trying 6:12,
  16:16,
  17:10, 27:2,
  31:3,

37:22.
tsunami
  13:16.
turn 7:3,
  42:22.
two 6:5, 14:1,
  14:2, 23:16,
  23:18, 30:5,
  36:12,
  36:13,
  42:22.
tying 5:14.
.
.
< U >.
UAE 26:25.
ultimately
  6:17, 18:9,
  44:16.
unattended
  14:22.
uncertainty
  24:7.
uncle 27:11.
underlying
  27:9.
underscore
  14:18,
  17:11,
  34:1.
Understand
  3:8, 3:10,
  3:16, 4:8,
  10:9, 13:22,
  16:18,
  18:21,
  19:12,
  24:23, 33:1,
  33:15, 34:8,
  47:7,
  52:3.
Understanding
  13:24,
  25:14,
  29:17.
Understood
  36:8,
  53:16.
undifferentiat
  ed 26:22,

27:1.
unit 5:6,
  5:13, 7:17,
  7:19, 7:21,
  7:22, 7:23,
  7:25, 8:1,
  8:3, 9:7,
  9:8, 11:9,
  11:19,
  12:12,
  12:16,
  12:18,
  26:11,
  26:18, 35:2,
  36:13,
  50:5.
United 1:1,
  1:18, 5:3,
  14:15,
  32:15.
units 4:4,
  4:6, 4:8,
  5:6, 5:13,
  5:14, 5:15,
  5:24, 9:4,
  9:11, 10:25,
  11:22,
  12:20,
  13:10, 39:1,
  39:4, 50:7,
  51:8.
until 26:2.
unwarranted
  45:10.
unwritten
  45:5,
  45:7.
urge 48:24,
  51:15.
using 4:7.
.
.
< V >.
v. 44:1, 44:2,
  45:1.
versus 2:6.
via 27:10.
view 22:22,
  37:3.
vigorously

| | | | |
|---|---|---|---|
| 52:10. | 37:24, | 36:15, | 52:4. |
| Village | 52:8. | 40:23, | worked |
| 10:23. | wants 9:13. | 47:21, | 52:21. |
| violated | Washington | 51:20, | works 19:10, |
| 30:13, | 1:12, 1:27, | 52:1. | 35:17, |
| 51:21, | 1:36, 1:44, | White 2:4, | 35:18. |
| 51:22. | 22:11, | 50:17. | worried |
| violating | 34:20, | wholesale | 15:23. |
| 38:14. | 35:16, | 38:25. | writ 12:20. |
| violation | 35:18. | wholly | write 2:18, |
| 3:20, 11:24, | Watchdog | 52:12. | 35:24, 36:4, |
| 12:17, 16:2, | 22:18. | will 18:12, | 36:6. |
| 27:20, | ways 49:12. | 21:25, | writing |
| 28:12, 31:2, | weapons 7:1, | 26:22, 27:9, | 50:16. |
| 34:25, 36:1, | 9:7, 9:8, | 28:1, 40:3, | . |
| 38:23, | 9:11, 9:19, | 40:16, | . |
| 50:7. | 10:13. | 44:16, | < Y >. |
| violations | website 20:13, | 46:12, | yardstick |
| 3:18, 4:5, | 23:8, | 48:17, | 14:14. |
| 4:10, 5:16, | 23:11. | 49:20, | year 24:1, |
| 5:19, 5:25, | weigh 16:22. | 51:18, 52:4, | 43:3. |
| 6:4, 6:16, | welcome | 53:16. | years 3:4, |
| 7:21, 8:3, | 47:16. | willing 17:14, | 9:20, 11:10, |
| 8:5, 8:12, | West 3:15, | 41:23. | 11:20, 12:9, |
| 8:21, 10:24, | 3:23, 4:2, | win 10:1, | 25:20, |
| 11:3, 12:9, | 7:1, 14:14, | 10:18, | 36:13, |
| 12:21, | 33:5, 33:7, | 10:19, | 44:20, 45:6, |
| 14:22, 17:2, | 33:9, 33:10, | 11:25. | 49:1, 51:1, |
| 22:13, | 33:14, | wipes 15:17. | 51:4. |
| 26:12, | 33:16. | wish 40:19. | Yellow 8:1, |
| 27:24, | Whatever 4:3, | within 8:25, | 8:3, 8:4, |
| 34:21, | 7:17, 9:4, | 28:12, | 8:6, 8:7, |
| 36:19, 38:8, | 12:12, 13:1, | 33:16, | 8:8, 26:7. |
| 39:4, | 13:5, 35:2, | 47:19. | yo 38:11. |
| 52:20. | 43:21, | without 7:15, | York 20:18, |
| violence | 44:15, | 7:18, 10:12, | 26:23. |
| 14:13. | 49:20. | 17:14, 22:3, | yourself |
| virtually | whatsoever | 25:10, 28:5, | 34:23, |
| 5:18, 9:10, | 17:23, | 28:14, | 36:15. |
| 51:8. | 22:22. | 48:16, | Yup 52:24, |
| voce 36:21. | whether 3:19, | 50:5. | 53:1. |
| vote 36:5. | 4:3, 4:4, | wondering | |
| vs 1:8. | 7:20, 7:22, | 21:3, 25:24, | |
| . | 11:18, | 30:25. | |
| . | 13:18, 14:7, | word 53:9. | |
| < W >. | 14:8, 14:12, | words 50:19. | |
| waiver 11:7. | 18:10, | work 17:10, | |
| wanted 17:12, | 21:23, | 17:23, | |
| 23:14, | 24:14, 25:3, | 49:21, | |
| 32:25, | 25:24, 31:6, | 49:22, | |